**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Lower Bucks Hospital,[1] | ) | Case No. 10-10239 (____) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Lower Bucks Health Enterprises, Inc., | ) | Case No. 10-10241 (____) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Advanced Primary Care Physicians, | ) | Case No. 10-10243 (____) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |

**AFFIDAVIT OF ALBERT A. MEZZAROBA IN**
**SUPPORT OF FIRST DAY MOTIONS FOR RELIEF**

I, Albert A. Mezzaroba, hereby state that the following is true to the best of my

knowledge, information, and belief.

1.      I am President, Chief Executive Officer and Chief Restructuring Officer of each

of the above-referenced debtors (the "Debtors") and am familiar with the Debtors' assets and

liabilities, operations and business affairs.  I have held such positions since the resignation of the

Debtors' prior chief executive officer on January 7, 2010 and, prior to my appointment, served as

---

[1]      The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
Lower Bucks Hospital (9667); Lower Bucks Health Enterprises, Inc. (7355); and Advanced Primary Care
Physicians (9053).  The Debtors' address is 501 Bath Road, Bristol, Pennsylvania 19007.

counsel to Lower Bucks Hospital's Board of Directors. Except as otherwise indicated, all facts set forth in this Affidavit are offered to the best of my knowledge, information and belief, and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Debtors' industry, operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Affidavit on behalf of the Debtors.

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). To enable the Debtors to operate effectively and preserve the value of estate assets, the Debtors have requested various types of relief in "first-day" applications and motions filed with this Court contemporaneously herewith (the "First Day Pleadings").

3.      I submit this Affidavit in support of the First Day Pleadings. Any capitalized term not defined herein shall have the meaning ascribed to such term in the relevant First Day Pleadings. The First Day Pleadings seek, among other things, to: (a) ensure the continuation of the Debtors' cash management systems and other business operations without interruption; (b) maintain employee morale and confidence; and (c) establish certain other administrative procedures to promote a smooth transition into Chapter 11. Gaining and maintaining the support of the Debtors' employees, customers, vendors, and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' business with minimal disruption, will be critical to the Debtors' reorganization.

4.    Part I of this Affidavit describes the Debtors' business and the circumstances surrounding the filing of the chapter 11 petitions. Part II sets forth the relevant facts in support of the First Day Pleadings. Part III concludes that the relief requested in the First Day Pleadings is in the best interests of the Debtors, their creditors and estates and therefore should be granted.

## PART I: BACKGROUND

### A.    General Background

5.    Lower Bucks Hospital ("LBH") is a nonprofit corporation organized under the laws of the Commonwealth of Pennsylvania. Its predecessor corporation was formed in 1952 to build and operate the Lower Bucks County Hospital (the "Hospital"), which is located in Bristol, Pennsylvania. LBH was formed in 1997, when the Hospital became part of the Temple University Health System. LBH disaffiliated from the Temple University Health System in 2002.

6.    LBH has four "subsidiary" nonprofit Pennsylvania member corporations, each of which has as its sole member LBH:

- *Lower Bucks Health Enterprises, Inc.* ("Enterprises"). Enterprises owns the real property (land and building) which comprises the ambulatory surgery center/medical office building located on the Hospital's campus. In addition, certain industrial health and wellness programs are operated by Enterprises.

- *Advanced Primary Care Physicians.* Advanced Primary Care Physicians employs four primary care physicians and their associated staff in a practice which operates in Fairless Hills, Pennsylvania, in leased space, under the name of Fairless Hills Medical Center.

- *Advanced Specialty Physicians Group.* This entity was formed in 2008 to employ certain specialty care physicians then employed by the Hospital. Advanced Specialty Physicians Group receives income for patient services rendered by certain specialists.

- *Bucks County Health Foundation.* This entity was formed in 2006 to act as the fund-raising arm of the Hospital. It has received certain contributions and transfers those contributions to the Hospital.

The first two of these entities – Enterprises and Advanced Primary Care Physicians – are debtors herein, along with LBH.

7.    Separately, LBH owns all of the capital stock of Bucks County Insurance Company ("BCIC").  BCIC is a Cayman Islands company, which provides medical malpractice insurance coverage to the Hospital and its physicians.

**B.    Hospital Facilities and Services**

8.    From its inception in the early 1950's, the Hospital has provided healthcare services as an acute care community hospital serving the Lower Bucks County area.  At present, the Hospital is licensed to operate 183 beds and it is currently staffing 150 beds.  The Hospital owns and operates a 36-acre campus with several medical facilities, including a 371,641 square foot main hospital, which includes a 104,650 square foot Patient Care Pavilion that was added in 1995.  In addition, the Hospital owns and operates the 33,754 square foot Ambulatory Surgery Center, a 11,680 square foot Health & Wellness Center and a Day Care Center, all of which are located on the main campus.  The Hospital provides a full range of acute, sub-acute, ambulatory and related services, including cardiac catheterization, open heart surgery, mental health, diagnostic imaging (including MRI), industrial health, maternity, home health and orthopedics.

9.    The Hospital's Emergency Room serves approximately 30,000 patients per year, and approximately 6,000 surgical procedures are conducted at the Hospital each year, on both an in-patient and out-patient basis.  Separately, approximately 125,000 persons visit the Hospital each year for various tests, such as MRIs, blood work, electrocardiograms, and the like.  In addition to its on-site services, the Hospital performs over 40,000 home visits annually through its Home Care division.

