## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| LOWER BUCKS HOSPITAL | : | Bky. No. 10-10239 ELF |
| | : | |
| LOWER BUCKS HEALTH ENTERPRISES, INC. | : | JOINTLY ADMINISTERED |
| | : | |
| ADVANCED PRIMARY CARE PHYSICIANS | : | |
| | : | |
| Debtors.[1] | : | |

## DISCLOSURE STATEMENT RELATING TO JOINT CHAPTER 11 PLAN OF REORGANIZATION OF LOWER BUCKS HOSPITAL, LOWER BUCKS HEALTH ENTERPRISES, INC., AND ADVANCED PRIMARY CARE PHYSICIANS

Dated: July 8, 2011

SAUL EWING LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA  19102
(215) 972-7777

ATTORNEYS FOR THE DEBTORS AND DEBTORS-IN-POSSESSION

*THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA (THE "BANKRUPTCY COURT") UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.*

---

[1] The Debtors and the last four digits of their respective taxpayer identification number are as follows: Lower Bucks Hospital (9667); Lower Bucks Health Enterprises, Inc. (7355); and Advanced Primary Care Physicians (9053). The Debtors' address is 501 Bath Road, Bristol, Pennsylvania 19007.

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................................1

II. NOTICE TO HOLDERS OF CLAIMS .................................................................1

III. EXPLANATION OF CHAPTER 11 ......................................................................3

IV. OVERVIEW OF THE PLAN .................................................................................4
 A. Summary of Key Terms of the Plan ..............................................................4
 B. Summary of Distributions Under the Plan ....................................................5

V. GENERAL INFORMATION .................................................................................7
 A. Businesses of the Debtors .............................................................................7
 B. History of the Debtors ...................................................................................8
 C. Organizational Structure ...............................................................................9
 D. Insurance Coverage ....................................................................................10
 E. Management ................................................................................................11
 F. Debt Structure ............................................................................................12
 G. Events Leading to the Commencement of the Chapter 11 Cases ...............14
 H. Sale and Marketing Efforts .........................................................................15
 I. Table Gaming Legislation ...........................................................................16

VI. THE CHAPTER 11 CASES .................................................................................16
 A. Commencement of the Chapter 11 Cases ...................................................16
 B. Continuation of Business After the Petition Date .......................................16
 C. Representation of the Debtors ......................................................................18
 D. Formation and Representation of the Committee .........................................18
 E. Appointment of Patient Care Ombudsman ..................................................19
 F. Matters Relating to Unexpired Leases and Executory Contracts ................19
 G. The HyperOx Lease ....................................................................................20
 H. Exclusivity .................................................................................................21
 I. Schedules and Bar Date ..............................................................................21
 J. Monthly Operating Reports .........................................................................21
 K. Asserted Claims ..........................................................................................22
 L. Medical Malpractice Claims ........................................................................23
 M. Insurance Premium Financing Motions .......................................................23
 N. Motion to Pay Prepetition Claims of Critical Service Providers ..................23
 O. The Bond Trustee Litigation .......................................................................24
 P. PASNAP Letter Agreement and Debtors' Rule 9019 Motion .....................29
 Q. Operating Engineers' Letter Agreement and Debtors' Rule 9019 Motion ...........29
 R. Termination of the Pension Plan ..................................................................30
 S. Post-Petition Business Operations ...............................................................30

THE CHAPTER 11 PLAN.................................................................................31
    A.    Introduction ........................................................................................31
    B.    Classification of Claims Against the Debtors...................................31
    C.    Treatment of Claims Against the Debtors ........................................33
    D.    Treatment of Unclassified Claims Under the Plan ...........................39
    E.    Means for Implementation of the Plan. ............................................41
    F.    The Disbursing Agent.......................................................................43
    G.    Distribution Provisions......................................................................44
    H.    Procedures for Resolving and Treating Contested Claims................46
    I.    Treatment of Executory Contracts and Unexpired Leases................48
    J.    Conditions Precedent to Confirmation of the Plan and the Occurrence of the
        Effective Date ...................................................................................49

VII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES.........................50
    A.    General..............................................................................................51
    B.    [intentionally omitted] ......................................................................51
    C.    Importance of Obtaining Professional Tax Assistance......................51

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ....52
    A.    Liquidation Under Chapter 7 of the Bankruptcy Code......................52
    B.    Alternative Plans of Reorganization.................................................53

IX. FEASIBILITY OF THE PLAN .....................................................................53

X. THE SOLICITATION; VOTING PROCEDURE.................................................54
    A.    Parties in Interest Entitled to Vote....................................................55
    B.    Classes Impaired under the Plan .......................................................56
    C.    Further Information; Additional Copies ............................................56

XI. RECOMMENDATION AND CONCLUSION ..................................................57

## I.

## INTRODUCTION

All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Joint Chapter 11 Plan of Reorganization of Lower Bucks Hospital, Lower Bucks Health Enterprises, Inc., and Advanced Primary Care Physicians, dated July 8, 2011 (the "Plan") (see Article I of the Plan entitled "Definitions").

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT "A," FILED BY LBH, ENTERPRISES AND APC (THE "DEBTORS").

OTHER THAN CLASSES A1, B1, C1 (PRIORITY NON-TAX CLAIMS) AND CLASSES A4, B4 AND C4 (OTHER SECURED CLAIMS), WHICH ARE UNIMPAIRED UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN, ALL CLASSES ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, THE DEBTORS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF ALL CLAIMS, OTHER THAN THOSE HOLDING CLASS A1, B1 AND C1 CLAIMS (PRIORITY NON-TAX CLAIMS) AND CLASS A4, B4 and C4 CLAIMS (OTHER SECURED CLAIMS).

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF AND PROVIDES THE HIGHEST AND BEST RECOVERIES TO HOLDERS OF ALL CLASSES OF CLAIMS. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY 4:00 P.M., EASTERN TIME, ON_____, 2011 (THE "VOTING DEADLINE"). FOR THE AVOIDANCE OF DOUBT, THE DEBTORS RESERVE THE RIGHT TO OBJECT TO CLAIMS AFTER THE VOTING DEADLINE.

FOR YOUR ESTIMATED PERCENTAGE RECOVERY UNDER THE PLAN, PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN – SUMMARY OF DISTRIBUTIONS UNDER THE PLAN."

## II.

## NOTICE TO HOLDERS OF CLAIMS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS AND DEBTORS IN-POSSESSION IN THESE CHAPTER 11 CASES.

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Moreover, except for the Debtors and certain of the Debtors' Professionals, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement, and if given or made, such information may not be relied upon as having been authorized by the Bankruptcy Court.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot and return the same to the address set forth on the Ballot in the enclosed, postage prepaid, return envelope so that it will be received by the Balloting Agent no later than the Voting Deadline.

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing commencing on _____, 2011 at ___:___ ___.m., prevailing Eastern Time, before the Honorable Eric L. Frank. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before_____, 2011 at __:___ ___.m. prevailing Eastern Time, in the manner described in the related order.

**THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

**III.**

**EXPLANATION OF CHAPTER 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor-in-possession may reorganize its business for the benefit of its creditors, equity holders and other parties-in-interest. The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the holders of claims against, and interests in, the debtor's estate.

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a liquidation of a debtor's assets. In either event, upon confirmation of the plan, the plan becomes binding on a debtor and all of its creditors and equity holders, and the obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan.

After a plan of reorganization has been filed, the holders of impaired claims against, and interests in (if any), a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against the Debtors in order to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.**

A bankruptcy court may confirm a plan of reorganization even though fewer than all the classes of impaired claims and equity interests accept such plan. For a plan of reorganization to be confirmed despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. **For present purposes, the Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of**

3

Claims and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims.

## IV.

## OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against all of the Debtors in In re Lower Bucks Hospital, et al., Case No. 10-10239 ELF (Jointly Administered).

### A.     Summary of Key Terms of the Plan

Although creditors and parties-in-interest should review the "Summary of Distributions Under the Plan" set forth below, as well as the full terms of the Plan itself, the Plan implements and is built around the following key elements:

- **Settlement of Bond Trustee Litigation**:  as described in greater detail below, LBH has been engaged in litigation against the Bond Trustee regarding several issues, including whether the Bond Trustee (on behalf of Bondholders) holds a secured Claim against LBH, as opposed to a Claim that is unsecured.  The Plan contains a settlement of the Bond Trustee Litigation that has been negotiated with the Bond Trustee.  Bondholders are urged to accept this settlement by voting to accept the Plan in *both* Classes A3 and A6. The Debtors believe the proposed settlement is favorable to holders of Bonds in that, among other things:

  o   The settlement is the result of intensive, arms-length, negotiations with the Bond Trustee, and is supported by Bondholders who hold in the aggregate almost 50% of the principal amount of the Bonds.

  o   The settlement gives holders of the Bonds a significantly greater recovery than the recovery that will be realized under the Plan by other creditors.

  o   The settlement provides holders of the Bonds a quicker recovery than they would realize if the Bond Trustee Litigation were to continue.

  o   The settlement allows the Bond Trustee to stop incurring legal and other fees and costs in connection with the Bond Trustee Litigation.  These amounts likely will be deducted from the recovery otherwise payable to Bondholders.  In other words, Bondholders are indirectly bearing the cost of the Bond Trustee Litigation.

  o   The Bond Trustee has informed the Debtors that, absent the settlement, it will exercise its right under the Indenture to stop defending the Bond Trustee Litigation unless it receives a contrary directive from the owners of a majority in principal amount of the Bonds, together with an indemnity from such Bondholders.

*For these reasons, the Debtors strongly urge holders of Bonds to vote to accept the Plan.*

- **Other Claims**. The Plan provides for payment in full of all Allowed Priority Claims, Secured Claims and Administrative Claims, and provides Allowed General Unsecured Claims a distribution that includes certain Guaranteed Cash and a Creditor Note to be issued under the Plan. Separate treatment is provided to the PBGC and holders of Medical Malpractice Claims. The Plan's proposed treatment of these claims is summarized below.

- **Funding**. The funds required for the initial distributions under the Plan are to come from a monetization of LBH's Table Gaming Grants, through the issuance of the 2011 Bonds, a mortgage loan secured by Enterprises, and certain Cash contributions from the Debtors. The Plan also contemplates the issuance of a Creditor Note, and other post-Confirmation payments to creditors.

## B.     Summary of Distributions Under the Plan

The following is a summary of the Plan Distributions. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit "A." The Claim amounts set forth below reflect what the Debtors believe to be reasonable estimates of the likely resolution of outstanding disputed Claims. The amounts utilized may differ from the outstanding filed Claims amounts.

| Class | Class Name | Debtor | Estimated Claim Amounts | Estimated Recovery & Treatment |
|---|---|---|---|---|
| n/a | Administrative | all | $377,000 – $485,000 (503(b)(9) Claims)[2] | Cash payment of 100% on the Plan's Effective Date or as soon thereafter as is reasonably practicable. |
| n/a | Priority Tax Claims | all | $0.00 | Cash payment of 100% on the Plan's Effective Date or as soon thereafter as is reasonably practicable |
| A1 | LBH Priority Non-Tax Claims | LBH | $0.00 - $15,000 | Cash payment of 100% on the Plan's Effective Date or as soon thereafter as is reasonably practicable |
| A2 | Bristol Township Secured Claim | LBH | $133,447.17 | 100% plus interest in equal quarterly payments, with the first such payment due three (3) months after the Effective Date |
| A3 | Bond Trustee Secured Claim | LBH | $0.00 - $15,353,325[3] | Holders of Bonds will receive the following:<br>• $8,150,000 in Cash; and<br>• the Reserve Funds.<br><br>All distributions under the Plan to holders of Bonds are paid first to the Bond Trustee, which, to the extent permitted by the Indenture, may deduct its fees, costs and expenses therefrom before causing such distributions to be paid to Bond holders. |
| A4 | Other Secured Claims | LBH | $1,345,000[4] | 100% in accordance with their respective loan or agreements. |
| A5 | PBGC General | LBH | $36 million | • Cash payment of $1.0 million from Reorganized Lower |

---

[2]   Exclusive of: (i) Claims for Professional Fees, which are estimated to be approximately $2.0 million; and (ii) Cure Costs, which are estimated to be approximately $1.5 million.

[3]   This figure represents the sum of the face amounts of the Bond Trustee's asserted Cash Collateral and the Reserve Funds as of the Petition Date.

[4]   This amount is comprised primarily of the following Claims: (a) a Claim of PNC Bank for approximately $689,000, secured by a Certificate of Deposit; and (b) a Claim of Horizon Mental Health Management LLC for approximately $558,000, purportedly secured by a cash deposit and certain set-off rights.

| Class | Class Name | Debtor | Estimated Claim Amounts | Estimated Recovery & Treatment |
|-------|-----------|--------|------------------------|-------------------------------|
| | Unsecured Claim | | | Bucks Hospital within one year after the Effective Date, in four (4) equal quarterly payments, without interest. <br> • An equal distribution to that realized, in the aggregate, by holders of Allowed General Unsecured Claims. <br> • All other amounts payable pursuant to the PBGC Stipulation. |
| A6 | Bond Trustee Unsecured Claim | LBH | $9.6 million - $25 million | Each holder of an Allowed Class A6 Claim will receive the treatment for Class A3 described above. <br><br> All distributions under the Plan to holders of Bonds are paid first to the Bond Trustee, which, to the extent permitted by the Indenture, may deduct its fees, costs and expenses therefrom before causing such distributions to be paid to Bond holders. |
| A7 | General Unsecured Claims | LBH | $7.25 million[5] | An estimated 10.6% in Cash on the Initial Distribution Date, plus payments on a Creditor Note, over four years, that will result in a 18.5% recovery on Allowed General Unsecured Claims on a net present value basis, so long as Allowed General Unsecured Claims do not exceed, in the aggregate, $9.0 million (in which case recoveries for Allowed General Unsecured Claims will diminish). |
| A8-A | Stipulated Medical Malpractice Claims | LBH | Unliquidated | Recovery solely from Insurance Coverage. |
| A8-B | Non-Stipulated Medical Malpractice Claims | LBH | Unliquidated | Recovery, first, from Insurance Coverage and, second, to the extent of any Uninsured Deficiency, from Reorganized Lower Bucks Hospital, but only to the extent of the percentage recovery realized by holders of Allowed General Unsecured Claims. |
| A9 | Convenience Claims | LBH | $775,000 | 20% on their Allowed Claims in Cash. |
| B1 | Priority Non-Tax Claims | Enterprises | $0.00 | 100% |
| B4 | Other Secured Claims | Enterprises | $1,000 | 100% |
| B5 | PBGC General Unsecured Claim | Enterprises | $22 million - $27 million | $2.0 million Cash plus all other amounts payable pursuant to the PBGC Stipulation. |
| B7 | General Unsecured Claims | Enterprises | $200,000[6] | The same treatment provided to Allowed General Unsecured Claims against LBH. |
| B9 | Convenience Claims | Enterprises | $25,000 | 20% on their Allowed Claims in Cash. |
| C1 | Priority Non-Tax Claims | APC | $0.00 | 100% |
| C4 | Other Secured Claims | APC | $0.00 | 100% |
| C5 | PBGC General Unsecured Claim | APC | $36 million | All amounts payable pursuant to the PBGC Stipulation. |
| C7 | General Unsecured Claims | APC | $20,000[7] | The same treatment provided to Allowed General Unsecured Claims against LBH. |
| C9 | Convenience Claims | APC | $15,000 | 20% on their Allowed Claims in Cash. |

---

[5]   Exclusive of Enterprise intercompany claim against LBH in the net amount of approximately $4.84 million.

[6]   Exclusive of LBH intercompany claim against Enterprises in the amount of $1,170,251.

[7]   Exclusive of LBH intercompany claim against APC in the amount of approximately $500,000.

## V.

## GENERAL INFORMATION

The Debtors consist of LBH, Enterprises and APC.