10.    The Hospital employs approximately 994 full and part-time employees, including approximately 232 nurses.   Approximately 400 physicians are affiliated with the Hospital.

11.    The Hospital is a party to collective bargaining agreements with two unions:  (a) the Nurses Association of Lower Bucks Hospital / the Pennsylvania Association of Staff Nurses and Allied Professionals (PASNAP) (the "Nurses Association"), which covers approximately 200 Hospital employees; and (b) the International Union of Operating Engineers, Local 835 AFL-CIO (the "Operating Engineers"), which has approximately 34 active members. The collective bargaining agreement with the Nurses Association expired on December 31, 2009 and has not been renewed or extended, although the parties continue to operate under the agreement in accordance with applicable labor law.  The collective bargaining agreement with the Operating Engineers is set to expire on June 30, 2011.

12.    LBH has a Pension Plan for its employees.  This Pension Plan is discussed in greater detail, below.

## C.    Recent Operating Results and Events

13.    In late 2007, the Hospital began to experience a decline in its patient service revenue.   This decline was attributable to a number of factors, including the general economic decline in the region.  Annual revenue for the Debtors, on a consolidated basis, was approximately $116 million in the fiscal year ending on June 30, 2007, approximately $125 million in the fiscal year ending on June 30, 2008 and approximately $114 million in the fiscal year ending on June 30, 2009.  Net income for the last three fiscal years was as follows:

| | |
|---|---|
| 2007 (one year period ending 6/30/07): | ($2.5 million) |
| 2008 (one year period ending 6/30/08): | ($4.2 million) |
| 2009 (one year period ending 6/30/09): | ($7.3 million) |

14.    Recognizing that its revenue was declining and that it needed to align its expense structure to match its declining revenue, in the Spring of 2008, the Hospital engaged Reliant Health Group ("Reliant"), a healthcare consulting company specializing in expense control. Reliant made a series of recommendations to reduce the Hospital's expenses, and those recommendations were implemented in the Summer and Fall of 2008. Despite these cost-cutting measures, the Hospital continued to experience monthly operating losses in excess of $500,000 per month throughout 2008.

**D.    Debt Structure**

15.    The Debtors' primary debts are the following:

a.    **Bond Debt**. LBH is obligated with respect to the Borough of Langhorne Manor Higher Education and Health Authority Hospital Revenue Bonds, Series of 1992 (The Lower Bucks Hospital) (the "Bonds"). The Bank of New York Mellon Trust Company, N.A. serves as trustee ("Indenture Trustee") with respect to the Bonds. As of the Petition Date, approximately $25 million is owed on the Bonds. The Bonds purportedly are secured by a $3.0 million bond reserve fund, as well as a pledge of LBH's "Unrestricted Gross Revenues".[2] The Debtors believe that the lien asserted by the holders of the bonds ("Bondholders") on

---

[2]    The term "Unrestricted Gross Revenues" is defined as:

unrestricted receipts, revenues, income and other monies received by or on behalf of [LBH] from whatever source derived recorded as additions to unrestricted current funds in the financial statements of [LBH] under Generally Accepted Accounting Principles, including without limiting the generality of the foregoing, transfers to unrestricted current funds from other funds of [LBH] such as the "Endowment Funds" as set forth on [LBH's] financial statements, and all rights to receive the same whether in the form of accounts receivable, contract rights, chattel paper, instruments, general intangibles or other rights and the proceeds thereof including any insurance proceeds and condemnation awards derived therefrom, whether now existing or hereafter acquired coming into existence and whether now owned or held or hereafter acquired by [LBH].

Loan and Security Agreement dated as of November 1, 1992 between the Borough of Langhorne Manor Higher Education and Health Authority and The Lower Bucks Hospital, at page 20.

Unrestricted Gross Revenues is avoidable and/or was not properly perfected in that, on October 16, 2009 – within 90 days of the Debtors' Petition Date – the Indenture Trustee filed corrective financing statements on account of its asserted lien.  Separately, and in any event, the Indenture Trustee does not have a "control agreement" covering any of the Debtors' bank accounts in which Gross Revenues are deposited.

b.    Payments with respect to the Bonds are due on June 15th and December 15th of each year.  Although LBH made the payment on its Bonds when due on June 15, 2009, it was unable to make the (approximately $915,000) payment due on December 15, 2009.  LBH's failure to make this payment is an event of default under the parties' applicable loan documents, which entitles the Trustee to exercise certain remedies thereunder.  Concern about the Trustee's potential exercise of these remedies – and the likely impact of such exercise on the Debtors' ability to fund operations and maintain patient care – was a primary cause of the Debtors' bankruptcy filing.  The Debtors' bankruptcy filing also was motivated by a desire to preserve for the benefit of the LBH bankruptcy estate the 90-day preference period, with respect to the actions taken by the Trustee on October 16, 2009 to purportedly perfect the Trustee's security interest in Unrestricted Gross Revenues.

c.    **Pension Underfunding**.  The Debtors are sponsors of the Lower Bucks Hospital Retirement Account Pension Plan, which is an ERISA-qualified defined benefit pension plan (the "Pension Plan").  The Debtors have not made any contributions to the Pension Plan since March 2009, benefits under the Pension Plan were "frozen" as of June 30, 2009 and the Pension Plan is now underfunded by approximately $35 million.  In addition, LBH did not make its annual contributions of approximately $3 million in the fiscal year ended June 30, 2009.  In the time period leading up to the Petition Date, the Debtors engaged in discussions with the

Pension Benefit Guaranty Corporation (the "<u>PBGC</u>") regarding the Pension Plan's termination, and likely will seek Court permission to proceed with such termination. The Debtors anticipate that the PBGC will assert one or more claims resulting from this termination.