### A.    Businesses of the Debtors

LBH is a community hospital located in Bristol, Pennsylvania. From its inception in the early 1950's, LBH has provided healthcare services as an acute care community hospital serving the Lower Bucks County area. LBH, together with Enterprises, owns and operates a 36-acre campus with several medical facilities. LBH specifically owns 23 acres of the campus, which includes a 371,641 square foot main hospital, a 104,650 square foot Patient Care Pavilion, a 11,680 square foot Health & Wellness Center and a Day Care Center. Enterprises owns 13 acres of the medical campus, on which a 33,754 square foot Ambulatory Surgery Center is located. At present, LBH is licensed to operate 186 beds. The Debtors' physical facilities are as follows:

**Current Facilities**

| Building Name | Date of Construction | Gross Square Feet | Building Use |
|---|---|---|---|
| Ambulatory Surgery Center | 1995 | 33,754 | Physician Offices & S.P.U. |
| Day Care | 1989 | 8,623 | Child Care |
| Health & Wellness | 1962,1993 | 11,680 | Clinical Outpatient Services |
| Main Hospital | 1954,1970 | 266,991 | Hospital |
| Patient Care Pavilion | 1995 | 104,650 | Hospital |
| 827 Old Orchard Lane | 1981-purchased | 1,500 | Finance Department |
| 4006 Apple Road | 1991-purchased | 2,450 | Living Quarters/Storage |
| **Total** | | **429,648** | |

The Debtors provide a full range of acute, sub-acute, ambulatory and related services, including cardiac catheterization, mental health, diagnostic imaging (including MRI), industrial health, maternity, home health and orthopedics. More specifically, the Debtors offer the following types of services:

| | |
|---|---|
| **Emergency Services** | LBH serves more than 30,000 patients in its emergency room each year, which is 17,500 square feet and contains 28 exam rooms including a five bay FastTrack, a three room locked psychiatric area and a hazardous materials decontamination area. |
| **Heart Care** | LBH offers sophisticated testing, services and surgery options for heart patients. |
| **Maternity** | Since 1954, approximately 70,000 babies have been delivered in the LBH maternity ward. The maternity ward includes labor-delivery-recovery suites, each with private bathroom and shower, 17 private rooms, and a Level II Neonatal Intensive Care Unit. |
| **Surgery & Same Day Surgery** | The Debtors' freestanding surgery center, owned by Enterprises, contains operating rooms that are equipped with the latest technology, including lasers, laparoscopes, microscopes and video. |

| **Comprehensive Home Care** | Over 40,000 times a year, LBH Home Care staff visits patients at home, providing skilled care and intervention to promote the return or achievement of the highest possible level of function. |
|---|---|
| **Wound Care** | LBH's Wound Care Center is dedicated to assisting patients with wounds that will not heal. Using the latest techniques and products that medical science offers, LBH helps hundreds of patients, with an average healing time under eight weeks. |
| **Sleep Disorders Center** | Since 1986, LBH has helped thousands of patients suffering from sleep disorders, including sleep apnea, narcolepsy, and insomnia. |
| **Psychological Services** | LBH offers a 24 bed mental health inpatient facility. |

LBH employs approximately 930 full and part-time employees including over 350 registered nurses, and over 490 physicians are affiliated with LBH. LBH routinely treats over 30,000 patients a year in its emergency room and performs over 3,100 surgical procedures, both on an inpatient and outpatient basis. Separately, approximately 110,000 persons visit LBH each year for various tests, such as MRIs, blood work, electrocardiograms, and the like. In addition to its on-site services, LBH performs over 40,000 home visits annually through its Home Care division.

LBH is a party to collective bargaining agreements with two unions: (a) the Nurses Association of Lower Bucks Hospital / The Pennsylvania Association of Staff Nurses and Allied Professionals (PASNAP) ("PASNAP"), which covers approximately 250 Hospital employees; and (b) the International Union of Operating Engineers, Local 835, AFL-CIO (the "Operating Engineers"), which has approximately 34 active members. The collective bargaining agreement ("CBA") with the PASNAP expires on June 30, 2012, subject to either party's rights, under certain circumstances, to terminate the CBA on two weeks written notice prior to December 31, 2011. The CBA with the Operating Engineers is set to expire on January 23, 2012, subject to either party's rights, under certain circumstances, to terminate the CBA before such time. LBH also has a pension plan for its employees, which is described below.

**B.      History of the Debtors**

LBH opened in 1954, meeting a need for a local community hospital in Bucks County. By 1956, LBH was running at over 100% occupancy. Intensive care was added in 1958, followed by a large expansion, which was completed in 1964. Since that time, LBH has continued to add services and space over the years to accommodate community needs. In 1989, for example, LBH began operating its Day Care Center. Furthermore, in 1993, LBH purchased the Health and Wellness Center building from Bucks County and began using it as part of the hospital that same year. In 1995, LBH added the Patient Care Pavilion and in 1996, LBH opened the Ambulatory Surgical Center.

On or about March 31, 1997, LBH entered into an affiliation agreement with, among other parties, Temple University Health Systems, Inc., and became part of the Temple University Health System. In connection with this transaction, on September 19, 1997, LBH merged with and into Temple Lower Bucks Hospital, Inc., a Pennsylvania nonprofit corporation, with

"Temple Lower Bucks Hospital, Inc." being the surviving corporation. On or about March 7, 2002, Temple Lower Bucks Hospital, Inc. entered into another affiliation agreement by which, among other things, it agreed to disaffiliate from Temple University Health Systems, Inc. and in May 2006, changed its name to Lower Bucks Hospital.

## C.  Organizational Structure

LBH's organizational structure is comprised of four Pennsylvania non-profit corporations and a "captive" for-profit insurance company, each of which has as its sole member (or, in the case of the for-profit insurance company, shareholder) LBH:

- **Enterprises**. Enterprises owns the 13 acres of real property on which an ambulatory surgery center/medical office building is located. In addition, Enterprises operates industrial health and wellness programs for various clients, including local businesses. Through these programs, Enterprises treats nonurgent injuries, provides pre-employment physical examinations and conducts any medical screenings that may be required for certain occupations.

- **APC**. APC employs four primary care physicians and their associated staff in a practice that operates in leased space in Fairless Hills, Pennsylvania under the name of Fairless Hills Medical Center. ·

- **Advanced Specialty Physicians Group**. This entity was formed in 2008 to employ certain specialty care physicians then employed by LBH. Advanced Specialty Physicians Group receives income for patient services rendered by certain specialists.

- **Bucks County Health Foundation**. This entity was formed in 2006 to act as the fund-raising arm of LBH. It has received certain contributions and from time to time transfers those contributions to LBH.

- **Bucks County Insurance Company**. LBH owns all of the capital stock of Bucks County Insurance Company ("BCIC"), a Cayman Islands-based captive insurance company that has been providing medical malpractice insurance coverage to LBH since July 1, 2005. Effective July 1, 2011, BCIC indemnifies LBH for its professional liability on a claims made basis. BCIC is governed by a board of directors appointed by LBH. BCIC is currently funded by LBH and as of June 30, 2010, BCIC had assets in excess of liabilities and reserves in the amount of approximately $150,000, exceeding the statutory capital requirement of $120,000.

BCIC Coverage Information. BCIC provides primary professional liability coverage to LBH in the amount of $500,000 per claim and $2,500,000 in the aggregate, fronted through an insurance carrier. Beyond this first layer is a second layer of coverage in the amount of $500,000, which consists of state-sponsored insurance funds from the Medical Care Availability and Reduction of Error Fund (MCARE). BCIC further provides a third layer of excess coverage of $5,000,000 per occurrence and $5,000,000 annual aggregate, which is fully reinsured. LBH has self-insured retention obligations between the second and third coverage layers which retention amounts differ based upon policy year, as set forth in the chart contained below.

9

BCIC also reinsures LBH for physician professional liability, nurse practitioner professional liability and follow form umbrella liability.

During the year ending June 30, 2007, BCIC entered into a Reinsurance Assignment and Reinsurance Assumption Agreement with Temple University Health System Insurance Company, Ltd. ("TUHIC"), Lexington Insurance Company, LBH and Temple University Health System, Inc. Pursuant to this agreement, BCIC assumed from TUHIC all rights, duties, interest, obligations, responsibilities and liabilities with respect to relevant insureds included in the policies issued by Lexington Insurance Company to TUHIC for the policy periods from July 1, 2001 to July 1, 2005 as if BCIC was the original reinsurer. Temple University Health System, Inc. financed this assignment and assumption as part of LBH's disaffiliation from the Temple University health system.

## D. Insurance Coverage

Medical Malpractice Coverage. As discussed above, to cover claims for alleged personal injuries and/or wrongful death, the Debtors maintain certain primary and excess insurance coverage, as well as the Medical Care Availability and Reduction of Error Fund (MCARE), all subject to certain limits, terms and conditions. As set forth below, such potentially available coverage, including the amount of any self-insured retention, varies by policy year:

| Policy Year | Primary | MCARE | Retention/Attachment Point | Excess |
|---|---|---|---|---|
| July 1, 2001 – June 30, 2002 | $500,000 | $700,000 | $10,000,000 | $10,000,000/ $38,000,000 |
| July 1, 2002 – June 30, 2003 | $500,000 | $700,000 | $10,000,000 | $10,000,000 |
| July 1, 2003 – June 30, 2004 | $500,000 | $500,000 | $2,000,000 | $5,000,000 per occurrence / $5,000,000 annual aggregate |
| July 1, 2004 – June 30, 2005 | $500,000 | $500,000 | $2,000,000 | $5,000,000 per occurrence / $5,000,000 annual aggregate |
| July 1, 2005 – June 30, 2006 | $500,000 per occurrence/ $2,500,000 aggregate | $500,000 | $3,000,000 | $5,000,000 per occurrence / $5,000,000 annual aggregate |
| July 1, 2006 – June 30, 2007 | $500,000 per occurrence/ $2,500,000 aggregate | $500,000 | $3,000,000 | $5,000,000 per occurrence / $5,000,000 annual aggregate |
| July 1, 2007 – June 30, 2008 | $500,000 per occurrence/ $2,500,000 aggregate | $500,000 | $2,000,000 | $5,000,000 per occurrence / $5,000,000 annual aggregate |
| July 1, 2008 – June 30, 2009 | $500,000 per occurrence/ $2,500,000 aggregate | $500,000 | $2,000,000 | $5,000,000 per occurrence / $5,000,000 annual aggregate |
| July 1, 2009 – June 30, 2010 | $500,000 per occurrence/ $2,500,000 aggregate | $500,000 | $2,000,000 | $5,000,000 per occurrence / $5,000,000 annual aggregate |
| July 1, 2010 – June 30, 2011 | $500,000 per occurrence/ $2,500,000 aggregate | $500,000 | N/A | $5,000,000 per occurrence / $5,000,000 annual aggregate |

Officer and Director Coverage. The Debtors maintain primary officer and director insurance coverage through Travelers Insurance Company and excess insurance coverage through Zurich American Insurance Company and RSUI Indemnity Company covering past and/or current officers and/or directors of any Debtor, subject to certain retention, limits, terms and conditions. The Debtors are not aware of any claims that have been made under these policies.

Under the Federal Volunteer Protection Act, 42 U.S.C. § 14503, a director is insulated from claims of a third party, so long as he/she acted within the scope of his/her responsibilities and the injury was not caused by willful or wanton misconduct. Under Pennsylvania law, each director will be immune from a claim brought by the bankruptcy estate unless (1) the director breached or failed to perform the duties of the office and (2) the breach or failure to perform constitutes self dealing, willful misconduct or recklessness. Pennsylvania Nonprofit Corporation Statute, at 15 Pa.C.S.A. § 5713. See also 15 Pa.C.S.A. §§ 5711-5717 (describing duties and obligations of a director of a Pennsylvania non-profit corporation).

Other Coverage. The Debtors maintain, among other types of insurance, general liability, automobile, property and workers compensation insurance.

### E.    Management

It is anticipated that the management of each of the Debtors who are serving as of the Confirmation Date will continue to serve in such capacities until the Effective Date. Entry of the Confirmation Order shall ratify and approve all actions taken by the managers and officers of the Debtors from the Petition Date through and until the Effective Date. Below is a list of the current management of the Debtors:

*Albert Mezzaroba, President and Chief Executive Officer.* Since January 7, 2010, when the Debtors' former President and Chief Executive Officer, Austin Cleveland, resigned, Mr. Mezzaroba has served as the President, Chief Executive Officer and Chief Restructuring Officer of the Debtors. Mr. Mezzaroba and the law firm with which he was affiliated, Bowman Kavulich, Ltd., previously served as counsel to LBH's Board of Directors. Mr. Mezzaroba has substantial experience in real estate development matters and has been involved in various legislative and political affairs for the City of Philadelphia. He served as President and Chief Executive Officer of the Pennsylvania Convention Center Authority from 2003 to 2008.

*John McHale, Executive Vice President and Chief Information Officer.* Mr. McHale has been employed by LBH for approximately ten years, and currently serves as LBH's Executive Vice President and Chief Information Officer. Mr. McHale has eighteen years of information technology experience within hospitals. Among other things, he is responsible for developing strategic plans as well as budgets, quality controls, system installations and management for all Lower Bucks entities.

*Michael Olivieri, Controller.* Mr. Olivieri currently serves as the Debtors' Controller. He has over eighteen years of accounting experience, eleven of which have been within the healthcare industry. Prior to joining LBH, Mr. Olivieri worked for Ernst & Young's healthcare audit division and served as Chief Financial Officer at hospitals for both Community Health Systems

11

and Universal Health Services. He is responsible for, among other things, managing the Debtors' general accounting services as well as financial reporting.

*Patricia Bain, Chief Nursing Officer.* Ms. Bain has nearly twenty-five years of nursing experience and currently serves as LBH's Chief Nursing Officer. She is responsible for directing the operations of LBH's nursing administration office as well as nursing resources and supplemental staffing. She has been with LBH since 2001.

*James G. Prendergast, Director of Purchasing.* Mr. Prendergast has over thirty years of senior level procurement and sourcing management experience in the corporate and health care industries. He serves as LBH's Director of Purchasing.

*Danielle Jackson, Business Office Director.* Ms. Jackson has twelve years of health care reimbursement and front-end registration experience. Prior to joining LBH, she was employed by Community Health Systems. She joined LBH in August 2010 and serves as LBH's Business Office Director.

### F.   Debt Structure

The Debtors' debt structure consists of the following:

**Bond Debt.** LBH is obligated with respect to the Borough of Langhorne Manor Higher Education and Health Authority Hospital Revenue Bonds, Series of 1992 (The Lower Bucks Hospital) (the "Bonds"). The Bank of New York Mellon Trust Company, N.A. serves as the trustee with respect to the Bonds ("Bond Trustee"). As of the Petition Date, $24,870.000.00 of principal was owed on the Bonds. The Bonds purportedly are secured by: (i) a *Debt Service Reserve Fund* that held approximately $2.1 million as of the Petition Date; (ii) a *Debt Service Fund* which held approximately $29,544.64 as of the Petition Date; (iii) cash in the approximate aggregate amount of $3,851,279.00, held in one or more bank accounts of LBH; and (iv) LBH's "Unrestricted Gross Revenues" in the approximate amount of $9.1 million as of the Petition Date.

The Debtors believe that the lien asserted by the Bond Trustee on LBH's Unrestricted Gross Revenues is avoidable and/or was not properly perfected. In addition, the Debtors believe that the Bond Trustee's asserted lien on LBH's cash is not perfected because the Bond Trustee does not control such bank accounts, either through possession or a control agreement. The Debtors also believe that the Bond Trustee's neither owns nor has a perfected security interest in the Debt Service Reserve Fund and the Debt Service Fund, which are held by an affiliate of the Bond Trustee. The Bond Trustee disputes the Debtors' position with respect to each of these matters. The Bond Trustee Litigation is described in greater detail in section VI(O) hereof.

**Pension Underfunding.** The Debtors are sponsors of the Lower Bucks Hospital Retirement Account Plan, which is an ERISA-qualified defined benefit pension plan (the "Pension Plan"). The Debtors have not made any contributions to the Pension Plan since March 2009. Benefits under the Pension Plan were "frozen" as of June 30, 2009. Per the PBGC, the Pension Plan is underfunded by approximately $36 million (*i.e.*, the assets of the Pension Plan are less than the amount of its liabilities, if terminated pursuant to a distress termination).

12

LBH did not make its annual contributions to the Pension Plan of approximately $3-4 million/year in the plan years ended June 30, 2009 and June 30, 2010. In the time period leading up to the Petition Date, the Debtors engaged in discussions with the PBGC regarding the Pension Plan's potential termination and, on February 1, 2011, applied for a distressed termination of the Pension Plan. As of the date of this Disclosure Statement, the Pension Plan has not been terminated. The termination of the Pension Plan is one of the conditions precedent to the effectiveness of the Plan.

On August 18, 2010, the PBGC filed four substantially identical claims against each of the Debtors (12 proofs of claim total) for asserted liabilities arising out of the Pension Plan. These claims can be described as follows:

- *General Unsecured Claims for Shortfall and Waiver Amortization.* The PBGC asserts general unsecured claims, in unliquidated amounts, against each of the Debtors for "shortfall and waiver amortization charges". These claims are based on 29 U.S.C. § 1362(c), which provides that when an underfunded pension plan is terminated, the plan's contributing sponsor and each member of its controlled group may be jointly and severally liable to the PBGC for: (1) the sum of the shortfall amortization charge for the year in which the pension plan termination date occurs plus the aggregate total of shortfall amortization installments for succeeding plan years; and (2) the sum of the waiver amortization charge for the plan year in which the pension plan termination date occurs, plus the aggregate total of waiver amortization installments for succeeding plan years. The Debtors do not believe that the PBGC is entitled to any claims based on 29 U.S.C. § 1362(c) because claims under this section arise only when the PBGC, as opposed to the Debtors, institutes plan termination proceedings. ·

- *Administrative/General Unsecured Claims for Minimum Funding Contributions Due to the Pension Plan.* The PBGC filed claims, in unliquidated amounts, for contributions needed to satisfy minimum pension plan funding standards. According to the PBGC, the normal cost portion of contributions attributable to the post-Petition Date period are entitled to administrative priority as ordinary course business expenses under Bankruptcy Code sections 503(b) and 507(a)(2). The PBGC's claims state that any contributions not entitled to priority under these statutory sections are asserted as general unsecured claims. The Debtors do not believe these claims are entitled to administrative expense priority status. The Pension Plan was frozen in June 2009, approximately six months prior to the Petition Date; as a result, normal costs could not have accrued during the post-Petition Date period so as to give rise to an administrative expense claim under section 503(b) of the Bankruptcy Code. ·

- *Administrative Claims for Pension Insurance Premiums.* The PBGC asserts unliquidated claims for insurance premiums, interest and penalties that the Debtors may owe to the PBGC. According to the PBGC, premiums arising after the Petition Date are entitled to priority under Bankruptcy Code sections 503(b)(1) and 507(a)(2), while premiums arising prior to the Petition Date are general unsecured claims. In the alternative, the PBGC asserts that its claims are entitled to tax priority under Bankruptcy Code section 507(a)(8). The Debtors believe that all Pension Plan premiums since the Petition Date

13

have been paid and that these Claims are either disallowable or allowable in the amount of $0.00.