          **d.**     **<u>Trade Debt</u>**. Although the Debtors were generally current with their trade creditors in the time period leading up to the Petition Date, the Debtors estimate that they owe trade creditors the approximate amount of $9.0 million.

**E.**     **Sale and Restructuring Efforts**

        16.     During the Summer and Fall of 2008, the Hospital engaged in discussions with a local healthcare system regarding a possible affiliation or acquisition, and the Hospital provided a significant amount of due diligence materials to that healthcare system. In addition, various overtures were made by members of the Hospital's Executive Committee and management to other healthcare systems in the region to determine if they would be interested in affiliating with or purchasing the Hospital. By December of 2008, it became apparent that the local healthcare system was not prepared to associate with the Hospital, and the Hospital's Executive Committee determined that a formal, structured process was needed to find a suitable partner that would assume financial and operational responsibility for the Hospital. The Executive Committee and management sought advice from various professionals familiar with distressed hospitals and from healthcare consultants.

        17.     In March of 2009, the Executive Committee engaged Joseph W. Marshall, III, former CEO of the Temple University Health System, to advise the Hospital with respect to a possible sale or affiliation and to help solicit prospective purchasers of the Hospital. These efforts led to the identification of a number of qualified prospects. Many of these prospects performed due diligence concerning the Hospital, and some provided written expressions of their intent to

make a formal offer to purchase.  In September 2009, the Debtors also engaged SSG Capital

Advisors, LLC ("SSG") to assist them in the marketing process.  The Debtors will file an

application seeking the Court to retain SSG on a post-petition basis.

18.    In addition to these sale efforts, the Debtors have pursued various "stand-

alone" alternatives by which their debt would be restructured.

### PART II: FIRST DAY PLEADINGS

19.    An important (and in many respects critical) element of the success of

these chapter 11 cases will be the entry of orders granting the relief requested in each of the First

Day Pleadings.  Generally, the First Day Pleadings are designed to facilitate: (a) the continuation

of the Debtors' existing cash management systems and other business operations without

interruption; (b) preservation of customer and vendor relationships; (c) maintenance of employee

morale and confidence; and (d) establishment of certain other administrative procedures to

promote a smooth transition into chapter 11.  The factual background in support of each First Day

Pleading is provided below:

A.    **Motion of Debtors and Debtors-in-Possession for An Order
Directing Joint Administration of Cases Pursuant to
Bankruptcy Rule 1015(b) (the "Joint Administration Motion")**

20.    In the Joint Administration Motion, the Debtors seek the joint

administration of their chapter 11 cases for procedural purposes only.  The Debtors are affiliates as

defined in Section 101(2) of the Bankruptcy Code.  Joint administration of their cases will promote

the economical, efficient, and convenient administration of the Debtors' estates.

21.    The Debtors' operations are closely integrated and there will be numerous

motions, applications, and other pleadings filed in these chapter 11 cases that will affect all of the

Debtors. Joint administration will allow for the efficient administration of the Debtors' three (3) chapter 11 cases.

22.     Joint administration of the Debtors' chapter 11 cases will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and for the proposed claims agent to combine notices to creditors and other parties-in-interest of the Debtors' respective estates.

23.     Allowing joint administration will significantly reduce the volume of pleadings that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly and minimize 'the number of unnecessary delays. Moreover, the relief requested by this Motion will simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.

24.     The proposed joint administration order also will save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties-in-interest to:  (a) use a single caption on the numerous documents that will be served and filed herein; and (b) file the papers in one case rather than in multiple cases.  Finally, joint administration will protect parties-in-interest by ensuring that parties in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in these cases.

25.     For the foregoing reasons, the Joint Administration Motion should be granted.

**B.     Motion of the Debtors for an Order Establishing Certain Notice, Case Management and Administrative Procedures (the "Case Management Procedures Motion")**

26.     By this Motion, the Debtors seek entry of an order establishing certain notice, case management, and administrative procedures, which include the following:

(a) directing that matters requiring notice under Bankruptcy Rule 2002(a)(2) – (6) will be served upon a specified list of parties and those creditors who file with the Court a request that they receive such notices pursuant to Bankruptcy Rule 2002; (b) allowing electronic service of all documents (except complaints and summons); and (c) directing that all matters be heard at monthly omnibus hearings to be scheduled in advance by the Court. The Debtors further request that the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules apply to these Chapter 11 Cases to the extent that they do not conflict with the Case Management Procedures.

C.    **Motion of the Debtors for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "Schedule Extension Motion")**

27.    In the Schedule Extension Motion, the Debtors seek a thirty-one (31) day extension of the deadline by which they must file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements"). The Debtors have filed a list of creditors which reflects that the total number of the Debtors' creditors far exceeds 1000. Pursuant to the Bankruptcy Code, the Debtors' deadline to file the Schedules and Statements is fourteen (14) days from the Petition Date.