- *Priority/General Unsecured Claims for Unfunded Benefit Liabilities.* Lastly, the PBGC asserts claims against each of the Debtors, in the amount of $27,051,332.00, for unfunded benefit liabilities arising upon the termination of the Pension Plan. The PBGC asserts that to a certain extent these claims are entitled to administrative expense priority as taxes incurred by the Debtors' Estates under Bankruptcy Codes sections 503(b)(1)(B) and 507(a)(2). The PBGC also asserts that these claims are entitled to priority under Bankruptcy Code section 507(a)(8) in an amount up to 30% of the controlled group's collective net worth. The Debtors do not agree with this assertion, although they agree that the PBGC has general unsecured claims against each of the Debtors on account of the underfunding of the Pension Plan.

As a result of discussions between the parties, the Debtors and the PBGC have reached agreement regarding both the amount and treatment of the PBGC's claims, in a plan of reorganization. Pursuant to the PBGC Stipulation, and as further set forth therein, upon the occurrence of the Effective Date, the PBGC is to release and discharge each of the Debtors, Advanced Specialty Physicians, Bucks County Health Foundation and Bucks County Insurance Company, Ltd. from (i) any and all claims of the PBGC, including but not limited to the PBGC Claims, relating to the Pension Plan, whether now existing or existing in the future; and (ii) any and all liabilities, including without Termination Premiums, in exchange for the following Plan treatment: (a) payment of $2.0 million from Enterprises on, or as soon as practical after, the occurrence of the Effective Date; (b) $1.0 million from LBH, within one (1) year after the Effective Date, in four (4) equal quarterly payments without interest; and (c) payments from LBH equal to the aggregate distributions to be provided under the Plan to holders of Allowed General Unsecured Claims.

**Trade Debt**. Although the Debtors were generally current with their trade creditors in the time period leading up to the Petition Date, the Debtors estimate that they owe trade creditors approximately $7.5 million, net of payments that will be made to creditors on account of Cure Costs and 503(b)(9) Claims and including anticipated rejection claims.

## G.   Events Leading to the Commencement of the Chapter 11 Cases

In 2007, LBH began to experience an accelerated decline in its patient service revenue. This decline was attributable to a number of factors, including the general economic decline in the region. Recognizing that its revenue was declining and that it needed to align its expense structure to match its declining revenue, in the Spring of 2008, LBH engaged Reliant Health Group, a healthcare consulting company. Reliant Health Group made a series of recommendations to reduce LBH's expenses and enhance revenue, which LBH worked to implement during the Summer and Fall of 2008. Despite these measures, LBH continued to experience monthly operating losses in excess of $500,000 per month throughout 2008.

Annual revenue for the Debtors, on a consolidated basis, was approximately $116 million in the fiscal year ending on June 30, 2007, approximately $125 million in the fiscal year ending on June 30, 2008, approximately $114 million in the fiscal year ending on June 30, 2009 and

14

approximately $98.6 million in the fiscal year ending on June 30, 2010. Net income for the last four fiscal years was as follows:

| | |
|---|---|
| 2007 (one year period ending 6/30/07): | ($2.5 million) |
| 2008 (one year period ending 6/30/08): | ($4.2 million) |
| 2009 (one year period ending 6/30/09): | ($7.3 million) |
| 2010 (one year period ending 6/30/10): | ($7.2 million) |

As a result of these operating losses, the Debtors were unable to make any contributions to the Pension Plan and "froze" the Pension Plan as of June 30, 2009. LBH also failed to make the December 15, 2009 interest payment on the Bonds, which was an event of default under the parties' applicable loan documents that entitled the Bond Trustee to exercise certain remedies thereunder. Concern about the Bond Trustee's potential exercise of these remedies, and the likely impact of such exercise on the Debtors' ability to maintain patient care, was a primary cause of the Debtors' bankruptcy filing. The timing of the Debtors' bankruptcy filing also was motivated by a desire to preserve, for the benefit of the Debtors' bankruptcy estates, the 90-day preference period pertaining to certain actions taken by the Bond Trustee on October 16, 2009, when the Bond Trustee filed certain financing statements naming LBH as the debtor and listing Unrestricted Gross Revenues as the Bond Trustee's collateral.

## H.    Sale and Marketing Efforts

In December 2008, LBH determined that a formal, structured process was needed to find a suitable partner that would assume financial and operational responsibility for LBH. In March of 2009, LBH engaged Joseph W. Marshall, III, former Chief Executive Officer of the Temple University Health System, to advise it with respect to a possible sale or affiliation and to help solicit prospective purchasers of LBH. These efforts led to the identification of several prospects. Certain of these prospects performed due diligence concerning LBH and some provided written expressions of their intent to make a formal offer to purchase. In the summer and early autumn of 2009, the Debtors negotiated intensively with one potential purchaser regarding a sale of substantially all of their assets. These negotiations broke down in early October 2009.

In September 2009, LBH engaged SSG Capital Advisors, LLC ("SSG") to assist in the marketing process. Shortly after the Petition Date, the Debtors filed an application with the Bankruptcy Court seeking authority to retain SSG on a post-petition basis. SSG has contacted a number of strategic buyers, rehabilitation hospitals and nursing homes, surgical centers and financial buyers to solicit interest in purchasing or affiliating with LBH. Certain of these parties requested confidentiality agreements in order to receive more detailed information about the Debtors, and approximately 20 signed such agreements.

Although SSG ultimately received expressions of potential interest from three parties, in the Debtors' judgment SSG did not receive any viable offers from a potential buyer reasonably likely to consummate a transaction. As a result, the Debtors have concluded that a stand-alone plan of reorganization, rather than a plan contemplating a sale of their assets to a third party, is in the best interests of all parties.

15

## I.      Table Gaming Legislation

In January 2010, the Commonwealth of Pennsylvania enacted legislation (4 Pa. Stat. Ann. § 13A02-04 (2010)) that allows licensed Pennsylvania casinos to add blackjack, poker, roulette and dice (table games) at their facilities. In March 2010, the Pennsylvania Gaming Control Board approved Parx Casino/Philadelphia Park Racetrack in Bucks County as a licensed facility for table gaming. As part of this legislation, Parx Casino/Philadelphia Park Racetrack is required to pay a "local share" of two percent (2%) of its gross table game revenue to Bucks County. Bucks County is in turn required to pay one-half of this amount to LBH, as grants, so long as LBH remains a non-profit hospital.

The Debtors, Bucks County and the Redevelopment Authority of Bucks County ("RDA") have agreed on a "monetization" of these grants for the benefit of LBH. The Debtors anticipate that this monetization will include: (i) the issuance by the RDA of new bonds (defined in the Plan as the "2011 Bonds") in the approximate amount of $14 million, for the benefit of LBH; (ii) use of the Table Gaming Grants to pay debt service on the 2011 Bonds, on a non-recourse basis; and (iii) the issuance of a full faith and credit guaranty of such bonds by Bucks County. On December 15, 2010, the Commissioners of Bucks County issued an ordinance authorizing the County to issue a full faith and credit guaranty of the 2011 Bonds, ensuring the 2011 Bonds' marketability. Bucks County's guaranty was submitted to the Pennsylvania Department of Community and Economic Development, which approved the guaranty on or about January 19, 2011. This monetization is a key source of the funding for the Plan.

## VI.

## THE CHAPTER 11 CASES

### A.      Commencement of the Chapter 11 Cases

On January 13, 2010, each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania. The Debtors' cases have been assigned to the Honorable Eric L. Frank.

### B.      Continuation of Business After the Petition Date

Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As discussed below, during the period immediately following the Petition Date, the Debtors sought and obtained authority from the Bankruptcy Court with respect to a number of matters that were, in the Debtors' view, essential to the Debtors' orderly transition into chapter 11 and the stabilization of the Debtors' operations.

#### a)      Use of Cash Collateral

Without the use of cash collateral, the Debtors would have been unable to ensure adequate patient care and likely would have been forced to immediately discontinue all business operations. Accordingly, shortly after the Petition Date, the Debtors filed a motion for the entry of an interim order: (i) authorizing the Debtors to use the Bond Trustee's asserted cash collateral;

(ii) granting adequate protection to the Bond Trustee; and (iii) scheduling a final hearing to consider granting the relief requested on a final basis (the "Cash Collateral Motion"). The Cash Collateral Motion requested, among other things, that certain adequate protection be provided to the Bond Trustee. This adequate protection included: (i) replacement liens on certain of LBH's assets, with the same validity, priority and avoidability as the Bond Trustee's liens as of the Petition Date; (ii) a super-priority claim pursuant to section 507(b) of the Bankruptcy Code; (iii) certain financial reporting by the Debtors; and (iv) the establishment of a deadline for the Debtors to commence litigation against the Bond Trustee on account of, among other things, the Bond Trustee's filing of financing statements naming LBH as debtor on October 16, 2009.

On January 15, 2010, the Bankruptcy Court entered an interim order [D.I. 47] authorizing the Debtors to use cash collateral and granting adequate protection to the Bond Trustee. Thereafter, on February 1, 2010, the Committee filed a limited objection [D.I. 114] in which it requested certain changes to the interim order, such as an extension of time to commence litigation against the Bond Trustee, and sought to reserve certain rights. The Bankruptcy Court entered a revised interim order addressing the Committee's requested changes, as agreed upon by the Debtors and the Bond Trustee, on February 5, 2010 [D.I. 120]. Since that date, several interim orders have been entered by the Bankruptcy Court, authorizing the Debtors' continued use of cash collateral and granting adequate protection to the Bond Trustee, subject to certain terms and conditions.

### b)     Bankruptcy-Related Relief

The Debtors sought various other types of "first day" relief, including, among other things, orders: (i) directing the joint administration of the Debtors' related bankruptcy cases; (ii) authorizing the Debtors to continue using their existing cash management systems; (iii) authorizing the Debtors to pay certain pre-petition obligations to their employees; (iv) prohibiting the Debtors' utility companies from altering, refusing or discontinuing service; and (v) establishing procedures for the assertion of claims pursuant to section 503(b)(9) of the Bankruptcy Code.

The Debtors filed a motion (the "Joint Administration Motion") pursuant to section 105(a) of the Bankruptcy Code and Rule 1015(b) of the Bankruptcy Rules for an order directing the joint administration of the Debtors' Chapter 11 Cases for procedural purposes only. This motion was granted by the Bankruptcy Court on January 15, 2010 [D.I. 39].

The Debtors also filed a motion (the "Cash Management Motion") pursuant to sections 105(a) and 363(c) of the Bankruptcy Code seeking authority, inter alia, to: (i) continue to use their pre-Petition Date cash management system, bank accounts, business forms and investment practices; and (ii) grant administrative expense priority to post-petition intercompany claims. On January 15, 2010, this motion was granted by the Bankruptcy Court [D.I. 61].

The Debtors filed a motion for authority to pay, among other things, pre-petition wages, salaries, bonuses and other compensation, reimbursable employee benefits and employee medical benefits (the "Employee Motion"). The Debtors also sought authority to: (i) continue to use their pre-Petition Date physician incentive program; (ii) pay fees to a temporary agency for work performed by temporary employees; (iii) allow employees to use paid vacation days in the

17

ordinary course of the Debtors' businesses; (iv) remit pre-petition amounts withheld or deducted from employee wages to the appropriate third parties; and (v) make further payments in the ordinary course of, or with respect to, employee benefits, workers' compensation obligations, union obligations and obligations to administrative service providers. This motion was granted, with certain modifications, by order dated January 15, 2010 [D.I. 57].

The Debtors filed a motion seeking entry of interim and final orders under sections 105(a) and 366 of the Bankruptcy Code: (i) determining that utility providers were provided with adequate assurance of payment; (ii) approving procedures whereby utility providers may request additional or different adequate assurance; and (iii) prohibiting utility providers from altering, refusing or discontinuing service to the Debtors (the "Utilities Motion"). Several utility providers objected to the relief sought in the Utilities Motion and the Debtors consensually resolved such objections pursuant to stipulations. On February 12, 2010, the Bankruptcy Court granted certain of the relief requested in the Utilities Motion with, among other things, modifications to account for the terms of the stipulations [D.I. 149].

The Debtors also filed a motion [D.I. 10] seeking entry of an order establishing procedures for the assertion of section 503(b)(9) claims. The Bankruptcy Court entered an order approving this motion on January 15, 2010 [D.I. 59], pursuant to which section 503(b)(9) claims are subject to the bar date set for the filing of all pre-Petition Date claims. The Bankruptcy Court specified in its order that section 503(b)(9) claimants were not to file motions to compel the allowance and payment of their claims prior to March 1, 2010, and that all motions or other proceedings initiated to assert rights under section 503(b)(9) would be stayed until March 1, 2010.

## C.    Representation of the Debtors

On January 19, 2010, the Debtors filed an application to retain Saul Ewing LLP as bankruptcy counsel in connection with the Chapter 11 Cases [D.I. 81]. By order dated February 12, 2010, the Bankruptcy Court approved this application [D.I. 147].

By orders dated February 12, 2010 [D.I. 145, 146, respectively], the Bankruptcy Court also approved the Debtors' applications to retain Executive Sounding Board Associates Inc. as their financial advisor and SSG as their investment banker. On June 8, 2010, the Debtors filed a modified application to employ SSG as investment banker to the Debtors [D.I. 394]. This application was granted by the Bankruptcy Court on June 30, 2010 [D.I. 468].

## D.    Formation and Representation of the Committee

On or about January 22, 2010, the United States Trustee appointed the Committee [D.I. 98]. The current members of the Committee are:

> Siemens Medical Solutions, USA, Inc.
> Horizon Mental Health Management, LLC
> Owens & Minor
> AmerisourceBergen
> Sodexo, Inc.
> PECO Energy Company

18

Crothall Services Group

By order dated March 8, 2010, the Bankruptcy Court approved the Committee's application to retain the law firm of Blank Rome LLP [D.I. 211] as its counsel. On April 8, 2010, the Bankruptcy Court approved the Committee's application to retain Deloitte Financial Advisory Services LLP as its financial advisor [D.I. 272].

**E.    Appointment of Patient Care Ombudsman**

On January 15, 2010, the Bankruptcy Court entered an order requiring the United States Trustee to appoint a patient care ombudsman to carry on the obligations set forth in sections 333(b) and 333(c) of the Bankruptcy Code. On February 3, 2010, the United States Trustee appointed Eric Huebscher (the "Patient Care Ombudsman") of NHB Advisors, Inc., as patient care ombudsman [D.I. 118]. By order dated May 14, 2010, the Bankruptcy Court authorized the Patient Care Ombudsman to retain the firm of Cooley Godward Kronish LLP as counsel [D.I. 358].

Pursuant to section 333(b) of the Bankruptcy Code, no later than 60 days after the date of a patient care ombudsman's appointment, and at least every 60 days thereafter, the patient care ombudsman must report to the court, after notice to parties in interest, regarding the quality of patient care provided to the debtor's patients. In the present case, the Patient Care Ombudsman has filed such reports on the following dates: (i) April 5, 2010 [D.I. 255]; (ii) June 2, 2010 [D.I. 384]; (iii) August 2, 2010 [D.I. 528]; (iv) September 30, 2010 [D.I. 651]; (v) November 29, 2010 [D.I. 790]; (vi) January 28, 2011 [D.I. 911]; (vii) March 29, 2011 [D.I. 1032]; and (vii) May 26, 2011 [D.I. 1139].

**F.    Matters Relating to Unexpired Leases and Executory Contracts**

Section 365 of the Bankruptcy Code grants a debtor the authority, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. Section 365(d)(4) of the Bankruptcy Code further provides that if a debtor does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within (i) 120 days after the petition date (the "Section 365(d)(4) Deadline"), (ii) an additional 90-day period as the bankruptcy court, for cause, may allow, or (iii) such additional time as the bankruptcy court may permit with the consent of the landlord of the leased premises, such lease will be deemed rejected.

By order of the Bankruptcy Court entered May 14, 2010, the Bankruptcy Court extended the initial Section 365(d)(4) Deadline through and including August 11, 2010 [D.I. 351]. By order entered November 19, 2010, the Bankruptcy Court further extended the Section 365(d)(4) Deadline through and including the Effective Date [D.I. 774].

The Debtors are parties to approximately 450 executory contracts and unexpired leases. By order dated April 9, 2010, the Bankruptcy Court granted the Debtors' motion to reject an equipment lease agreement with First Financial Corporate Services, Inc. [D.I. 316]. Generally, the Plan contemplates the rejection of all executory contracts and unexpired leases as of, and

19

subject to, the occurrence of the Effective Date, except for any executory contract or unexpired lease specifically designated for assumption, as set forth in the Plan.