28.    Given the size and complexity of the Debtors' business, a significant amount of information must be accumulated, reviewed and analyzed in order to properly prepare the Schedules and Statements. In addition, there are a number of critical issues facing the Debtors in the fourteen days following the Petition Date. These issues and others will require substantive attention by the Debtors' personnel and their professionals. Thus, while the Debtors have initiated the major task of assembling the data necessary for the Schedules and Statements, they will not be able to complete this undertaking within fourteen days from the Petition Date.

29.     In light of the circumstances outlined above, the Court should grant the

relief requested in the Schedule Extension Motion and authorize a thirty-one day extension of the

deadline by which the Debtors must file their Schedules and Statements.

**D.      Motion of the Debtors for Entry of an Order (A) Authorizing the Debtors to (I) Continue Use of Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms and (III) Maintain Existing Investment Practices; and (B) Granting Post-Petition Intercompany Claims Administrative Expense Priority (the "Cash Management Motion")**

30.     In the Cash Management Motion, the Debtors seek authority to maintain

existing bank accounts, to continue to use existing business forms, and to continue to use certain

existing cash management systems (the "Cash Management System").    The Cash Management

System will provide an efficient means of moving funds through the Debtors' corporate structure

as needed.

31.     Prior to the Petition Date, the Debtors' Cash Management System operated

in the manner described in the Cash Management Motion.

32.     The Debtors seek authority to use the Cash Management System.    Given

the size and complexities of the Debtors' operations, as well as the need to preserve and enhance

their respective going concern values, a successful chapter 11 case simply cannot be accomplished

if there is substantial disruption in the Debtors' Cash Management System.    Moreover, the Cash

Management System includes the accounting controls necessary to enable the Debtors, their

creditors, and this Court to accurately trace funds through the Cash Management System.

33.     The Debtors have used the bank account structure that is the foundation of

the Cash Management System for a number of years as part of their ordinary and usual business

practices.    The Cash Management System is specifically tailored to the Debtors' needs in light of

its current financial situation and is necessary to efficiently deal with the specialized needs of the

Company.  If the Debtors are not permitted to continue to use their Cash Management System, their operations will be severely, and perhaps, irreparably, impaired.

34.    Accordingly, the Court should grant the relief requested in the Cash Management Motion and authorize the Debtors' continued use of their existing Cash Management System.

E.    **Motion of Debtors for an Order (A) Authorizing the Debtors to Pay Certain Prepetition (I) Wages, Salaries, Bonuses, and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; (B) Confirming that the Debtors May Continue Prepetition Employee Programs in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Employee Wage Motion")**

35.    In the Employee Wage Motion, the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to pay certain prepetition (i) wages, salaries, bonuses, and other compensation, (ii) reimbursable employee expenses, and (iii) employee medical and similar benefits; (b) confirming that the Debtors may continue their prepetition physician incentive program in the ordinary course of business; and (c) authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

36.    Currently, the Debtors employ approximately 994 employees, of which approximately 529 are full-time employees and approximately 465 are part-time employees.  The Debtors employ approximately 109 salaried employees and 885 hourly employees, and utilize the services of temporary workers, contract employees and independent contractors (collectively, the "Employees").  The Employees perform a variety of critical functions for the Debtors' businesses, and the Employees' skills and their specialized knowledge and understanding of the Debtors' infrastructure and operations, as well as their relationships with patients, vendors, and other third-

parties, are essential to the Debtors' continuing operations and their reorganization effort. The continued and uninterrupted service of the Employees is critical to the successful reorganization of the Debtors.

37.     To avoid the personal hardship that the Employees will suffer if pre-petition employee-related obligations are not paid when due or as expected, and to maintain morale, the Debtors seek authority, in their sole discretion, to pay and honor certain pre-petition claims for, among other items, wages, salaries, commission, incentive bonuses and other compensation, other amounts withheld (e.g., garnishments, employee share of insurance premiums, tuition reimbursements, paid time off, medical benefits, insurance benefits, workers' compensation benefits, and all other employee benefits that the Debtors historically paid or honored in the ordinary course of business to Employees and to pay all costs incident to the foregoing. The Debtors also seek authority, in their discretion, to pay reimbursable business expenses of Employees.

38.     In addition, the Debtors seek confirmation that they are permitted to pay any and all local, state, and federal withholding and payroll-related taxes relating to pre-petition periods.

39.     Further, the Debtors seek entry of an order authorizing all banks to receive, process, honor, and pay any and all checks drawn on the Debtors' payroll or general operating accounts or fund transfer requests with respect to payments authorized by this Motion, whether presented before or after the Petition Date, upon receipt, each bank and financial institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

i.    **Unpaid Compensation**

40.    In the ordinary course of business, the Debtors (a) transfer funds via direct deposit or issue payroll checks to their salaried and hourly Employees; and (b) pay temporary employees and independent contractors pursuant to invoices received and paid in the ordinary course of business.  Seventy-three percent of the Employees are paid by direct deposit transfers from the Debtors' payroll account at Citizens Bank (the "Payroll Account") with the other twenty-seven percent of Employees receiving paper payroll checks.