## G.   The HyperOx Lease

As of the Petition Date, HyperOx I, L.P. and certain related entities (collectively, "HyperOx") and the Debtors were parties to a lease agreement, as amended, under which HyperOx leased certain equipment and personnel needed for the Debtors to provide hyperbaric oxygen treatment to patients. Specifically, the HyperOx Lease consisted of: (i) an original lease dated March 19, 2007 (the "Original Lease") for the provision by HyperOx of hyperbaric oxygen treatment equipment at LBH's Bath Road facility; (ii) an amended lease dated January 2, 2009 (the "Amended Lease") for the provision of an additional hyperbaric oxygen chamber and wound care services at LBH's Roosevelt Boulevard facility; and (iii) an addendum dated June 27, 2008 (the "Addendum"), extending the term of the Original Lease as amended by the Amended Lease. The Original Lease, together with the Amended Lease and the Addendum are collectively referred to as the "HyperOx Lease."

On March 3, 2010, HyperOx filed a motion (the "HyperOx Motion") requesting that the Bankruptcy Court: (i) allow payment of an administrative claim in the amount of approximately $240,000 for post-petition services provided by HyperOx under the HyperOx Lease; (ii) direct the Debtors to pay HyperOx in accordance with the terms and conditions of the HyperOx Lease; and (iii) direct the Debtors to provide an accounting to HyperOx of all post-petition hyperbaric oxygen services provided by the Debtors.

On March 19, 2010, the Debtors filed a motion for entry of an order authorizing the Debtors to reject the HyperOx Lease under section 365 of the Bankruptcy Code (the "Rejection Motion"). Thereafter, LBH and HyperOx entered into a stipulation (the "First Stipulation") resolving the Rejection Motion pursuant to which the parties agreed that: (i) the Amended Lease would be terminated pursuant to a termination agreement; (ii) the Original Lease and the Addendum, referred to thereafter as the "Modified Agreement," would remain in effect; and (iii) LBH would pay the amount of $60,000 to HyperOx, to be applied to LBH's post-petition obligations with respect to hyperbaric oxygen treatment services provided at LBH's Bath Road facility. The First Stipulation further provided for the preservation of certain claims of HyperOx and provided, further, that HyperOx could not assert any rejection claim on account of or related to wound care services or the HyperOx Lease. By order dated April 22, 2010 [D.I. 303], the Bankruptcy Court approved the First Stipulation.

On May 4, 2010, the Bankruptcy Court entered an order establishing certain discovery deadlines with respect to the HyperOx Motion and setting a hearing date on the Rejection Motion [D.I. 336]. Thereafter, on May 12, 2010, certain HyperOx entities filed an adversary complaint against the Debtors pursuant to which they made certain allegations about the Debtors' actions with respect to the HyperOx Lease and demanded the turnover of certain funds held in an escrow account.

After the parties completed discovery and held settlement discussions, they entered into a stipulation to resolve both the Rejection Motion and the HyperOx Motion (the "Second Stipulation"). The Second Stipulation provided, inter alia, that: (i) the parties would execute a

20

termination agreement to govern the termination of the Modified Agreement; (ii) the Debtors would pay $110,000 to HyperOx in full and final settlement and release of any administrative expense claim against the Debtors and any claim that HyperOx has any interest in, or right to, certain funds; (iii) HyperOx would withdraw its adversary complaint; and (iv) HyperOx would, without causing damage to the Debtors' properties, remove its hyperbaric oxygen chamber, modular mobile buildings and all other equipment located on the Debtors' premises at its sole cost. The Bankruptcy Court approved the Second Stipulation by order entered July 1, 2010 [D.I. 473]. HyperOx removed its hyperbaric oxygen chamber and related equipment thereafter. Separately, and as permitted by the Second Stipulation, HyperOx asserted unsecured claims against each of the Debtors. Certain of these claims have been assigned, in whole or in part, to Dr. Reddy Dandolu. HyperOx's asserted unsecured claims have not been adjudicated.

As of November 15, 2010, certain HyperOx entities – HyperOx, Inc., HyperOx I, LP, HyperOx III, LP and East Coast TMR, Inc. – merged into WJO, Inc. WJO, Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on November 15, 2010.

## H.    Exclusivity

The Debtors have received several extension of the time periods in which they have the exclusive right to file a chapter 11 plan (the "Exclusive Filing Period") to solicit acceptances of such filed Plan (the "Exclusive Solicitation Period"). The Debtors' Exclusive Filing Period and Exclusive Solicitation Period are currently extended through July 8, 2011 and September 6, 2011.

## I.    Schedules and Bar Date

On January 15, 2010, the Bankruptcy Court entered an order extending the deadline by which the Debtors were required to file their Schedules and Statements of Financial Affairs to February 18, 2010. On February 18, 2010, the Debtors filed their Schedules and Statements of Financial Affairs [D.I. 157, 158, 159, 160, 161, 162]. As set forth in the Schedules, as of the Petition Date, the Debtors' consolidated assets and liabilities were $53,156,924.49 and $76,192,672.38, respectively.

By order entered July 1, 2010, the Bankruptcy Court established August 20, 2010 as the deadline for holders of all alleged pre-petition claims against the Debtors to file proofs of claim [D.I. 475].

## J.    Monthly Operating Reports

The Debtors have filed monthly operating reports in accordance with Bankruptcy Code section 704 and Federal Rule of Bankruptcy Procedure 2015 on the following dates: (i) April 7, 2010 [D.I. 264, 265, 266, 267]; (ii) May 3, 2010 [D.I. 326, 327, 328]; (iii) May 27, 2010 [D.I. 379, 380, 381]; (iv) July 8, 2010 [D.I. 502, 503, 504]; (v) August 3, 2010 [D.I. 536, 537, 538]; (vi) September 3, 2010 [D.I. 595, 596, 597]; (vii) October 1, 2010 [D.I. 655, 656, 657]; (viii) November 2, 2010 [D.I. 735, 736, 737]; (ix) December 1, 2010 [D.I. 794, 795, 796]; January 3, 2011 [D.I. 854, 855, 856]; February 3, 2011 [D.I. 918, 919, 920]; (x) March 1, 2011 [D.I. 977, 967, 968] and (xi) April 6, 2011 [D.I. 1055, 1056, 1057].

Selected portions of the Debtors' monthly operating reports for April 2011 are attached hereto as collective Exhibit "B".

## K.   Asserted Claims

Approximately 474 proofs of claim have been filed with the Debtors' Claims Agent, with the total amount asserted, including scheduled claims, being approximately $506 million. Specifically, the proofs of claim can be broken into the following groups:

| CLASS | CLASS TITLE | NO. CLAIMS | AMOUNT ($) |
|---|---|---|---|
| A1 | LBH Priority Non-Tax Claims | 12 | 305,782.22 |
| A2 | PBGC Priority Claims | 2 | Unliquidated |
| A3 | Bond Trustee Secured Claim | 1 | 24,870,000.00 |
| A4 | LBH Other Secured Claims | 36 | 1,795,819.00 |
| A5 | PBGC General Unsecured Claim | 4 | 27,051,332.00 |
| A6 | Bond Trustee Unsecured Claim | 1 | Unliquidated |
| A7 | LBH General Unsecured Claims | 234 | 17,372,995.01 |
| A8-A | LBH Stipulated Medical Malpractice Claims | 25 | 162,091,180.08 |
| A8-B | LBH Non-Stipulated Medical Malpractice Claims | 27 | 179,680,000.00 |
| A9 | LBH Convenience Claims | 460 | 476,334.32 |
| B1 | Enterprises Priority Non-Tax Claims | 0 | 0 |
| B2 | PBGC Priority Claims | 2 | Unliquidated |
| B4 | Enterprises Other Secured Claims | 1 | 609.57 |
| B5 | PBGC General Unsecured Claim | 4 | 27,051,332.00 |
| B7 | Enterprises General Unsecured Claims | 22 | 3,069,910.89 |
| n/a | Enterprises Stipulated Medical Malpractice Claims | 3 | 15,400,000.00 |
| n/a | Enterprises Non-Stipulated Medical Malpractice Claims | 0 | 0 |
| B9 | Enterprises Convenience Claims | 10 | 23,753.02 |
| C1 | APC Priority Non-Tax Claims | 0 | 0 |
| C2 | PBGC Priority Claims | 2 | Unliquidated |
| C4 | APC Other Secured Claims | 0 | 0 |
| C5 | PBGC General Unsecured Claim | 4 | 27,051,332.00 |
| C7 | APC General Unsecured Claims | 13 | 2,022,480.92 |
| n/a | APC Stipulated Medical Malpractice Claims | 4 | 16,900,000.00 |
| n/a | APC Non-Stipulated Medical Malpractice Claims | 0 | 0 |
| C9 | APC Convenience Claims | 40 | 15,545.10 |

In addition, 31 administrative Claims have been filed, in the total amount of $516,753.33. Twenty-one of these Claims are section 503(b)(9) claims, which total $512,194.79. Nine of the remaining ten Claims were asserted by the PBGC in unliquidated amounts, with the remaining Claim, asserted by a vendor, in the amount of $4,558.54.

In the ordinary course of business, the Debtors maintain books and records that reflect, *inter alia*, the Debtors' liabilities and the amounts owed to creditors in connection with such liabilities. To determine the validity of the proofs of claim submitted in the Chapter 11 Cases, the Debtors and their professionals will review the proofs of claim, including any supporting documentation, and compare the Claims asserted with the Debtors' books and records. Based upon this review, the Debtors may file procedural and substantive objections to Claims both before and after the Effective Date. For present purposes, the Debtors have set forth in section IV(B), above, a chart that contains estimates of the actual amounts the Debtors believe are owed

to creditors. Although these estimates have been prepared in good faith, the Debtors do not warrant their accuracy.

## L.    Medical Malpractice Claims

Approximately 59 proofs of claim have been filed which arise from pre-petition Medical Malpractice Claims. Twelve medical malpractice claimants have sought relief from, or a modification of, the automatic stay under Bankruptcy Code section 362 in order to continue pursuing their medical malpractice actions against the Debtors and other codefendants. All twelve of these motions have been resolved and, in exchange for consensual relief from the automatic stay, the claimants have agreed to waive their Medical Malpractice Claims against the Debtors' Estates and look only to the Debtors' available insurance for any recovery. The Debtors have entered into similar stipulations with seven other medical malpractice claimants that did not file motions for relief from stay. Due to the resolution of these Claims, the Debtors estimate, as stated above, that the amount of unsecured Medical Malpractice Claims against the Debtors has been reduced from approximately $374,071,180.08 to approximately $179,680,000.00.

## M.    Insurance Premium Financing Motions

On January 21, 2010, the Debtors filed a motion for entry of an order pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, granting the Debtors authority to honor a prepetition insurance premium financing agreement. In the ordinary course of the Debtors' businesses, and pursuant to an existing insurance premium financing agreement, the Debtors financed the premiums for two insurance policies (collectively, the "Financed Policies"). By the motion, the Debtors sought to continue honoring their obligations under the insurance premium financing agreement as a means to preserve the Debtors' cash flow and estates. The Bankruptcy Court entered an order granting the relief requested by the Debtors on February 16, 2010 [D.I. 148].

On June 8, 2010, the Debtors filed a motion pursuant to section 364(c)(2) of the Bankruptcy Code for authority to enter into a new insurance premium financing agreement in connection with their renewal of the Financed Policies. The aggregate amount of the premiums financed is $2,412,806. By order entered July 2, 2010, the Bankruptcy Court granted the relief sought in the Debtors' motion [D.I. 477]. On June 22, 2011, the Debtors filed another motion pursuant to section 364(c)(2) of the Bankruptcy Code for authority to enter into an insurance premium finance agreement. In this motion [D.I. 1184], the Debtors sought financing in connection with their renewal of eight insurance policies that were set to expire. The aggregate amount of premiums financed under the agreement is $1,596,915.

## N.    Motion to Pay Prepetition Claims of Critical Service Providers

On March 19, 2010, the Debtors filed a motion for an order authorizing the Debtors, in their sole discretion, to pay certain pre-petition claims of certain physicians who provide critical services to the Debtors. Because any cessation of these services would cause immediate harm to the Debtors' Estates, the Debtors sought to pay the critical service providers' claims, which were in the aggregate amount of approximately $60,000, on the condition that the providers continue to supply services to the Debtors.

A hearing on the Debtors' motion was held on April 9, 2010 before the Bankruptcy Court. Following the hearing, the Bankruptcy Court entered an order granting the relief requested by the Debtors [D.I. 279].

## O.  The Bond Trustee Litigation

### (a)  Description of the Litigation

The Initial Complaint: On April 30, 2010, the Debtors filed an adversary complaint against the Bond Trustee [Adv. No. 10-00174-elf]. The adversary complaint asserted, among other things, that: (i) the Bond Trustee's asserted lien and security interest in the Debtors' Unrestricted Gross Revenues (essentially, LBH's cash and accounts receivable) is avoidable as a preference under section 547(b) of the Bankruptcy Code because it purportedly was "perfected" within 90 days of the Petition Date, when the Bond Trustee filed one or more financing statements naming LBH as the debtor; (ii) the Bond Trustee's asserted security interest in funds held in certain bank accounts and the Reserve Funds is not perfected; and (iii) the Bond Trustee had no right under the Indenture to use funds in the Reserve Funds for the payment of its fees and expenses.

On June 9, 2010, the Bond Trustee filed a motion to dismiss the Bond Trustee Litigation. In its motion, the Bond Trustee contended, among other things, that (i) its filing of financing statements in the 90-day period prior to LBH's bankruptcy filing was protective only, and cannot be avoided, because its security interest in LBH's Unrestricted Gross Revenues has been perfected since 1992 due to certain revisions made to Article 9 of the Uniform Commercial Code in 2001; (ii) some or all of the Debtors' complaint is barred under the in pari delicto doctrine because the Debtors allegedly had a duty to ensure that the Bond Trustee's security interests were at all times perfected; (iii) the Debtors lack standing to challenge the Bond Trustee's security interests in the Reserve Funds because the Debtors have no interest in such funds; and (iv) the Bond Trustee exercised control over the Reserve Funds and was expressly permitted under the Indenture to deduct any amounts owed to it from those funds.

After the parties briefed the issues, the Bankruptcy Court entered an order granting in part and denying in part the Bond Trustee's motion to dismiss and granting LBH leave to amend certain counts of its complaint.

The First Amended Complaint. On September 1, 2010, LBH filed its First Amended Complaint ("First Amended Complaint"), under which it sought: (i) to avoid, as a preference, the financing statements filed by the Bond Trustee within 90 days of LBH's bankruptcy filing; (ii) a declaratory judgment that the Bond Trustee lacks a properly perfected security interest in LBH's bank accounts and in the Reserve Funds, and (iii) a declaratory judgment that the Bond Trustee has no right under the Indenture to pay its fees and expenses from the Reserve Funds. The First Amended Complaint also contained an objection to the proof of claim filed by the Bond Trustee against LBH on August 18, 2010, in the amount of $25,906,294.98, plus interest and fees (the "Bond Trustee Claim") because LBH believes the amount of the Bond Trustee Claim is overstated by approximately $900,000.

On September 23, 2010, the Bond Trustee moved to dismiss that portion of the First Amended Complaint that seeks a declaration that the Bond Trustee does not have a properly perfected security interest in the Reserve Funds. After briefing by the parties, the Bankruptcy Court entered an order dated October 18, 2010, denying the Bond Trustee's motion to dismiss and directing the Bond Trustee to file an answer to the First Amended Complaint on or before November 28, 2010.

Committee Intervention. On October 25, 2010, the Committee filed a motion to intervene in the adversary proceeding. The Bond Trustee filed a response to the Committee's motion on November 11, 2010. Thereafter, the Bankruptcy Court granted the Committee's motion by order dated November 18, 2010. On November 24, 2010, the Committee filed a joinder to the Debtors' First Amended Complaint.

The Bond Trustee's Answer and Third Party Complaint. The Bond Trustee filed an answer to the First Amended Complaint on November 29, 2010.[8] The Bond Trustee also filed a third party complaint against the Borough of Langhorne Manor Higher Education and Health Authority (the "Authority"), the entity that had issued the Bonds. The Bond Trustee asserted in its third party complaint that if its interest in LBH's Unrestricted Gross Revenues is not perfected and if LBH is determined not to have an obligation to maintain the perfection of its security interests, the Authority should be liable for any damage or loss to the Bond Trustee as a result of such lack of perfection. On December 1, 2010, the Bankruptcy Court entered an order scheduling a hearing to consider whether it could exercise subject matter jurisdiction over the Bond Trustee's third party complaint. A hearing to consider whether the Bond Trustee's third party complaint against the Authority should be dismissed for lack of subject matter jurisdiction was scheduled for February 7, 2011. At such hearing, the Bond Trustee stated that it would consensually withdraw its third party complaint against the Authority. This withdrawal occurred on March 21, 2011.