41.    The Debtors estimate that approximately $950,000 in wages, salaries, overtime pay, incentive pay, vacation and sick leave taken and other compensation (excluding accrued vacation and severance pay), remain unpaid (collectively, and including any checks tendered to Employees on account of such items that have not cleared the Payroll Account, the "Unpaid Compensation").  Items of Unpaid Compensation were due and owing on the Petition Date because, inter alia:

> a.  the chapter 11 petitions were filed during the Debtors' regular and customary salary and hourly wage payroll periods, and temporary and contract worker invoice periods;

> b.  some payroll checks issued to Employees from the Payroll Account prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date;

> c.  Employees have not yet been paid all their salaries and wages for services performed prior to the Petition Date on behalf of the Debtors; and

> d.  In addition, in the ordinary course of business, the Debtors incur compensation obligations to temporary employees.  The Debtors estimate that approximately $22,500 is paid per week (the "Temporary Agency Fees") to the temporary agency for work performed by temporary employees.

42.    Paid Vacation.    The Debtors offer various vacation benefits to the Employees.  Generally, Employees are entitled to a certain number of days of paid vacation per

calendar year depending on their duration of employment, and either company policy of the Employee is independent, or the respective collective bargaining agreement of the Employee is a member of a union. Employees do not get paid for unused vacation days unless they leave the employ of the Debtors and have accrued vacation.

43.    As of the Petition Date, most of the Debtors' Employees have accrued unused vacation days. The total amount of such accrued vacation as of the Petition Date is approximately $1,100,000. Employees receive up to four (4) paid personal days each year. While Employees are not permitted to carry over unused personal days from year to year, they are paid their unused personal days upon termination or resignation.

44.    The Debtors request: (a) authority to pay and honor payments made on account of the Unpaid Compensation; (b) authority to pay the Temporary Agency Fees; (c) that the Employees be authorized to use paid vacation days in the ordinary course of the Debtors' business; and (d) authority to cash-out paid vacation time and personal days of Employees in the event of their departure.

**ii.    Employee Benefits**

45.    The Debtors have established various plans and policies to provide their Employees with medical, dental, disability and life insurance, tuition reimbursement and other similar benefits (collectively the "Employee Benefits"). These Employee Benefits are described below.

46.    The Employees are entitled to health insurance for medical coverage through Keystone Health Plan East, Inc., prescription benefits through Health Insurance Solution, Inc., and for dental coverage through Aetna (the medical, including prescription, and dental coverage are hereinafter referred to as the "Health Benefits").

47.    The cost of the premiums for the Health Benefits is paid by the Debtors each month in the approximate amount of $579,000. The Debtors then deduct the appropriate amount from each Employees' paycheck.

48.    The Employees are also entitled to participate in a self-funded flexible spending account ("FSA") to pay for eligible out-of-pocket healthcare, dependant care costs and transportation expenses. The Debtors deduct the Employee contributions to the FSA from the Employees' paychecks and therefore bear a small cost associated with the administration of the Employees' FSAs.

49.    The Debtors request that the Court authorize the Debtors to pay any premium amounts that are outstanding as of the Petition Date to providers of the Health Benefits in the ordinary course of business, to continue to maintain such programs for Employees in the ordinary course of business and to continue to take actions necessary to administer the Employees' FSAs.

### iii.    **Employee Insurance Benefits**

50.    Included with the Employee Benefits are certain insurance benefits provided to Employees (the "Employee Insurance Benefits").

51.    The Debtors provide the Employees with primary life insurance through Sun Life. The Employees may also purchase supplemental life insurance, the premiums for which are paid entirely by the electing Employee though a payroll deduction. Long-term disability ("LTD") benefits are also provided for the Employees through Sun Life. Employees may purchase supplemental long-term disability benefits at their own cost. Employees may also purchase short-term disability benefits at their own cost through Aflac or Colonial Life.

52.    The Debtors also provide the Employees with workers' compensation insurance through PMA Insurance Group ("PMA"). Premium costs and claims reimbursement costs are approximately $43,000 per month and the Debtors expect to pay annual insurance premiums and fees to PMA an aggregate amount of approximately $525,000.

53.    The Debtors pay an average of approximately $751,000 in premiums per year on account of the Employee Insurance Benefits described above which is comprised of (i) $70,000 in annual coverage costs with respect to life insurance, (ii) $156,000 in annual costs with respect to LTD benefits, and (iii) $525,000 for annual premium costs and fees with respect to workers' compensation insurance. The Debtors seek authority, in the Debtors' discretion, to continue to pay such amounts, inclusive of amounts due as of the Petition Date.

54.    The Debtors request that the Court authorize (but not direct) the Debtors to continue, in the ordinary course of their business, to provide the Employee Insurance Benefits.

**iv.    Other Employee Benefits**

55.    The Debtors provide the Employees with certain other benefits listed in the following paragraphs (the "Other Benefits").

56.    The Debtors offer tuition reimbursement to union and non-unionized employees (the "Tuition Reimbursement Program"). In order to receive the benefit, courses must: (i) be taken at an accredited university; (ii) be work related and; (iii) lead to a degree. Each non-union employee can receive up to $7,000 of reimbursement each year, PASNAP Members (the Nurses Union) can each receive up to $5,000 of reimbursements each year and Local 835 Members can each receive up to $2,000 of reimbursements each year. A participating employee must pay the initial tuition costs and will only be reimbursed by the Debtors after receiving a C or

better in each course. The Debtors estimate that approximately $10,000 of unpaid Tuition Reimbursement will have accrued as of the Petition Date.