The Bond Trustee's Proposed First Amended Answer, Counterclaims and Third Party Claims. On June 9, 2011, the Bond Trustee filed a motion seeking leave of the Bankruptcy Court to file its proposed First Amended Answer, Counterclaims, and Third Party Claims (the "Proposed Amended Answer"). Among other things, the Proposed Amended Answer includes the following assertions: (a) that LBH held Gross Unrestricted Revenues in express trust for the benefit of holders of the Bonds; (b) that LBH held Gross Unrestricted Revenues in constructive Trust for holders of the Bonds; and (c) that the Bond Trustee has recoupment claims against LBH, based on alleged express or constructive trust, breach of contract, conversion and unjust enrichment theories. The Bond Trustee also seeks, through its Proposed Amended Answer, to assert two causes of action pursuant to the orders entered by the Bankruptcy Court regarding Cash Collateral. Specifically, the Bond Trustee seeks, among other things: (i) a declaratory judgment that it is entitled to adequate protection against any diminution of the Bond Trustee's collateral position during these cases; and (ii) a declaration that the Debtors' professionals' fees and expenses have not benefitted the Bond Trustee, that the amount of such fees and expenses

---

[8]     LBH and the Committee had agreed, and the Bankruptcy Court concurred, that the Bond Trustee could file its Answer on November 29, 2010 rather than November 28, 2010.

should not be "surcharged" against the Bond Trustee's collateral and that the amount of such fees and expenses should be added to the Bond Trustee's alleged secured claim.

### (b)   The Parties' Positions – A Summary

As noted above, the parties to the Bond Trustee Litigation disagree on many issues.

*Continuous Perfection.* Among the parties' most significant disagreements is whether the Bond Trustee was continuously perfected since 1992. If the Bond Trustee was continuously perfected since 1992, as it asserts, its actions in the 90 day period prior to LBH's bankruptcy filing would have had no effect, and therefore could not be an avoidable preference. In arguing that it was continuously perfected since 1992, the Bond Trustee relies on revisions to the Pennsylvania Uniform Commercial Code that became effective in 2001. Pursuant to the revised Uniform Commercial Code, but solely under certain circumstances, financing statements (which typically are effective only for five years) may remain effective for 30 years if certain conditions are satisfied.

LBH does not believe the financing statements filed by the Bond Trustee (or a predecessor trustee) in 1992 satisfied, or could have satisfied, these conditions, which were not established until 2001. Moreover, and among other things, LBH believes that the 30-year effective period for financing statements can only be obtained by the filing of an "addendum" to a UCC-1 financing statement, which did not take place. As part of their briefing on the Bond Trustee's motion to dismiss the Initial Complaint, the Debtors produced several articles, published in anticipation of the effective date of the amendment, in 2001, to Article 9 of the Uniform Commercial Code, that financing statements filed prior to 2001 could not be eligible for the 30-year effective period that the Bond Trustee asserts. The Bond Trustee has cited no contrary authority.

*In Pari Delicto.* The Bond Trustee also argues, among other things, that LBH is barred from seeking to avoid the Bond Trustee's asserted liens on Unrestricted Gross Revenues based on a theory of in pari delicto, or "unclean hands." That is, the Bond Trustee contends that LBH had a contractual obligation to ensure that the Bond Trustee's liens were at all times perfected, and as a result cannot now assert that such liens were not perfected. The Debtors believe this argument has no merit. As set forth in its various briefs, the in pari delicto defense has never been successfully asserted as a defense to a preference action. The Debtors believe that preference actions are subject only to the statutory defenses that are set forth in the Bankruptcy Code, and that the in pari delicto defense has only been applied to actions brought under nonbankruptcy law, such as negligence actions.

*Reserve Funds.* Another issue of dispute is whether the Bond Trustee has ownership of or, or a perfected security interest in, the Reserve Funds. The Debtors argue that the Bond Trustee does not have ownership of the Reserve Funds or a perfected security interest in the Funds because the Bond Trustee does not have "control" over such Funds under the Uniform Commercial Code, due to the fact that the Funds are held by an affiliate of the Bond Trustee, The Bank of New York Mellon, N.A. ("Bank of New York Mellon"), rather than the Bond Trustee itself. In this regard, the Bond Trustee asserts a number of arguments: (i) that it properly has control pursuant to section 9-104 of the Uniform Commercial Code; (ii) that it has an agency

26

relationship with Bank of New York Mellon; (iii) that the Funds are held in trust; and (iv) that the Cash Collateral Orders issued by the Court reflect a concession that the Bond Trustee has control over the Funds. The Debtors contest each of these arguments.

*Permitted Use of Reserve Funds*. The Bond Trustee further argues that it has the right to pay its fees and expenses out of the Reserve Funds pursuant to the terms of the Indenture. The Debtors argue that the Bond Trustee has no such right because the Reserve Funds constitute property of the LBH bankruptcy estate and the Bond Trustee's interest in such Reserve Funds is not perfected.

*The Bond Trustee's Claim*. The Debtors assert that the Bond Trustee's Claim is overstated by approximately $900,000 because, in the calculation of its Claim, the Bond Trustee has failed to give LBH credit for approximately $900,000 that the Bond Trustee removed from the Reserve Funds shortly before the Petition Date. The Debtors do not believe that the Bond Trustee has articulated any basis for its failure to provide LBH with a credit for this amount in the calculation of its Claim.

*Express/Constructive Trust Assertions*. The Bond Trustee asserts that LBH held Unrestricted Gross Revenues in express and/or constructive trust for the benefit of the holders of the Bonds. The Debtors are aware of no provisions of the parties' underlying loan documents that provide that LBH holds Unrestricted Gross Revenues in express trust for the holders of Bonds. Similarly, the Debtors do not believe that the Bond Trustee has alleged, or can allege, any facts that would support the imposition of a constructive trust with respect to Unrestricted Gross Revenues.

*Recoupment Theories*. The Bond Trustee asserts that LBH's avoidance actions are subject to the Bond Trustee's alleged right of recoupment, by virtue of the Bond Trustee's alleged claims for express or constructive trust, breach of contract, conversion and unjust enrichment and, further, that the Bond Trustee's security interest in Unrestricted Gross Revenues is retained. The Debtors believe there is no merit to these assertions, which in the Debtors' view are unsupported by legal precedent and contrary to fundamental principles of commercial law. Moreover, the Debtors believe that the Bond Trustee's underlying allegations regarding alleged express or constructive trust, breach of contract, conversion and unjust enrichment are without merit.

*Cash Collateral – Adequate Protection*. As noted above, the Bond Trustee seeks to assert certain rights to adequate protection for its alleged rights in cash collateral. The Bankruptcy Court has entered several orders, on consent, authorizing use of cash collateral and providing the Bond Trustee with adequate protection, subject to certain terms and conditions. The Debtors believe, among other things, that to the extent the adequate protection requested in the Proposed Amended Answer is identical to the adequate protection provisions contained in the Bankruptcy Court's prior orders regarding cash collateral, the Bond Trustee's requested relief is unnecessary. The Debtors further believe, alternatively, that to the extent the relief requested in the Proposed Amended Answer is different from the provisions contained in the Bankruptcy Court's prior orders regarding cash collateral, the Proposed Amended Answer constitutes an improper and belated collateral attack on already-entered orders of the Bankruptcy Court.

*Cash Collateral – Surcharge Assertion.* The Bond Trustee seeks, in its Proposed Amended Answer, to add the fees and expenses of the Debtors' professionals to the amount of the Bond Trustee's alleged secured claim, based on the allegation that such fees and expenses have not benefited the Bond Trustee and that such fees and expenses cannot properly be surcharged against the Bond Trustee's alleged collateral. The Bond Trustee also seeks a replacement lien on all unencumbered property of the estate equal to the amount of the Bond Trustee's alleged collateral used to pay such fees and expenses, as well as certain superpriority administrative claims. The Debtors believe that none of these arguments has merit. In the Debtors' view, and among other things, no "surcharge" has occurred. Rather, the Bond Trustee has consented to the Debtors' use of asserted cash collateral to pay professional fees and other costs of administering the Debtors' bankruptcy cases. The Debtors further believe that any right of the Bond Trustee to replacement liens, superpriority claims and adequate protection is governed by the Bankruptcy Court's orders regarding cash collateral, and that there is no basis, under either the Bankruptcy Court's cash collateral orders or otherwise, for the amount of the Debtors' professional fees and expenses to be added to the Bond Trustee's alleged secured claim. Holders of Bonds, and other persons, wishing to review the specific pleadings and assertions made by the parties in the Bond Trustee Litigation can do so by reviewing the Bankruptcy Court docket, which can be accessed at http://www.pacer.gov/cgi-bin/links.pl.

(c)    **The Settlement**

As indicated above, the Debtors and the Bond Trustee have reached an agreement regarding the settlement of the Bond Trustee Litigation. The Debtors believe that this settlement is beneficial to Bondholders, and that Bondholders accordingly should vote to accept the Plan, for the following reasons:

(i)    The settlement was negotiated, intensively, over a period of many months with the Bond Trustee and its advisors (the law firm of Bryan Cave LLP and accounting firm of Grant Thornton LLP) in consultation with several Bondholders holding approximately 50% of the outstanding principal amount of the Bonds.

(ii)    The settlement gives Bondholders a significantly greater recovery than that realized by other creditors. Whereas general unsecured creditors are expected to realize an approximately 18.5% recovery on their Allowed Claims under the Plan, Bondholders will receive a recovery of approximately 35% on their Allowed Claims.

(iii)    The settlement provides holders of the Bonds with a much quicker recovery than they would realize if the Bond Trustee Litigation were to continue.

(iv)    The Bond Trustee has informed the Debtors that, absent the settlement, it will exercise its right under the Indenture to stop defending the Bond Trustee Litigation unless it receives a contrary directive from the owners of a majority in principal amount of the Bonds, together with an indemnity from such Bondholders.

(v)    The proposed settlement is a favorable result for Bondholders, given the Debtors' view of the strengths and weaknesses of the parties' respective litigation positions. As

28

indicated above, the Debtors believe the contentions of the Bond Trustee in the Bond Trustee Litigation have no merit.

**(d)    Recommendation**

For these reasons, the Debtors strongly recommend that holders of Bonds vote to <u>accept</u> the Plan, in both Class A3 and Class A6.

**P.    PASNAP Letter Agreement and Debtors' Rule 9019 Motion**

On December 17, 2010, the Debtors and PASNAP entered into a letter agreement resolving a dispute between the parties as to whether the parties' CBA remained in effect. The letter agreement contained the following terms: (i) the CBA will remain in effect until June 30, 2011; (ii) the CBA may be terminated before June 30, 2011 (extended by agreement through December 31, 2011) on two weeks prior written notice if such termination is in the context of negotiations for a successor agreement between PASNAP and LBH or if such termination is in the context of negotiations between PASNAP and a potential buyer of LBH; (iii) in the event the Pension Plan is terminated, LBH will, with certain exceptions, negotiate with PASNAP in good faith regarding the establishment of a new retirement plan that will take the form of a defined contribution plan sponsored by LBH; and (iv) the termination of the Pension Plan, or any actions taken by LBH that may result in the termination of the Pension Plan, will not constitute a breach of the CBA.

On December 17, 2010, the Debtors filed motion pursuant to section 363 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules for the approval of the letter agreement with PASNAP [D.I. 828]. The Bankruptcy Court entered an order granting this motion on January 7, 2011 [D.I. 883].

**Q.    Operating Engineers' Letter Agreement and Debtors' Rule 9019 Motion**

On January 6, 2011, the Debtors and the Operating Engineers entered into a letter agreement which provided that: (i) the parties' CBA will remain in effect until January 23, 2012; (ii) the CBA may be terminated before January 23, 2012 on two weeks prior written notice if such termination is in the context of negotiations for a successor agreement between the Operating Engineers and LBH or if such termination is in the context of negotiations between the Operating Engineers and a potential buyer of LBH; (iii) in the event the Pension Plan is terminated, LBH will, with certain exceptions, negotiate with the Operating Engineers in good faith regarding the establishment of a new retirement plan that will take the form of a defined contribution plan sponsored by LBH; and (iv) the termination of the Pension Plan, or any actions taken by LBH that may result in the termination of the Pension Plan, will not constitute a breach of the CBA.

On January 18, 2011, the Debtors filed a motion pursuant to section 363 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules for the approval of the letter agreement with the Operating Engineers [D.I. 894]. The Bankruptcy Court entered an order granting this motion on February 7, 2011 [D.I. 930].

29

**R.**    **Termination of the Pension Plan**

On February 1, 2011, the Debtors submitted a "Form 600" – a formal request for the distress termination of the Pension Plan – to the PBGC. Subsequent to this submission, the Debtors have had certain discussions with the PBGC regarding the potential termination of the Pension Plan, and have responded to certain requests for additional information from the PBGC. As of the date of the submission of the Plan, the PBGC has not indicated whether it believes the Pension Plan should be terminated. A prerequisite to termination of the Pension Plan is the approval of such termination by the Bankruptcy Court and its finding that unless the Pension Plan is terminated, the Debtors will be unable to pay all if their debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process. See 29 U.S.C. § 1341(c)(2)(B)(ii).

**S.**    **Post-Petition Business Operations**

Since January 2010 and continuing into the post-petition period, the Debtors have made a number of operational improvements that, collectively, have enabled the Debtors to stabilize their operations and to improve their financial performance. These improvements include changes in management, certain technological improvements, physician-related changes, as well as other changes.

With respect to management, the Debtors have engaged a number of new key employees, such as (a) a new CEO/President, (b) a new Controller, (c) a new Case Management Director, (iv) a new Business Office Director, (v) a new Patient Access Director, (vi) a new Purchasing Director and (vii) a new Medical Records Director.

The Debtors also have made a number of technological improvements since filing for bankruptcy. Among other things, the Debtors have: installed an emergency room information system; implemented an enhanced purchasing system; converted from a manual timekeeping system to an electronic system through ADP; obtained improved accounts receivable collection software; improved their billing systems to track denial of payments and to help appeal denials of claims and improved their cash collection systems to more effectively manage cash flow prospectively at time of admission than after discharge. The Debtors also have converted to a computerized central scheduling system and have now a "forms fast" system to ensure automatic printing of forms and patient wristbands that include patient information.

The Debtors also have made changes in physician personnel, including appointing a new medical director and a new orthopedic surgeon. The Debtors also have obtained ear/nose/throat coverage, and have become affiliated with Capital Health in its neuro-science network. Separately, the Debtors have become more aggressive in collecting co-pays and deductibles, and have obtained assistance from a vendor to improve collections of old accounts receivable. The Debtors also have outsourced their coding of medical records, have engaged outside vendor assistance in initiating and completing Medicaid applications, and have re-negotiated various managed care reimbursement contracts to include more favorable terms and conditions.

Creditors and other parties seeking more detailed information regarding the Debtors' post-Petition Date operations should review the Monthly Operating Report excerpts attached hereto as Exhibit "B".

## THE CHAPTER 11 PLAN

**A.    Introduction**

The following is a summary of certain terms and provisions of the Plan. This summary of the Plan is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit "A."

**B.    Classification of Claims Against the Debtors**

The following is a classification of Claims under the Plan.  As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified under the Plan, and will instead be treated separately as unclassified Claims on the terms set forth in Article VI of the Plan.

Classes of Claims against the Debtors are as follows:

- **Claims Against LBH**

    o  Class A1:  LBH Priority Non-Tax Claims (Class A1 consists of all Priority Non-Tax Claims against LBH)

    o  Class A2:  Bristol Township Secured Claim (Class A2 consists of the Bristol Township Secured Claim)

    o  Class A3:  Bond Trustee Secured Claim (Class A3 consists of the Bond Trustee Secured Claim)

    o  Class A4:  LBH Other Secured Claims (Class A4 consists of all Other Secured Claims against LBH)

    o  Class A5:  PBGC General Unsecured Claim (Class A5 consists of the PBGC General Unsecured Claim against LBH)

    o  Class A6:  Bond Trustee Unsecured Claim (Class A6 consists of the Bond Trustee Unsecured Claim)

    o  Class A7:  LBH General Unsecured Claims (Class A7 consists of all General Unsecured Claims against LBH)

    o  Class A8-A:  LBH Stipulated Medical Malpractice Claims (Class A8-A consists of all Stipulated Medical Malpractice Claims against LBH)

- o  Class A8-B:  LBH Non-Stipulated Medical Malpractice Claims (Class A8-B consists of all Non-Stipulated Medical Malpractice Claims against LBH)

- o  Class A9:  LBH Convenience Claims (Class A9 consists of all Convenience Claims against LBH)

- **Claims Against Enterprises**

  - o  Class B1:  Enterprises Priority Non-Tax Claims (Class B1 consists of all Priority Non-Tax Claims against Enterprises)

  - o  Class B4:  Enterprises Other Secured Claims (Class B4 consists of all Other Secured Claims against Enterprises)

  - o  Class B5:  PBGC General Unsecured Claim (Class B5 consists of the PBGC General Unsecured Claim against Enterprises)

  - o  Class B7:  Enterprises General Unsecured Claims (Class B7 consists of all General Unsecured Claims against Enterprises)

  - o  Class B9:  Enterprises Convenience Claims (Class B9 consists of all Convenience Claims against Enterprises)

- **Claims Against APC**

  - o  Class C1:  APC Priority Non-Tax Claims (Class C1 consists of all Priority Non-Tax Claims against APC)

  - o  Class C4:  APC Other Secured Claims (Class C4 consists of all Other Secured Claims against APC)

  - o  Class C5:  PBGC General Unsecured Claim (Class C5 consists of the PBGC General Unsecured Claim against APC)

  - o  Class C7:  APC General Unsecured Claims (Class C7 consists of all General Unsecured Claims against APC)

  - o  Class C9:  APC Convenience Claims (Class C9 consists of all Convenience Claims against APC)

Priority Non-Tax Claims and Other Secured Claims are not impaired under the Plan. Holders of Priority Non-Tax Claims and Other Secured Claims are deemed to have accepted the Plan, and accordingly are not entitled to vote to accept or reject the Plan. All other classes of Claims are impaired under the Plan. If a dispute arises as to whether any Claim, or any class of Claims, is impaired under the Plan, the Plan provides that the Bankruptcy Court shall, after notice and a hearing, determine such dispute.