57.    The Debtors have a retirement plan for their Employees which is administered by Met Life and Vanguard. Pursuant to restrictions imposed by the Internal Revenue Service, Employees under the age of 50 may contribute up to $16,500 per year and Employees over the age of 50 may contribute up to $21,000 per year. The Debtors do not match Employee contributions. The average yearly cost of administering the retirement plan is paid entirely by the Employees participating in the Retirement Plan through a payroll deduction.

**v.    Contributions on Behalf of Union Employees**

58.    The Debtors take monthly deductions in the approximate amount of $10,000 from union employees for union dues.

59.    The Debtors request that the Court authorize (but not direct) the Debtors to continue providing the Other Benefits described above.

**vi.    Reimbursable Expenses**

60.    In the ordinary course of their business, the Debtors reimburse certain Employees for costs and expenses associated with (a) mileage, (b) tolls, (c) attendance at conferences, (d) publication expenses, (e) telephone expenses, (f) membership dues, (g) office supplies and (h) other business-related expenses paid by the Employees (collectively, the "Reimbursable Expenses"). As of the Petition Date, the Debtors estimate that they owe approximately $10,000 with respect to these costs.

61.    Accordingly, the Debtors seek to be authorized, but not required, to pay the Reimbursable Expenses to the Employees in the ordinary course of business.

### vii.    Withheld Taxes and Employee Contributions

62.    The Debtors deduct directly from their Employees' paychecks employee contributions for all insurance plans and flexible spending plans. The Debtors also deduct (i) payroll taxes and the Employees' portions of FICA and statutory unemployment taxes; and (ii) legally-ordered deductions such as wage garnishments, child support and tax levies (collectively, the "Employee Deductions"). The Debtors forward amounts equal to the Employee Deductions from their general operating account to appropriate third-party recipients. Such Employee Deductions likely are not property of the Debtors' estates. On average, the Debtors have deducted approximately $81,000 from the Employees' paychecks per each weekly payroll.

63.    By this Motion, the Debtors seek authority to forward the Employee Deductions to the appropriate parties.

### viii.    Physician Incentive Program

64.    In the ordinary course of business, to incentivize certain physicians (the "Participating Physicians") to maximize revenue, the Debtors offered an incentive program (the "Physician Incentive Program").

65.    Under the Physician Incentive Program, a Participating Physician can earn a bonus, in addition to base salary, if such Participating Physician attains a certain revenue goal. The bonuses are either (i) that a predetermined fixed amount; or (ii) a percentage of the revenue that the Debtors recognize was generated by that Participating Physicians work.

66.    Under the Prepetition Physician Incentive Program, approximately six (6) physicians are entitled to receive bonuses. As of the Petition Date, none of the Participating Physicians are eligible to receive a bonus but nonetheless may become eligible in the post-petition period. Therefore, the Debtors seek (i) confirmation that they may continue their Prepetition

Physician Incentive Program in the ordinary course of business and (ii) authority to pay any prepetition amounts related to the Prepetition Physician Incentive Program.

**ix.    Severance Benefits**

67.    The Debtors provide the Employees certain severance benefits (the "Severance Benefits") in accordance with a specific payment schedule, which is based on years of continuous service.

68.    In the Debtors' business judgment, any failure of the Debtors to honor Employees' Severance Benefits would be extremely detrimental to the morale, and hence stability, of the Debtor's workforce.    The Debtors accordingly request that the Court authorize (but not direct) the Debtors to honor all Severance Benefits, in the ordinary course of business.

69.    The Employees are essential to the Debtors' operations.    Without the continued and uninterrupted service of the Employees, the Debtors would be unable to continue operating.    The continued performance of the Employees is necessary to sustain the Debtors' business operations, thus it is essential that the Debtors be authorized to make payments on account of pre-petition amounts due to such Employees.    Accordingly, the "necessity of payment" doctrine authorizes the Debtors to pay the amounts they seek pursuant to the Employee Wage Motion.

70.    The Employees will be exposed to significant financial and health-related risks if the Debtors are not permitted to satisfy unpaid Employee Obligations, particularly Unpaid Compensation and Health Benefits, as well as Reimbursable Expenses and Severance Benefits. Moreover, the Debtors believe that if they are unable to honor their Employee Obligations, Reimbursable Expenses and Severance Benefits, Employee morale and loyalty will be jeopardized at a time when Employee support is critical.

71.    Moreover, the Employee Deductions principally represent employee earnings that belong to the employees or, in the case of garnishments, judicial authorities that have been designated for deduction from the Employees' paychecks. The failure to pay these benefits could result in hardship to certain Employees. If the Debtors cannot remit these amounts, the Employees may face legal action due to the Debtors' failure to submit these payments.

72.    The Employees are essential assets to a value-maximizing reorganization. Deterioration in employee morale and welfare at this critical time undoubtedly would adversely impact the Debtors, the value of their assets and businesses, and, ultimately, the Debtors' ability to maximize value for creditors.

73.    For all of the foregoing reasons, the Employee Wage Motion should be granted.

**F.    Motion of the Debtors for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utilities Motion")**

74.    In the Utilities Motion, the Debtors seek entry of an order: (i) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (ii) approving procedures whereby the Utility Providers may request additional or different adequate assurance; (iii) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of pre-petition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (iv) establishing a process by which Utility Providers may object to the Debtors' proposed adequate assurance procedures; and (v) setting a Final Hearing on the Debtors' proposed adequate assurance.