C.     **Treatment of Claims Against the Debtors**

The classes of Claims against, with respect to and to the extent applicable for, each Debtor are treated under the Plan as follows:

- **Claims Against LBH**

  o   Class A1 – LBH Priority Non-Tax Claims (Unimpaired).   On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such LBH Priority Non-Tax Claim becomes an Allowed LBH Priority Non-Tax Claim, or (iii) the date on which such LBH Priority Non-Tax Claim becomes due and payable pursuant to any agreement between the Debtors and a holder of an LBH Priority Non-Tax Claim, each holder of an Allowed LBH Priority Non-Tax Claim shall receive from the Disbursing Agent in full satisfaction, settlement, release and discharge of and in exchange for such Allowed LBH Priority Non-Tax Claim (a) Cash equal to the unpaid portion of such Allowed LBH Priority Non-Tax Claim or (b) such other treatment as the Debtors (or Reorganized Debtors) and such holder shall have agreed in writing. All Allowed LBH Priority Non-Tax Claims which are not by their terms due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

  o   Class A2 – Bristol Township Secured Claim (Unimpaired).   The Allowed amount of the Bristol Township Secured Claim, plus interest thereon from the Petition Date at the judgment rate in effect in Pennsylvania, shall be paid by Reorganized Lower Bucks Hospital in Cash in four (4) equal quarterly installments, with the first installment payable on the three (3) month anniversary of the Effective Date and the subsequent installments payable at three (3) month intervals thereafter. Bristol Township shall retain its asserted lien(s), notwithstanding anything to the contrary contained herein, provided, however, that such lien(s) shall be deemed vacated and of no force or effect to the extent of a judicial determination, by Final Order, that the Bristol Township Secured Claim is unperfected and, provided further, that such lien(s) shall be divested upon full payment of the Allowed Class A2 Claim of Bristol Township.  Upon full payment of its Allowed Class A2 Claim, Bristol Township shall make any filings required to remove its lien(s) as of record.

  o   Class A3 – Bond Trustee Secured Claim (Impaired).   Pursuant to the Bond Trustee Settlement Agreement, and subject to Section 5.1.3(B) of the Plan: (i) each holder of an Allowed Class A3 Claim shall, on or as soon as reasonably practical after the Effective Date, receive such holder's Pro Rata share of: (a) the Reserve Funds; and (b) $8,150,000.00 in full satisfaction, settlement, release and discharge of and in exchange for such holder's Allowed Claim; (ii) the Bond Trustee Litigation shall on the Effective Date be deemed settled and dismissed with prejudice, and Reorganized LBH shall be deemed authorized and directed to file with the Clerk of the Bankruptcy Court, on behalf of all parties to the Bond Trustee Litigation, any notices and/or other pleadings necessary or desirable to

33

reflect and/or effectuate such settlement and dismissal; and (iii) upon the written request of Reorganized Lower Bucks Hospital, the Bond Trustee shall promptly make any filings required to removed its alleged lien(s) as of record. All Distributions to holders of Allowed Class A3 Claims pursuant to Section 5.1.3 of the Plan shall be subject to Section 10.3 of the Plan including without limitation those provisions relating to the Bond Trustee's fees, costs and expenses payable from such Distributions pursuant to the Indenture or applicable law.

o   Class A4 – LBH Other Secured Claims (Unimpaired).   On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such LBH Other Secured Claim becomes an Allowed LBH Other Secured Claim or (iii) the date on which such LBH Other Secured Claim becomes due and payable pursuant to an agreement between LBH and the holder of an Allowed LBH Other Secured Claim, each holder of an Allowed LBH Other Secured Claim shall receive from Reorganized Lower Bucks Hospital in full satisfaction, settlement, release and discharge of and in exchange for such Allowed LBH Other Secured Claim, at the sole discretion of the Debtors, (a) Cash equal to the unpaid portion of such Allowed LBH Other Secured Claim, (b) reinstatement of the legal, equitable and contractual rights of the holder of such Allowed LBH Other Secured Claim, or (c) such other treatment as the Debtors (or Reorganized Debtors) and such holder shall have agreed in writing. Pursuant to the Plan, the Debtors' failure to object to any LBH Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the holder of such Claim. Nothing in the Plan or elsewhere shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Encumbrance on any asset of a Debtor or the value of any collateral.

o   Class A5 – PBGC General Unsecured Claim (Impaired).   The Plan incorporates the PBGC Stipulation and provides that, upon the occurrence of the Effective Date the PBGC Stipulation shall be deemed approved by the Bankruptcy Court. The Plan, consistent with the PBGC Stipulation, and subject to Section 15.7 of the Plan, provides for the following treatment of Claims in Class A5:

   (i)      on the Effective Date or as soon thereafter as is reasonably practical, one-half of the Guaranteed Cash, from the Disbursing Agent;  and

   (ii)     one-half of all payments due from the Creditor Note;

   (iii)    the following payments, in Cash, from the indicated Entities:

      (1)   Bucks County Insurance Company, Ltd:   an amount to be agreed to by the parties;

      (2)   Bucks County Health Foundation: an amount to be agreed to by the parties; and

(3)    Advanced Specialty Physicians Group: an amount to be agreed to by the parties.

(iv)    $1,000,000, to be paid by Reorganized Lower Bucks Hospital, from Cash on hand subsequent to the Effective Date, in four (4) equal quarterly installments, without interest, with the first payment to be made three (3) months after the Effective Date.

Pursuant to the PBGC Stipulation, upon the occurrence of the Effective Date, the PBGC releases and discharges each of the Debtors, Advanced Specialty Physicians, Bucks County Health Foundation and Bucks County Insurance Company, Ltd. from (i) any and all claims of the PBGC, including but not limited to the PBGC Claims, relating to the Pension Plan, whether now existing or existing in the future; and (ii) any and all liabilities, including without limitation premiums, that are no owed, or that may become owed in the future, relating to the termination of the Pension Plan under 29 U.S.C. § 1306, including without limitation 29 U.S.C. § 1306(a)(7)(A) and (B) (defined in the Plan as "Termination Premiums").

Notwithstanding anything in the foregoing to the contrary, and further nothing in the Debtors' Chapter 11 Cases, Confirmation Order, Plan, Disclosure Statement, the Bankruptcy Code (and section 1141 thereof), or any other document filed by the Debtors in the Chapter 11 Cases shall in any way be construed to discharge, release, limit, or relieve the Debtors, the Reorganized Debtors, or any other party, in any capacity, from any fiduciary liability or fiduciary responsibility with respect to the Pension Plan.

o    Class A6 – Bond Trustee Unsecured Claim (Impaired).    Each holder of an Allowed Claim in Class A6 shall receive the treatment described in Section 5.1.3(A) of the Plan in full satisfaction, settlement, release and discharge of and in exchange for such holder's Allowed Class A6 Claim. All Distributions to holders of Allowed Class A6 Claims shall be subject to Section 10.3 of the Plan including without limitation those provisions relating to the bond Trustee's fees, costs and expenses payable from such Distributions pursuant to the Indenture or applicable law.

o    Class A7 – LBH General Unsecured Claims (Impaired).    Each holder of an Allowed LBH General Unsecured Claim shall, in full satisfaction of such holder's Allowed LBH General Unsecured Claim, receive from the Disbursing Agent:

(i)    on the Initial Distribution Date, a Pro Rata Share of one-half of the Guaranteed Cash, in accordance with that holder's Pro Rata Share of the aggregate of all Allowed General Unsecured Claims; and

(ii)    a Pro Rata Share of one-half of all payments due from the Creditor Note, in accordance with the holder's Pro Rata Share of the aggregate of all Allowed General Unsecured Claims.

o    Class A8-A – LBH Stipulated Medical Malpractice Claims (Unimpaired). Pursuant to orders of the Bankruptcy Court, each holder of a LBH Stipulated

35

Medical Malpractice Claim has been, or upon the occurrence of the Effective Date shall be, granted relief from the automatic stay, to the extent applicable, to pursue litigation on account of its Class A8-A Claim against Reorganized Lower Bucks Hospital, or to prosecute litigation on account of its Class A8-A Claim that was pending against Lower Bucks Hospital on the Petition Date, with the result of such litigation to constitute the Allowance or Disallowance of the applicable Class A8-A Claim, provided that Reorganized Lower Bucks Hospital shall retain, and may in its sole discretion assert, any and all legal and equitable defenses and/or counterclaims of Lower Bucks Hospital against each holder of a Class A8-A Claim other than its receipt of a discharge pursuant to the Plan, the Confirmation Order and/or Section 1141 of the Bankruptcy Code and, provided further, that each holder of an Allowed Class A8-A Claim shall recover, to the extent entitled under applicable law, solely from any available Malpractice Insurance Coverage. In no event shall Reorganized Lower Bucks Hospital be obligated to pay any amount to any holder of a Class A8-A Claim other than from Insurance Coverage. Each holder of a Class A8-A Claim shall be permanently enjoined from recovering or seeking to recover from Reorganized Lower Bucks Hospital, whether directly or indirectly, other than from any available Malpractice Insurance Coverage.

o   Class A8-B – LBH Non-Stipulated Medical Malpractice Claims (Impaired). Upon the Effective Date, but only after it has timely and fully complied with the Non-Stipulated Medical Malpractice Claims Procedures, as set forth in the Plan, each holder of a Class A8-B Claim shall receive relief from the automatic stay, to the extent applicable, to commence litigation on account of its Class A8-B Claim against Reorganized Lower Bucks Hospital, or to prosecute litigation on account of its Class A8-B Claim that was pending against Lower Bucks Hospital on the Petition Date, with the result of such litigation to constitute the Allowance or Disallowance of the applicable Class A8-B Claim; provided, that:

(i)     Reorganized Lower Bucks Hospital shall retain, and may in its sole discretion assert, any and all legal and equitable defenses and/or counterclaims of Lower Bucks Hospital against each holder of a Class A8-B Claim other than its receipt of a discharge pursuant to the Plan, the Confirmation Order and/or Section 1141 of the Bankruptcy Code; and

(ii)    holders of Allowed Class A8-B Claims shall recover, to the extent entitled under applicable law, if any:

(1)    first, from any available Malpractice Insurance Coverage; and

(2)    second, and solely to the extent of any Uninsured Deficiency, from Reorganized Lower Bucks Hospital, provided that in no event shall Reorganized Lower Bucks Hospital be obligated to pay any holder of an Allowed Class A8-B Claim, on account of any Uninsured Deficiency, more, on a percentage basis, than

36

the percentage distribution provided to holders of Allowed Class A7 Claims under the Plan. Pursuant to the Plan, each holder of a Class A8-B Claim shall be permanently enjoined from recovering or seeking to recover from Reorganized Lower Bucks Hospital on account of any Uninsured Deficiency more than the percentage distribution provided to holders of Allowed Class A7 Claims under the Plan.

o  <u>Class A9 – LBH Convenience Class Claims (Impaired)</u>.  Each holder of an Allowed Class A9 Convenience Claim shall, on, or as soon as reasonably practical after, the Effective Date, in full satisfaction of such holder's Allowed Convenience Claim, receive from the Disbursing Agent a single Cash payment equal to 20% of its Allowed Convenience Claim.

- **Claims Against Enterprises**

  o  <u>Class B1 – Enterprises Priority Non-Tax Claims (Unimpaired)</u>.  On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Enterprises Priority Non-Tax Claim becomes an Allowed Enterprises Priority Non-Tax Claim, or (iii) the date on which such Enterprises Priority Non-Tax Claim becomes due and payable pursuant to any agreement between the Debtors and a holder of an Enterprises Priority Non-Tax Claim, each holder of an Allowed Enterprises Priority Non-Tax Claim shall receive from the Disbursing Agent in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Enterprises Priority Non-Tax Claim (a) Cash equal to the unpaid portion of such Allowed Enterprises Priority Non-Tax Claim or (b) such other treatment as the Debtors (or Reorganized Debtors) and such holder shall have agreed in writing.  All Allowed Enterprises Priority Non-Tax Claims which are not by their terms due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

  o  <u>Class B4 – Enterprises Other Secured Claims (Unimpaired)</u>.  On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Enterprises Other Secured Claim becomes an Allowed Enterprises Other Secured Claim or (iii) the date on which such Enterprises Other Secured Claim becomes due and payable pursuant to an agreement between Enterprises and the holder of an Allowed Enterprises Other Secured Claim, each holder of an Allowed Enterprises Other Secured Claim shall receive from Reorganized Enterprises in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Enterprises Other Secured Claim, at the sole discretion of the Debtors, (a) Cash equal to the unpaid portion of such Allowed Enterprises Other Secured Claim, (b) Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Enterprises Other Secured Claim, or (c) such other treatment as the Debtors (or Reorganized Debtors) and such holder shall have agreed in writing.  Pursuant to the Plan, the Debtors' failure to object to any Enterprises Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to

37

contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the holder of such Claim. Nothing in the Plan or elsewhere shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Encumbrance on any asset of a Debtor or the value of any collateral.

o   Class B5 – PBGC General Unsecured Claim (Impaired). The holder of the Class B5 PBGC Unsecured Claim shall receive from the Disbursing Agent the following, consistent with the PBGC Stipulation, and subject to Section 15.7 of the Plan: (i) the treatment described in Section 5.1.5 of the Plan; and (ii) $2.0 million in Cash.

o   Class B7 – Enterprises General Unsecured Claims (Impaired). Each holder of an Allowed Enterprises General Unsecured Claim shall, in full satisfaction of such holder's Allowed Enterprises General Unsecured Claim, receive from the Disbursing Agent: (i) on the Initial Distribution Date, a Pro Rata Share of one-half of the Guaranteed Cash, in accordance with that holder's Pro Rata Share of the aggregate of all Allowed General Unsecured Claims; and (ii) a Pro Rata Share of one-half of all payments due from the Creditor Note, in accordance with the holder's Pro Rata Share of the aggregate of all Allowed General Unsecured Claims.

o   Class B9 – Enterprises Convenience Class Claims (Impaired). Each holder of an Allowed Class B9 Convenience Claim shall, on, or as soon as practical after, the Effective Date, in full satisfaction of such holder's Allowed Convenience Claim, receive from the Disbursing Agent a single Cash payment equal to 20% of its Allowed Convenience Claim.

• **Claims Against APC**

o   Class C1 – APC Priority Non-Tax Claims (Unimpaired). On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such APC Priority Non-Tax Claim becomes an Allowed APC Priority Non-Tax Claim, or (iii) the date on which such APC Priority Non-Tax Claim becomes due and payable pursuant to any agreement between the Debtors and a holder of an APC Priority Non-Tax Claim, each holder of an Allowed APC Priority Non-Tax Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed APC Priority Non-Tax Claim (a) Cash equal to the unpaid portion of such Allowed APC Priority Non-Tax Claim or (b) such other treatment as the Debtors (or Reorganized Debtors) and such holder shall have agreed in writing. All Allowed APC Priority Non-Tax Claims which are not by their terms due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

o   Class C4 – APC Other Secured Claims (Unimpaired). On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on

which such APC Other Secured Claim becomes an Allowed APC Other Secured Claim or (iii) the date on which such APC Other Secured Claim becomes due and payable pursuant to an agreement between APC and the holder of an Allowed APC Other Secured Claim, each holder of an Allowed APC Other Secured Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed APC Other Secured Claim, at the sole discretion of the Debtors, (a) Cash equal to the unpaid portion of such Allowed APC Other Secured Claim, (b) Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed APC Other Secured Claim, or (c) such other treatment as the Debtors (or the Reorganized Debtors) and such holder shall have agreed in writing. Pursuant to the Plan, the Debtors' failure to object to any APC Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the holder of such Claim. Nothing in the Plan or elsewhere shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Encumbrance on any asset of a Debtor or the value of any collateral.

o   Class C5 – PBGC General Unsecured Claim (Impaired).  The holder of the Class C5 PBGC General Unsecured Claim shall receive the treatment described in Section 5.1.5 of the Plan in full satisfaction, release and discharge of, and in exchange for, its Allowed Class C5 Claim.

o   Class C7 – APC General Unsecured Claims (Impaired).  Each holder of an Allowed APC General Unsecured Claim shall, in full satisfaction of such holder's Allowed APC General Unsecured Claim, receive from the Disbursing Agent:  (i) on the Initial Distribution Date, a Pro Rata Share of one-half of the Guaranteed Cash, in accordance with that holder's Pro Rata Share of the aggregate of all Allowed General Unsecured Claims; and; (ii) a Pro Rata Share of one-half of all payments due from the Creditor Note, in accordance with the holder's Pro Rata Share of the aggregate of all Allowed General Unsecured Claims.

o   Class C9 – APC Convenience Class Claims (Impaired).  Each holder of a Class C9 Allowed Convenience Claim shall, on or as soon as practical after, the Effective Date, in full satisfaction of such holder's Allowed Convenience Claim, receive a single Cash payment equal to 20% of its Allowed Convenience Claim.