75.    In the ordinary course of business, the Debtors regularly incur utility expenses for water, electricity, gas, local telephone service, long-distance telephone service, cellular phone service and internet service. The Debtors' aggregate average monthly cost for utility services is approximately $205,000. The utility services are provided by approximately nine (9) Utility Providers. A list of these Utility Providers is attached as Exhibit "1" to the Utilities Motion.

76.    The Debtors have a long and established payment history with most or all of the Utility Providers indicating generally consistent payment for utility service. As of the Petition Date, however, the Debtors may have had (a) pre-Petition Date accounts payable to certain Utility Providers, (b) outstanding checks issued to certain Utility Providers in payment for pre-Petition Date charges for utility services that had not cleared the Debtors' bank account prior to the Petition Date, or (c) liabilities for pre-Petition Date utility services for which the Debtors had not yet been billed.

77.    It is critical that the Utility Services provided by all of the Utility Providers to the Debtors continue uninterrupted.

78.    The Debtors intend to pay all postpetition obligations to the Utility Providers in a timely manner. Pursuant to the Debtor's proposed use of cash collateral, the Debtors anticipate that they will have available sufficient funds to pay all postpetition Utility Services in the ordinary course of business and to pay the proposed adequate assurance prepayments and deposits to the Utility Providers as set forth in the Utilities Motion.

79.    As adequate assurance of future payment to the Utility Providers, the Debtors propose to pay postpetition obligations owed to the Utility Providers in a timely manner. Assuming the Court grants the Debtors' motion for authority to use cash collateral, filed

contemporaneously herewith (the "Cash Collateral Motion"), they will have sufficient cash on hand to pay such postpetition obligations.

80.     The Debtors also propose to provide a deposit equal to one (1) month of utility service, calculated based on the historical average over the twelve (12) months before the Petition Date to any Utility Provider who requests such a deposit in writing (the "Adequate Assurance Deposit"), provided that such Utility Provider does not already hold a deposit equal to or greater than the value of one (1) month of utility services and provided further that such Utility Provider is not currently paid in advance for its services.   As a condition of requesting and accepting an Adequate Assurance Deposit, the requesting Utility Provider shall be deemed to have stipulated that the Adequate Assurance Deposit constitutes adequate assurance of payment to such Utility Provider within the meaning of section 366 of the Bankruptcy Code and shall further be deemed to have waived any right to seek additional adequate assurance during the course of these Chapter 11 Cases.

81.     The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Providers.

82.     For the foregoing reasons, the Utilities Motion should be granted.

G.     **Debtors' Motion for Entry of an Order Authorizing Debtors to Employ Donlin, Recano & Company, Inc. as Notice, Claims and Solicitation Agent (the "DRC Retention Motion")**

83.     In the DRC Retention Motion, the Debtors seek the appointment of Donlin, Recano & Company, Inc. ("DRC") as the Debtors' notice, claims and solicitation agent. As more fully set forth in the Affidavit of Louis A. Recano, attached to the DRC Retention Motion as an exhibit, DRC and the Debtors have entered into a certain Standard Claims Administration

and Noticing Agreement (the "Donlin, Recano Agreement").  Pursuant to the Donlin, Recano

Agreement, DRC will act as the notice, claims and balloting agent in these cases.  As notice,

claims and balloting agent, DRC will provide comprehensive administrative-support services to

the Court, the Debtors, and other parties in interest in these Chapter 11 Cases.  These services

include, but are not limited to: (a) maintaining the list of the Debtors' creditors; (b) serving

required notices in these Chapter 11 Cases; (c) preparing related certificates or affidavits of

service; (d) administering and reconciling claims and proofs of claim; (e) providing plan

solicitation and balloting services related to chapter 11 plans; and (f) providing disbursement

services with respect to the Debtors' bankruptcy cases, if requested.  In addition to the foregoing,

the Debtors seek to have DRC appointed to assist them with, among other things: (a) the

reconciliation and resolution of claims; (b) the preparation of the Schedules of Assets and

Liabilities and Statements of Financial Affairs; and (c) the preparation, mailing and tabulation of

ballots for the purpose of voting to accept or reject any plan proposed by the Debtors in these

cases.

> 84.    The specified assistance from DRC will expedite service of required

notices, streamline the claims administration process, and permit the Debtors to focus on their

reorganization efforts.  Accordingly, the DRC Retention Motion should be granted.

**H.      Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Use
         Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate
         Protection Pursuant to 11 U.S.C. §§ 361, 362 and 363, and (III) Scheduling a
         Final Hearing Pursuant to Bankruptcy Rule 4001(b) (the "Cash Collateral
         Motion")**

> 85.    Pursuant to the Cash Collateral Motion, the Debtors seek the entry of

interim and final orders (a) authorizing the Debtors to use cash collateral, (b) granting adequate

protection to Trustee with respect to the Bonds, and (c) scheduling a final hearing.

86.    As noted above, pursuant to that certain loan and security agreement (the "Loan and Security Agreement") entered into in connection with the issuance of the Bonds, LBH granted to the Trustee a lien on and security interest in the "Unrestricted Gross Revenues" (as such term is defined in the Loan and Security Agreement) of LBH (to the extent such Unrestricted Gross Revenues existed immediately prior to the Petition Date, the "Prepetition Collateral").