**D.    Treatment of Unclassified Claims Under the Plan**

**Unclassified Claims.**  Administrative Expense Claims and Priority Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Administrative Expense Claims and Priority Tax Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

**Treatment of Administrative Expense Claims.**  All Administrative Expense Claims are treated as follows:

- <u>Time for Filing Administrative Expense Claims</u>. The holder of an Administrative Expense Claim, other than (i) a Fee Claim, (ii) a liability incurred and payable after the Petition Date in the ordinary course of business by a Debtor, (iii) a Section 503(b)(9) Claim or (iv) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors, the Committee and the U.S. Trustee, notice of such Administrative Expense Claim within thirty (30) days after service of Notice of Effective Date or such other specific date as may be established by the Bankruptcy Court. The Plan requires that such notice include (a) the name of the Debtor(s) that are purported to be liable for the Claim, (b) the name of the holder of the Claim, (c) the amount of the Claim and (d) the basis of the Claim (including any documentation evidencing or supporting such Claim). THE FAILURE TO FILE A NOTICE OF AN ADMINISTRATIVE EXPENSE CLAIM ON OR BEFORE THE FOREGOING DEADLINE AND THE FAILURE TO SERVE SUCH NOTICE TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED, DISALLOWED AND DISCHARGED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT.

- <u>Time for Filing Fee Claims</u>. Each Professional who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date or such other specific date as may be established by the Bankruptcy Court. THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION SHALL RESULT IN THE FEE CLAIM BEING FOREVER BARRED, DISALLOWED AND DISCHARGED.

- <u>Time for Filing Section 503(b)(9) Claims</u>. Each holder of a Section 503(b)(9) Claim was required to file with the Claims Agent a proof of claim asserting Section 503(b)(9) priority prior to August 20, 2010. THE FAILURE TO HAVE FILED SUCH A CLAIM BY THE SECTION 503(B)(9) BAR DATE SHALL RESULT IN THE SECTION 503(B)(9) CLAIM BEING DEEMED DISALLOWED AS AN ADMINISTRATIVE EXPENSE CLAIM.

- <u>Allowance of Administrative Expense Claims, Fee Claims and Section 503(b)(9) Claims</u>. An Administrative Expense Claim (other than a Fee Claim or Section 503(b)(9) Claim) with respect to which notice has been properly filed and served pursuant to Section 6.2(a) of the Plan, or a Section 503(b)(9) Claim with respect to which a proof of claim has been properly filed before the Section 503(b)(9) Bar Date, shall become an Allowed Administrative Expense Claim if no objection is filed within sixty (60) days after the later of (i) the Effective Date or (ii) if applicable, the date of service of the applicable notice of Administrative Expense Claim or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such 60-day period (or any extension thereof), the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order. A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Section 6.2(b) of the Plan shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.

40

- **Payment of Allowed Administrative Expense Claims.** On, or as soon as reasonably practical after, the latest of (a) the Effective Date, (b) the date on which an Administrative Expense Claim becomes Allowed or (c) the date on which such Administrative Expense Claim becomes due and payable pursuant to any agreement between the Debtors and the holder of the Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim shall receive in full satisfaction of such Claims (i) the amount of such holder's Allowed Administrative Expense Claim in one Cash payment or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; provided that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; provided further, that an Administrative Expense Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.

    **Treatment of Priority Tax Claims.** On, or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which a Priority Tax Claim becomes Allowed or (iii) the date on which such Priority Tax Claim becomes due and payable pursuant to any agreement between the Debtors and the holder of the Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall receive in full satisfaction of such holder's Allowed Priority Tax Claim, (a) the amount of such holder's Allowed Priority Tax Claim in Cash, or (b) such other treatment as may be agreed upon in writing by such holder; provided that such agreed-upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Priority Tax Claim. The Confirmation Order shall enjoin any holder of an Allowed Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person or officer of the Debtors that otherwise would be liable to such holder for payment of a Priority Tax Claim so long as the Debtors are in compliance with Section 6.3 of the Plan. The Plan further provides that so long as the holder of an Allowed Priority Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person or officer under Section 6.3 of the Plan or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

E.     **Means for Implementation of the Plan**

    **Effective Date and Initial Distribution Date Payments.** Unless otherwise stated in the Plan, the funds required to make the payments required under the Plan shall come from the following sources.

    **Sale / Leaseback of Hospital Facility.** LBH shall, on the Effective Date, sell the Hospital Facility to the RDA for the net proceeds received from the sale of taxable, guaranteed bonds to be issued by the RDA in the gross aggregate principal amount of $14 million (the "2011 Bonds"). The Plan further provides that immediately upon the occurrence of such sale, the RDA shall lease the Hospital Facility back to Reorganized Lower Bucks Hospital pursuant to the terms of the Hospital Facility Lease. According to the Plan, the rental obligations of Reorganized Lower Bucks Hospital under the Hospital Facility Lease shall be equal to the debt service payments due with respect to the 2011 Bonds, provided that Reorganized Lower Bucks Hospital's rental obligations under the Hospital Facility Lease shall be payable solely from the

41

grants, if any, payable by the County of Bucks to Reorganized Lower Bucks Hospital pursuant to that Pennsylvania statute codified at 4 Pa. Stat. Ann. § 13A02-04 (2010). Such grants are hereinafter referred to in the Plan as "Table Gaming Grants".

The 2011 Debt Service Reserve Fund shall be established upon the issuance of the 2011 Bonds. According to the Plan, the 2011 Debt Service Reserve Fund shall be funded, on the Effective Date, with sufficient funds to pay the first year of debt service on the 2011 Bonds, as follows: (i) all Table Gaming Grants accrued as of the Effective Date shall be paid by the County of Bucks into the 2011 Debt Service Reserve Fund; and (ii) to the extent, if any, that the Table Gaming Grants accrued as of the Effective Date are less than the first year of debt service on the 2011 Bonds, the gross proceeds of the sale of the 2011 Bonds shall be used to fund the 2011 Debt Service Reserve Fund. The Plan further provides that to the extent Table Gaming Grants payable after the Effective Date exceed the amounts required to pay Reorganized Lower Bucks Hospital's rental obligations under the Hospital Facility Lease, such excess shall be deposited into the 2011 Debt Service Reserve Fund until the 2011 Debt Service Reserve Fund contains three years of debt service on the 2011 Bonds.

Upon satisfaction of the foregoing three year debt service requirement, any Table Gaming Grants in excess of the amount necessary to make lease payments under the Hospital Facility Lease shall be paid to Reorganized Lower Bucks Hospital. According to the Plan, at the expiration of the Hospital Facility Lease, the RDA shall convey the Hospital Facility back to Reorganized Lower Bucks Hospital or its successors or assigns in accordance with, and subject to the terms and conditions of, the Hospital Facility Lease.

The 2011 Bonds shall be guaranteed by the County of Bucks on a full faith and credit basis.

**Cash Contribution**. On, or as soon as reasonably practical after, the Effective Date, Reorganized Lower Bucks Hospital shall pay $900,000 in Cash, from funds on hand, to the Disbursing Agent.

**Creditor Note**. Reorganized Lower Bucks Hospital will issue the Creditor Note as of the Effective Date.

**Mortgage Loan on Enterprise's Ambulatory Surgical Center**. As of the Effective Date, Enterprises shall obtain a $2.0 million mortgage loan, to be secured by a lien on Enterprises' ambulatory surgical center. On or about the Effective Date, Reorganized Lower Bucks Hospital shall enter into a lease agreement with Enterprises by which Reorganized Lower Bucks Hospital shall lease the ambulatory surgical center from Enterprises such that the rental payments with respect to such lease shall equal the amount payable with respect to the foregoing $2.0 million mortgage.

**Operations Between the Confirmation Date and the Effective Date**. Through the Effective Date, the Debtors shall continue to operate their businesses as Debtors-in-Possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect.

42

**Continued Corporate Existence**.  The Debtors shall continue to exist, as Reorganized Debtors, after the Effective Date as separate entities, with all the powers available to such legal entities, in accordance with applicable law and pursuant to their constituent documents, as may be modified by the Plan.

**Re-vesting of Assets**.  Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates and any property acquired by a Debtor or Reorganized Debtor under the Plan shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided herein.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

**Post-Confirmation Management**.  As of the Effective Date, the officers and directors of each of the Reorganized Debtors shall be as set forth in the Plan Supplement.  Thereafter, the officers and directors of the Reorganized Debtors shall be selected and determined in accordance with the provisions of the organizational documents of the Reorganized Debtors and applicable law.

F.    **The Disbursing Agent**

**Appointment of the Disbursing Agent**.  Upon the occurrence of the Effective Date, the Disbursing Agent shall have all powers, rights, duties and protections afforded the Disbursing Agent under the Plan.

**Powers and Duties**.  Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall be empowered and directed to (a) take all steps and execute all instruments and documents necessary to make Plan Distributions to holders of Allowed Claims, (b) comply with the Plan and its obligations thereunder, (c) pending distribution pursuant to the Plan, hold in segregated trust accounts all funds the Disbursing Agent receives pursuant to the Plan; and (d) exercise such other powers as may be vested in the Disbursing Agent pursuant to the Plan, the Plan Documents or order of the Bankruptcy Court.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court or required by the Bankruptcy Code or the Bankruptcy Rules. The Disbursing Agent shall be authorized and directed to rely upon the Debtors' and Claims Agent's books and records and the Disbursing Agents and any representatives and professionals of the Disbursing Agent in determining Allowed Claims entitled to Distributions under the Plan.

On, or as soon as practicable after the Effective Date, the Reorganized Debtors shall turn over to the Disbursing agent all of the Cash realized pursuant to Sections 8.1.1, 8.1.2 and 8.1.3 of the Plan including the Cash contributions contemplated by such Sections.  The Disbursing Agent shall establish separate accounts in the name of each of the Debtors with respect to such funds.

All Cash held by the Disbursing Agent pursuant to the Plan shall be deposited or invested in accordance with Section 345 of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court.

Reorganized Lower Bucks Hospital shall pay, from funds obtained subsequent to the Confirmation Date, all reasonable costs and expenses, including reasonable professional fees, of the Disbursing Agent in complying with the Disbursing Agent's obligations under the Plan.

**Exculpation.**  Except as otherwise provided in Section 9.3 of the Plan, the Disbursing Agent, together with its officers, directors, employees, agents and representatives, are exculpated pursuant to the Plan by all Persons, Entities, holders of Claims and all other parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Disbursing Agent by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Disbursing Agent's willful misconduct or gross negligence. No holder of a Claim, or representative thereof, shall have or pursue any Cause of Action against the Disbursing Agent or its officers, directors, employees, agents and representatives for making Plan Distributions in accordance with the Plan.  Nothing contained in Section 9.3 of the Plan shall preclude or impair any holder of an Allowed Claim from bringing an action in the Bankruptcy Court against the Disbursing Agent to compel the making of Plan Distributions contemplated by the Plan on account of such Claim.

## G.    Distribution Provisions

**Sources of Cash for Plan Distributions.**  All Cash necessary for the Disbursing Agent to make payments and Plan Distributions shall be obtained from the Reorganized Debtors.

**Investment of Funds Held by the Disbursing Agent; Tax Reporting by the Disbursing Agent.**  The Disbursing Agent may, but shall not be required to, invest any funds held by the Disbursing Agent pending the distribution of such funds pursuant to the Plan in investments that are exempt from federal, state and local taxes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Disbursing Agent may (a) treat the funds and other property held by it as held in a single trust for federal income tax purposes in accordance with the trust provisions of the Internal Revenue Code (sections 641, et seq.) and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

**Plan Distributions.**  Pursuant to the terms and provisions of the Plan, and except as stated otherwise in the Plan, the Disbursing Agent shall make the required Plan Distributions specified under the Plan.  Notwithstanding anything to the contrary set forth in the Plan, and unless otherwise agreed by the Bond Trustee, all Distributions payable under the Plan to holders of Bonds shall be paid to the Bond Trustee, which shall distribute such Distributions (net of any Bond Trustee fees, costs and expenses payable from such Distributions under the Indenture or applicable law), or cause such Distributions (net of any Bond Trustee fees, costs and expenses payable from such Distributions under the Indenture or applicable law) to be distributed, to the holders of the Bonds in accordance with the terms of the Indenture.  Distributions to holders of Bonds may be made by means of book-entry exchange through the facilities of the Depository

44

Trust Corporation in accordance with the contrary practices of the Depository Trust Corporation, as and to the extent practicable. In connection with such book-entry exchange, the Bond Trustee may deliver instructions to the Depository Trust Corporation directing the Depository Trust Corporation to effect distributions (net of the Bond Trustee's fees and expenses as permitted under the Indenture) on a pro rata basis as provided under the Plan.

**Timing of Plan Distributions**. In the event a Plan Distribution is payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due. A Plan Distribution shall be deemed to have been timely made if made on such date or within fourteen (14) days thereafter. For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

**Manner of Payment under the Plan**. Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**Fractional Plan Distributions**. Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractions of dollars are required to be made. At the Disbursing Agent's option, fractions of dollars may be rounded to the nearest whole unit (with any amount equal to or less than one-half dollar to be rounded down).

**Surrender and Cancellation of Instruments**. As a condition to receiving any Plan Distribution, the holder of an Allowed Claim evidenced by a certificate, instrument or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, shall (a) surrender such certificate, instrument or note representing such Claim, and (b) execute and deliver such other documents as may be necessary to effectuate the Plan in the sole determination of the Disbursing Agent. Such certificate, instrument or note shall thereafter be cancelled and extinguished. The Disbursing Agent shall have the right to withhold any Plan Distribution to be made to or on behalf of any holder of such Claims unless and until (i) such certificates, instruments or notes are surrendered, or (ii) any relevant holder provides to the Disbursing Agent an affidavit of loss or such other documents as may be required by the Disbursing Agent together with an appropriate indemnity in the customary form. Any such holder who fails to surrender such certificates, instruments or notes, or otherwise fails to deliver an affidavit of loss and indemnity prior to the second anniversary of the Effective Date, shall be deemed to have forfeited its Claims and shall not participate in any Plan Distribution. All property in respect of such forfeited Claims shall revert to the Reorganized Debtors, as applicable.

**Record Date for Distributions**. At the close of business on the Distribution Record Date, the transfer records for Claims shall be closed, and there shall be no further changes in the

45

record holders of such Claims.   None of the Reorganized Debtors, the Claims Agent, the Disbursing Agent nor the Bond Trustee shall have any obligation to recognize any transfer of claims occurring after the Distribution Record Date, and they shall be entitled instead to recognize and deal for all purposes under the Plan with only those record holders as of the close of business on the Distribution Record Date.

**Subsequent Distributions**.   The Disbursing Agent shall be authorized and directed to make subsequent Plan Distributions on account of such Claims which are either: (a) Allowed Claims as of the Initial Distribution Date; or (b) Contested Claims as of the Initial Distribution Date but which subsequently become Allowed Claims pursuant to Article XI of the Plan. The Disbursing Agent shall make the subsequent Plan Distributions from time to time and in the exercise of its business judgment. The Disbursing Agent's ability to make such subsequent Plan Distributions shall be based on the availability of additional assets of the Debtors' Estates and/or the disallowance of Contested Claims, as discussed in Article XI of the Plan.

**De Minimus Distributions**.   The Disbursing Agent shall not have any obligation to make any distribution to any holder of an Allowed Claim if the amount to be distributed is less than $10.00.

## H.   Procedures for Resolving and Treating Contested Claims

**Prosecution of Contested Claims**.   After the date the Confirmation Order becomes a Final Order, only the Reorganized Debtors may object to the allowance of Claims.   All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Section 11.3 of the Plan.

**Objection Deadline**.   As soon as practicable, but in no event later than one hundred and twenty (120) days after the Effective Date (subject to being extended as set forth herein or by order of the Bankruptcy Court upon motion of the Reorganized Debtors without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made. The holder of a Claim subject to an objection will not receive a distribution on account of such Claim until such Claim is Allowed, provided, however, that the filing of a motion to extend the deadline to file objections to Claims shall automatically extend the claim objection deadline until a Final Order is entered or such motion. In the event that such motion to extend is denied, the claims objection deadline shall be the later of the then-current claims objection deadline (as previously extended, if applicable) or thirty (30) days after the Bankruptcy Court's order denying the motion to extend the claims objection deadline.

**Claims Settlement**.   Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Reorganized Debtors shall have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court.

**No Distribution Pending Allowance**.   Notwithstanding any other provision of the Plan, if any portion of a Claim is a Contested Claim, and/or is subject to a pending objection that has not been resolved by Final Order, no payment or distribution provided under the Plan shall be

made on account of such Claim unless and until such Claim becomes an Allowed Claim that is not a Contested Claim, subject to the setoff rights preserved under the Plan.