87.    Upon information and belief, the Trustee asserts that it holds a valid, non-avoidable first priority, perfected security interest in and lien on the Prepetition Collateral, which includes certain assets that may constitute cash collateral (the "Cash Collateral"). The Debtors dispute such assertion. More specifically, the Debtors believe that the Trustee purportedly perfected certain of its liens by filing a financing statement or an amendment to its existing financing statement, within ninety (90) days prior to the Debtors' bankruptcy filing. In addition, the Trustee does not have any "control agreement" with respect to LBH's bank accounts.

88.    By the Cash Collateral Motion, the Debtors seek authority to use the Trustee's alleged cash collateral subject to the terms of a budget for an initial interim period to expire upon the earlier of (i) February 12, 2010 or (ii) the occurrence of a Termination Event (as defined in the Cash Collateral Motion).

89.    The Debtors propose to provide adequate protection to the Trustee (solely to the extent of any diminution in the value of the interest of the Trustee in the Pre-Petition Collateral, from and after the Petition Date, but only if and to the extent the Trustee's asserted lien on the Pre-Petition Collateral is determined by the Court to be a valid, perfected, enforceable and non-avoidable first priority lien) in the form of: (i) a replacement lien in Unrestricted Gross Revenues received by LBH subsequent to the Petition Date, and all proceeds thereof; (ii) a lien on

and security interest in the Debtors' real estate, subject only to that certain lien of the Township of Bristol; (iii) a "superpriority" claim; and (iv) certain reporting requirements and other protections.

90.     The Debtors intend to use Cash Collateral, among other things, (i) to pay payroll, vendors, lease payments, and other expenses, (ii) as general working capital; and (iii) for other general corporate purposes, all as shown on the budget.  The Debtors do not have available sources of working capital or sufficient financing to carry on their business without the use of Cash Collateral.  As such the use of Cash Collateral is required to fund day-to-day operating expenses, including payments to employees, suppliers and vendors, to maintain patient care and generally to sustain the Debtors' business operations.  Without authority to use Cash Collateral, the Debtors will be unable to pay for services and expenses necessary to continue their business operations in an orderly manner and would be forced to immediately close and discontinue all business operations.

91.     The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral is vital to the preservation and maintenance of the going concern values of the Debtors.  Therefore, approval of the Cash Collateral Motion, entry of the Interim Order and authorization to use Cash Collateral pending a final hearing is in the best interests of the Debtors' estates and their creditors.

I.      **Motion of the Debtors, Pursuant to Sections 105(a) and 503 of the Bankruptcy Code and Bankruptcy Rules 3002 and 3003, for an Order Establishing Procedures for the Assertion of Section 503(b)(9) Claims Relating to Goods Received by the Debtors within Twenty Days Before the Petition Date (the "503(b)(9) Motion")**

92.     In the 503(b)(9) Motion, the Debtors seek entry of an order establishing procedures for the assertion of any claims entitled to priority under section 503(b)(9) of the

93.    Bankruptcy Code ("503(b)(9) Claims") relating to goods received by the Debtors within 20 days immediately prior to the Petition Date (the "Twenty-Day Period").

94.    Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors purchased a variety of goods used in their Hospital operations. Goods were received by the Debtors on a regular basis, and substantial amounts of goods were received within the Twenty-Day Period. The Debtors estimate that within the Twenty-Day Period, the Debtors received goods from suppliers worth approximately $900,000. Many of these suppliers have not yet been paid for these goods.

95.    To eliminate any uncertainty regarding the procedures to be used by claimants asserting 503(b)(9) Claims, to avoid piecemeal litigation and to maintain uniformity and consistency, the Debtors seek to establish procedures for the assertion (and determination) of 503(b)(9) Claims pursuant to the normal prepetition claims process in these cases and subject to the general bar date to be set by the Court in these cases for the filing of all prepetition claims ("503(b)(9) Procedures") as further defined in the 503(b)(9) Motion.

96.    The 503(b)(9) Procedures will provide clear guidance to all parties as to how 503(b)(9) Claims shall be filed in these cases and will streamline the process for consideration of such claims. Requiring 503(b)(9) Claimants to participate in the normal claims adjudication process will provide the Debtors the opportunity to address the allowance of claims in an orderly and efficient way, will not impair in any way the substantive rights of any parties and will ensure that similarly situated creditors receive equal treatment.

97.    The Debtors further request that the 503(b)(9) Procedures be the sole and exclusive method for creditors to assert, seek determination of and obtain payment of the 503(b)(9) Claims.

98.    For the foregoing reasons, the 503(b)(9) Motion should be granted.

## PART III:  CONCLUSION

Accordingly, for the reasons stated herein and in each of the First Day Pleadings, the relief sought therein is in the best interests of the Debtors, their creditors and estates; and therefore, on behalf of the Debtors, I respectfully request that the First Day Pleadings be granted.

I declare under penalty of perjury that, to the best of my knowledge, and after reasonable inquiry, the foregoing is true and correct.

Executed this _11_ day of January, 2010.

_____
Albert A. Mezzaroba

SUBSCRIBED AND SWORN TO BEFORE ME
this _11_ day of _January_ 2010

_____
Notary Public
My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
DEBORAH A. KACZYNSKI, Notary Public
City of Philadelphia, Phila. County
My Commission Expires July 11, 2010