**Entitlement to Plan Distributions Upon Allowance**. When a Contested Claim becomes an Allowed Claim, the holder of such Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

**Contested Claims Reserve**. The Disbursing Agent may establish one or more contested claims reserves (defined in the Plan as "Contested Claims Reserves") for the purpose of effectuating distributions to holders of Contested Claims, Claims subject to a pending objection and counterparties to executory contracts and/or unexpired leases that have been or may be rejected, pending the allowance or disallowance of such Claims in accordance with the Plan.

**Estimation of Claims**. An Estimation Order may be used to calculate and establish the amount of the Contested Claims Reserve. The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Contested Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Contested Claim, the amount so estimated shall constitute either (a) the Allowed amount of such Claim, (b) a maximum limitation on such Claim or (c) in the event such Claim is estimated in connection with the estimation of other Claims within the same class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Contested Claims so estimated. If the estimated amount constitutes a maximum limitation on the amount of such Claim, or on more than one such Claim within a class of Claims, as applicable, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claims. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or otherwise resolved by any mechanism approved by the Bankruptcy Court.

**No Recourse Against the Debtors, the Reorganized Debtors or Disbursing Agent**. If a Contested Claims Reserve is established pursuant to Section 11.6, any holder of a Contested Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable distribution under the Plan solely from any Contested Claim Reserve established on account of such Contested Claims. In no event shall any holder of a Contested Claim have any recourse with respect to distributions made, or to be made, under the Plan to holders of such Claims, to any Debtor, any Reorganized Debtor or the Disbursing Agent on account of such Contested Claim, regardless of whether such Contested Claim shall ultimately become an Allowed Claim, and regardless of whether sufficient Cash or other property remains available for distribution in the Contested Claim Reserve established on account of such Contested Claims at the time such Claim becomes entitled to receive a distribution under the Plan.

47

I.     **Treatment of Executory Contracts and Unexpired Leases**

**Assumption and Rejection of Executory Contracts and Unexpired Leases.**  All
executory contracts and unexpired leases of the Debtors shall be rejected pursuant to the
provisions of section 365 of the Bankruptcy Code effective as of and subject to the occurrence of
the Effective Date, unless another date is specified in the Plan, except: (i) any executory
contracts and unexpired leases that are the subject of a motion to assume filed pursuant to section
365 of the Bankruptcy Code by the Debtors before the Effective Date; (ii) contracts and leases
listed in Schedule 1 attached to the Disclosure Statement and any subsequently filed "Schedule
of Assumed Executory Contracts and Unexpired Leases" to be filed by the Debtors with the
Bankruptcy Court; (iii) all executory contracts and unexpired leases assumed under the Plan or
by order of the Bankruptcy Court entered before the Effective Date; and (iv) any agreement,
obligation, security interest, transaction, or similar undertaking that the Debtors believe is not
executory or a lease that is later determined by the Bankruptcy Court to be an executory contract
or unexpired lease that is subject to assumption or rejection under section 365 of the Bankruptcy
Code. Any order entered post-confirmation by the Bankruptcy Court, after notice and a hearing,
authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to
be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such
relief was granted and such order was entered pre-confirmation. The Debtors reserve the right to
amend Disclosure Statement Schedule 1 or any "Schedule of Assumed Executory Contracts and
Unexpired Leases" prior to the entry of the Confirmation Order and subsequent to the entry of
the Confirmation Order with respect to any executory contract or unexpired lease that is the
subject of a dispute over the amount or manner of cure pursuant to Section 12.2 of the Plan and
for which the Debtors make a motion to reject such contract or lease based upon the existence of
such dispute filed at any time.  Each executory contract and unexpired lease to be assumed or
rejected by the Debtors shall include modifications, amendments, supplements, restatements, or
other similar agreements made directly or indirectly by any agreement, instrument or other
document that affects such executory contract or unexpired lease.

The inclusion of a contract, lease or other agreement on Disclosure Statement Schedule 1
or on any "Schedule of Assumed Executory Contracts and Unexpired Leases" shall not
constitute an admission by the Debtors as to the characterization of whether any such included
contract, lease or other agreement is, or is not, an executory contract or unexpired lease or
whether any claimants under any such contract, lease or other agreement are time barred from
asserting Claims against the Debtors.  The Debtors reserve all rights with respect to the
characterization of any such agreements.

The Plan shall constitute a motion to reject the executory contracts and unexpired leases
rejected pursuant to Section 12.1 of the Plan, and the Debtors shall have no liability thereunder
except as is specifically provided in the Plan. Entry of the Confirmation Order shall constitute
approval of such rejections pursuant to section 365(a) of the Bankruptcy Code, subject to the
occurrence of the Effective Date, and a finding by the Bankruptcy Court that each such rejected
agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is
in the best interests of the Debtors and their Estates.

The Plan shall constitute a motion to assume all executory contracts and unexpired leases
except those rejected pursuant to Section 12.1 of the Plan. Entry of the Confirmation Order by

the Clerk of the Bankruptcy Court shall constitute approval of such assumption pursuant to sections 365(a) and (b) of the Bankruptcy Code.

**Cure**. Any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease. In the event of a dispute regarding: (i) the amount of any cure payments; (ii) the ability to provide adequate assurance of future performance under the contract or lease to be assumed or assumed and assigned; or (iii) any other matter pertaining to assumption or assumption and assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable. Disclosure Statement Schedule 1 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" sets forth the Debtors' cure obligations for each agreement for which cure obligations must be satisfied as a condition to the assumption of such agreement. Any non-Debtor counterparty to an agreement listed on the Disclosure Statement Schedule 1 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" who disputes the scheduled cure obligation (or objects to the omission of a scheduled cure obligation) must file with the Bankruptcy Court, and serve upon the Debtors, a written objection to the cure obligation in the manner, and within such time period, as the Bankruptcy Court may direct in the Confirmation Order. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the cure obligation set forth on the Disclosure Statement Schedule 1 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption of the relevant agreement as proposed by the Debtors.

**Claims Arising from Rejected Contracts**. Rejection Damage Claims must be submitted to the Claims Agent, with copies to counsel for the Debtors, by the first Business Day that is at least thirty (30) days following the Effective Date. Properly submitted Rejection Damage Claims shall be treated as General Unsecured Claims or Convenience Claims, as applicable, subject to objection by the Reorganized Debtors. ANY REJECTION DAMAGE CLAIMS THAT ARE NOT PROPERLY SUBMITTED PURSUANT TO SECTION 12.3 OF THE PLAN WILL FOREVER BE BARRED FROM ASSERTION AND SHALL NOT BE ENFORCEABLE AGAINST THE REORGANIZED DEBTORS, THEIR RESPECTIVE ESTATES, AFFILIATES OR ASSETS.

**J.     Conditions Precedent to Confirmation of the Plan and the Occurrence of the Effective Date**

**Conditions Precedent to Confirmation**. As conditions precedent to confirmation of the Plan, the Clerk of the Bankruptcy Court shall have entered an order or orders:

(i)     approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)    authorizing the solicitation of votes with respect to the Plan; and

49

(iii)   determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan.

**Conditions Precedent to the Occurrence of the Effective Date.** Unless waived in writing by the Debtors, the following are conditions precedent to the occurrence of the Effective Date:

(i)   the Confirmation Order shall have been entered by the Clerk of the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction;

(ii)   any necessary regulatory consents, authorizations and approvals have been given;

(iii)   the 2011 Bonds shall have been issued in the aggregate principal amount of $14 million and the net proceeds thereof shall have been used by the RDA to purchase the Hospital Facility from LBH;

(iv)   LBH shall have leased back the Hospital Facility from the RDA pursuant to the Hospital Facility Lease;

(v)   a mortgage loan in the amount of approximately $2.0 million shall have been obtained and secured by Enterprises' real property; and

(vi)   the assets in the Pension Plan shall have been transferred to the PBGC in connection with a termination of the Pension Plan.

(vii)   Notwithstanding anything to the contrary set forth herein, the actions set forth in subsections (iii), (iv) and (v) of the Plan may occur, and shall be deemed to occur, simultaneously with the occurrence of the Effective Date.

**Effect of Non-Occurrence of the Effective Date.** If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against a Debtor; (b) prejudice in any manner the rights of any party in interest; or constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other party in interest.

## VII.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain United States federal income tax aspects of the Plan, for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim. This discussion does not purport to be a complete analysis or listing of all potential tax considerations. This discussion is based on existing provisions of the Internal

Revenue Code (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the United States federal income tax consequences of the Plan.

No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. No representations or assurances are being made to the holders of Claims with respect to the United States federal income tax consequences described herein.

Each holder of a Claim affected by the Plan is strongly urged to consult its tax advisor regarding the specific tax consequences of the transactions described herein and in the Plan.

## A.    General

The United States federal income tax consequences to holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the holder; (7) whether the Claim is an installment obligation for United States federal income tax purposes; and (8) whether the Claim constitutes a "security" for United States federal income tax purposes. Certain holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed herein. There also may be state, local, and/or foreign income or other tax considerations or United States federal estate and gift tax considerations applicable to holders of Claims, which are not addressed herein. Each holder of a Claim should consult its tax advisor for information that may be relevant to its particular situation and circumstances and for advice concerning the particular tax consequences to it of the transactions contemplated by the Plan.

## B.    [intentionally omitted]

## C.    Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL,

STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX
CONSEQUENCES OF THE PLAN.

## VIII.

## ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN

The Debtors have evaluated numerous alternatives to the Plan, including, without limitation, the sale of the Debtors as a going concern, either as an entirety or on limited bases, and the liquidation of the Debtors. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries of holders of Claims. The following discussion provides a summary of the analysis supporting the conclusion that a liquidation of the Debtors or an alternative plan of reorganization for the Debtors will not provide higher value to holders of Claims.

**A.    Liquidation Under Chapter 7 of the Bankruptcy Code**

Section 1129(a)(7) of the Bankruptcy Code provides that, with respect to impaired classes, each holder of a claim or interest of such class must receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor liquidated under chapter 7 of title 11 on such date. As demonstrated by the liquidation analysis attached hereto as Exhibit "C," the Plan satisfies this standard.

The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee for bankruptcy and advisors to such trustee such as attorneys, accountants, health-care consultants and real estate brokers/agents; (2) the erosion in value of Assets in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (3) the significant costs that would be incurred in connection with a closing of the Hospital Facility including without limitation costs incurred in preserving patient records, purchasing required "tail" insurance, complying with the WARN Act, and complying with state and federal regulatory notice periods prior to the cessation of services; and (4) the substantial increases in Claims which would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases. Accordingly, the Debtors have determined that confirmation of the Plan will provide each holder of a Claim with a greater recovery than it would receive pursuant to a liquidation of the Debtors under chapter 7.

Notwithstanding the foregoing, the Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative. The liquidation analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a sale of assets, as well as the amount of Claims that will ultimately become Allowed Claims. Claims estimates are based solely upon the Debtors' incomplete review of any Claims filed and the Debtors' books and records. No Order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in

the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. The estimate of Allowed Claims is based upon different assumptions and formula for different purposes than the estimates of Allowed Claims set forth in other sections of this Disclosure Statement.

## B.    Alternative Plans of Reorganization

If the Plan is not confirmed, any other party in interest could undertake to formulate a different plan of reorganization. Such a plan of reorganization might involve either (x) a reorganization and continuation of the business of the Debtors, (y) the sale of the Debtors as a going concern or (z) an orderly liquidation of the properties and interests in property of the Debtors. With respect to an alternative plan of reorganization, the Debtors have examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, enables holders of Claims to realize the best recoveries under the present circumstances. In a liquidation of the Debtors under chapter 11, the properties and interests in property would be sold in a more orderly fashion and over a more extended period of time than in a liquidation under chapter 7, probably resulting in marginally greater recoveries. Further, if a trustee were not appointed, since one is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than in a chapter 7 case. However, although preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 for the Debtors is a much less attractive alternative to holders of Claims than the Plan because the recovery realized by holders of Claims under the Plan is likely to be greater than the recovery under a chapter 11 liquidation. IX.

## IX.

## FEASIBILITY OF THE PLAN

In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

To support their belief in the feasibility of the Plan, the Debtors have relied upon, among other things, the financial projections attached to this Disclosure Statement as Exhibit "D" (the "Financial Projections"). The Financial Projections and, in particular, the assumptions contained therein, should be reviewed carefully. Among other things, the Financial Projections contain assumptions regarding (a) the future patient volume of the hospital; (b) the overall reimbursement rates, and the increases therein, expected to be obtained from the Debtors' payors; (c) payor mix; (c) the Debtors' ongoing expenses, including salary costs and benefits; (d) repairs and maintenance, (e) the cost of supplies, (f) the cost of outside services, and (g) future capital expenditures.

The Financial Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations as contemplated.

Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Financial Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles. Furthermore, no independent certified public accountants have compiled or examined the Financial Projections and accordingly no opinion or any other form of assurance has been obtained with respect thereto.

The Financial Projections assume that (1) the Plan will be confirmed and consummated in accordance with its terms, (2) there will be no material change in legislation or regulations, or the administration thereof, including environmental legislation or regulations, that will have an unexpected effect on the operations of the Reorganized Debtors, (3) there will be no change in United States generally accepted accounting principles that will have a material effect on the reported financial results of the Reorganized Debtors, and (4) there will be no material -382}-contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors. To the extent that the assumptions inherent in the Financial Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are considered reasonable by the Debtors when taken as a whole, the assumptions and estimates underlying the Financial Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Financial Projections are speculative in nature. It should be expected that some or all of the assumptions in the Financial Projections will not be realized and that actual results will vary from the Financial Projections, which variations may be material and may increase over time. The Financial Projections should therefore not be regarded as a representation by the Debtors or any other person that the results set forth in the Financial Projections will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Financial Projections. The Debtors do not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

## X.

## THE SOLICITATION; VOTING PROCEDURE

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code and that the disclosures by the Debtors concerning the Plan have been adequate and have included information concerning all payments made or to be made in connection with the Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Rule 3020(b)(2) of the Bankruptcy Rules, it may do so without receiving evidence if no objection is timely filed.

In particular, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (a) the Plan has been accepted by the requisite votes of the Classes of impaired Claims unless approval will be sought under section 1129(b) of the Bankruptcy Code despite the dissent of one or more such classes, which will be the case under the Plan, (b) the Plan is "feasible," which means that there is a reasonable probability that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization, and (c) the Plan is in the "best interests" of all holders of Claims and Interests, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan. Thus, even if all Classes of impaired Claims accept the Plan by the requisite votes, the Bankruptcy Court must make an independent finding that the Plan conforms to the requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the holders of Claims against, and Interests in, the Debtors. These statutory conditions to confirmation are discussed above.

## A.    Parties in Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be impaired under a Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) the claim or interest is allowed, which means generally that no party in interest has objected to such claim or interest, and (2) the claim or interest is impaired by the plan. If the holder of an impaired claim or interest will not receive or retain any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan. If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent need not solicit such holder's vote.

The holder of a Claim against a Debtor that is impaired under the Plan is entitled to vote to accept or reject the Plan if (i) the Plan provides a distribution in respect to such Claim and (ii) (a) the Claim has been Scheduled by the Debtors (and such claim is not Scheduled at zero or as disputed, contingent, or unliquidated) or (b) it has filed a Proof of Claim on or before the bar date applicable to such holder, pursuant to sections 502(a) and 1126(a) of the Bankruptcy Code and Bankruptcy Rules 3003 and 3018. Any Claim as to which an objection has been timely filed and has not been withdrawn or dismissed or denied by Final Order is not entitled to vote unless the Bankruptcy Court, pursuant to Federal Rule of Bankruptcy Procedure 3018(a), upon application of the holder of the Claim with respect to which there has been objection, temporarily allows the Claim in an amount that the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**B.      Classes Impaired under the Plan**

Classes A2, A3, A5, A6, A7, A8-B, A9, B5, B7, B9, C5, C7 and C9 are entitled to vote to accept or reject the Plan. By operation of law, each unimpaired Class of Claims is deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

**C.      Further Information; Additional Copies**

If you have any questions about (1) the procedures for voting your Claim, (2) the packet of materials that you have received or (3) the amount of your Claim, or if you wish to obtain an additional copy of the Plan or this Disclosure Statement, please contact:

LOWER BUCKS HOSPITAL
c/o Donlin Recano
419 Park Avenue South
New York, New York 10016
(212) 481-1411

56

## XI.

## RECOMMENDATION AND CONCLUSION

The Debtors believe that the Plan is in the best interest of all holders of Claims and urge all holders of impaired Claims to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying this Disclosure Statement. IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AND RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.

Dated: July 8, 2011

Respectfully submitted,

Lower Bucks Hospital
Lower Bucks Health Enterprises, Inc.
Advanced Primary Care Physicians

**List of Exhibits**

Exhibit "A" –   Joint Chapter 11 Plan of Reorganization of Lower Bucks Hospital, Lower Bucks Health Enterprises, Inc., and Advanced Primary Care Physicians

Exhibit "B" –   Monthly Operating Reports – April 2011 (selected portions)

Exhibit "C" –   Liquidation Analysis

Exhibit "D" –   Financial Projections

**Schedules**

Schedule 1:  Schedule of Assumed Executory Contracts and Unexpired Leases