UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| LOWER BUCKS HOSPITAL, | : | Bky. No. 10-10239 ELF |
| | : | |
| LOWER BUCKS HEALTH ENTERPRISES, INC., | : | |
| | : | |
| ADVANCED PRIMARY CARE PHYSICIANS, | : | JOINTLY ADMINISTERED |
| | : | |
| Debtors. | : | |
| | : | |

# O P I N I O N

## TABLE OF CONTENTS

I.    INTRODUCTION


II.   FACTUAL AND PROCEDURAL BACKGROUND

        A.  The Debtors

        B.  The Bond Transaction

        C.  The Bankruptcy Filing

        D.  The Bond Litigation

        E.  The Bond Litigation Settlement Terms

        F.  The 9019 Motion

        G.  The Indenture Trustee's August 16, 2011 Notice to the Bondholders

        H.  The September 14, 2011 Hearing on the Rule 9019 Motion

        I.  The Plan and Disclosure Statement

                1.  a short chronology

2. the Plan

3. the Disclosure Statement

    a. Part IV of the DS

    b. Part VI.O. of the DS

    c. The Chapter 11 Plan disclosures

J.  Becker's Motion for Reconsideration of the 9019 Order

K.  The Class Action Complaint in District Court

L.  The Indenture Trustee's October 14, 2011 Notice to the Bondholders

M.  The November 16, 2011 Order Modifying the 9019 Approval Order

N.  The November 17, 2011 Telephone Conference

O.  The December 2, 2011 Confirmation Hearing

P.  The December 7, 2011 Orders

Q.  The March 2, 2012 Hearing

III.    DISCUSSION

A.  The Legal Dynamics Created by the Indemnification Provisions of the Loan Agreement and the Indenture

    1. the relevant provisions of the Loan Agreement and the Indenture

    2. the impact of the global settlement negotiations on BNYM's rights under the exculpation, liability and indemnification provisions

B.  The Parties' Basic Contentions

C.  The Court Has Subject Matter Jurisdiction

1. the court had subject matter jurisdiction on December 2, 2011 to decide the contested matter relating to the confirmability of §15.7 of the Plan

2. the court retained jurisdiction to decide the contested matter after entry of the Confirmation Order

D.  BNYM's Two (2) Distinct Roles in the Settlement Process

1. Did BNYM have an unconditional right to condition its decision to settle the Bondholders' dispute with LBH on the inclusion in the settlement of a release of Bondholder claims against BNYM?

2. Was the Third Party Release in the mutual best interests of both BNYM and the Bondholders?

E.  The Third Party Release Cannot Be Approved

1. the 9019 Order does not control

2. the pre-solicitation disclosures were inadequate

a. Rule 3016(a)

b. the absence of information regarding the merits or value of the potential claims against BNYM

F.  The Consequences of the Inadequate Disclosure

IV. CONCLUSION

# I. INTRODUCTION

This chapter 11 case is in an odd procedural posture.  Following a confirmation hearing, the court confirmed a joint chapter 11 plan in the above jointly-administered bankruptcy cases – **but not entirely**!  Presently before the court is the question whether the specific provision of the chapter 11 plan that was reserved for decision should now be approved and included as part of the confirmed plan.

The explanation for the division of the confirmation process into two (2) stages – with the court confirming most of the chapter 11 plan after the first confirmation hearing and determining the confirmability of the balance of the plan after a later hearing – requires a lengthy exposition of the convoluted procedural history of this case.  In the end, it is a cautionary tale for reorganization lawyers, and perhaps, for the court as well.

In order to assist the reader in following the details, I begin with a brief overview of the procedural history.

On December 2, 2011, Debtors Lower Bucks Hospital, Lower Bucks Health Enterprises, Inc. and Advanced Primary Care Physicians (collectively, "the Debtors"), appeared at a hearing to consider the confirmation of their First Amended Joint Plan of Reorganization, As Modified ("the Plan" or, where appropriate, "the Confirmed Plan").  The Plan provided for nineteen (19) classes of claims (some impaired and some unimpaired) and for several unclassified classes of claims.

The Plan included a provision for a third-party release ("the Third Party Release") in favor of The Bank of New York Mellon Trust Company, N.A. ("BNYM" or "the Indenture

Trustee" or "the Bond Trustee"),[1] as Indenture Trustee for The Borough of Langhorne Manor

Higher Education and Health Authority Hospital Revenue Bonds, Series of 1992 (Lower Bucks

Hospital). The Third Party Release provided for the release of all claims of the bondholder-

creditors who were classified as Class A3 creditors under the Plan. Leonard Becker ("Becker"),

a Class A3 creditor, objected to confirmation of the Plan. His objection was based on the

inclusion of the Third Party Release in the Plan. See 11 U.S.C. §524(e) (debtor's discharge

"does not affect the liability of any other entity"); First Fidelity Bank v. McAteer, 985 F.2d 114,

118 (3d Cir. 1993).

No other party in interest filed an objection to confirmation of the Plan.

At the December 2, 2011 confirmation hearing, all of the interested parties, including

Becker, agreed that it was in no one's interest to delay confirmation of the Plan pending litigation

regarding the propriety of the Third Party Release. There was a consensus that further delays

arising from the litigation and a potential adverse decision on confirmation of the Plan might

well jeopardize the Debtors' reorganization and the creditors' prospects for recovery on their

claims. Consequently, all of the parties requested that the Plan be confirmed without a

determination regarding the permissibility, enforceability and scope of the Third Party Release

and that those issues be considered at a later hearing. It was agreed that the outcome of that later

hearing regarding the Third Party Release would not affect the Confirmed Plan. In effect, the

parties agreed that, at the subsequent hearing, the court would: (1) employ a legal fiction by

analyzing the propriety of the Third Party Release as if the confirmation order had not been

---

[1]        Throughout this case, the parties and the court have referred to BNYM both as "the
Indenture Trustee" and "the Bond Trustee." I will use all three (3) terms interchangeably.

-5-

entered; and (2) then either sever the provision or re-attach it to the Confirmed Plan.

The court accepted the parties' suggestion and, on December 2, 2011, held the confirmation hearing on the Plan (treating the Plan as if it did not include the Third Party Release). Based on the record made at the hearing, the court ruled that the Plan (without the Third Party Release) should be confirmed pursuant to 11 U.S.C. §1129(b). The confirmation order was entered a few days later, on December 7, 2011.

The subsequent, second confirmation hearing, devoted solely to the confirmability of the Third Party Release, was held and concluded on March 2, 2012. Following this hearing, Becker continued to assert jurisdictional, procedural and substantive objections to the incorporation of the Third Party Release in the Confirmed Plan.[2]

The issue before the court – the propriety of a third-party release contained in a chapter 11 plan of reorganization – arises in an unusual procedural posture, i.e., it is being decided after confirmation of the balance of the plan. The issue is complicated further by the facts that:

> (a) the Third Party Release was included in a pre-confirmation settlement of an adversary proceeding between the Debtors and the Indenture Trustee;
>
> (b) the settlement included terms for the treatment of the claims held by the bondholders ("the Bondholders"), treatment that the Indenture Trustee recommended the Bondholders accept; and,
>
> (c) the court approved the adversary proceeding settlement pursuant to the process prescribed by Fed. R. Bankr. P. 9019.

---

[2]   The parties have stipulated that for purposes of the confirmation hearing, Becker was not a record bondholder, but was a beneficial holder. Consequently, they agreed that he has standing to object to confirmation of the Plan. (3/2/12 Transcript at 13) (hereafter "Tr.").

-6-

As explained below, after careful consideration of the record and the parties' lengthy

submissions, I conclude that the Third Party Release cannot be approved at this juncture due to

inadequate disclosure to the Bondholders regarding the Third Party Release prior to the

Bondholders' vote on the Plan.  I will defer a final decision on whether the Third Party Release

should be stricken from the Confirmed Plan until the parties have an opportunity to be heard on

the possibility of a re-solicitation of the Bondholders.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Debtors

As set forth in the Debtors' approved disclosure statement (Bky. Doc. # 1352),[3] the lead

Debtor, Lower Bucks Hospital ("LBH" or "the Debtor"), is a 186-bed, community hospital

located in Bristol, PA.  It has been operating since the 1950s and provides a range of medical

services, including emergency services, heart care, maternity care, surgery, in-home services,

wound care, sleep disorder services and psychological services.

LBH treats over 30,000 patients per year in its emergency room, performs more than

3,000 in-patient and out-patient surgical procedures and provides on-site services to

approximately 110,000 people per year, as well as over 40,000 home visits through its home-care

division.  The hospital employs 350 nurses and is affiliated with over 490 physicians.  It is a

party to two (2) collective bargaining agreements, one (1) with the Nurses Association of Lower

---

[3]        When citing to docket of the main bankruptcy case, I will use the notation "Bky. Doc. #."
When citing to the docket of the adversary proceeding between the Debtors and the Indenture Trustee
that will be discussed in some detail below (Adv. No. 10-0174), I will use the notation "Adv. Doc. #."

Bucks Hospital/The Pennsylvania Association of Staff Nurses and Allied Professionals, and the

other with the International Union of Operating Engineers, Local 835, AFL-CIO.

LBH is the sole member of four (4) non-profit corporations, including the two (2) jointly-

administered debtors, Lower Bucks Health Enterprises, Inc. ("Enterprises") and Advanced

Primary Care Physicians ("APC"). Enterprises owns 13 acres of real property and operates

certain programs. APC employs four (4) primary care physicians and associated staff in a

practice operating in Fairless Hills, PA.


### B. The Bond Transaction

In 1992, LBH entered into a multi-party municipal bond financing transaction in order to

refinance certain of its outstanding obligations and to pay for capital improvement projects ("the

Bond Transaction"). In the Bond Transaction, The Borough of Langhorne Manor Higher

Education and Health Authority ("the Authority")[4] agreed to issue $35,980,000.00 in hospital

revenue bonds ("the Bonds") and lend the bond proceeds to LBH.

The Bond Transaction was memorialized primarily in two (2) agreements, each dated as

of November 1, 1992 (and a third agreement, see n.6, infra). The first agreement was a Loan and

Security Agreement ("the Loan Agreement") between the Authority and LBH. (Ex. I-2). The

second was a Trust Indenture ("the Indenture") between the Authority and the original Indenture

---

[4]     The Authority is a body organized under the Pennsylvania Municipality Authorities Act,
Pa. Cons. Stat. Ann. §§5601 et seq. for the purpose of acquiring, holding, constructing, financing,
improving, maintaining, operating, owning or leasing projects for health centers.

Trustee, Continental Bank. (Ex. I-1).[5]

The Loan Agreement provided for, inter alia:

- the Authority to lend the proceeds of the Bonds to LBH, (Loan Agreement §2.1);

- the repayment of the loan by LBH, (id. §§2.1, 4.1);

- LBH to grant the Authority a security interest in, inter alia, LBH's unrestricted gross revenues, (id. §6.2);

- the Authority to assign most of its rights under the Loan Agreement to the Indenture Trustee; (id. §6.3);[6]

- broad indemnification rights in favor of the Authority against LBH, (id. §11.4(b)), except for losses arising from "malfeasance or nonfeasance in office, bad faith, gross negligence, wilful misconduct, fraud or deceit."[7]

Section 11.4(e) of the Loan Agreement is particularly pertinent in the present dispute. It

provided that LBH "shall indemnify the Trustee against all liabilities which it may incur in the

exercise and performance of its powers and duties under the Indenture, provided that such

_____

[5]     There is no dispute that BNYM is the successor to Continental Bank.

[6]     The Authority also executed a separate, written assignment. (Ex. I-3). Carved out of the rights assigned by the Authority to the Indenture Trustee was the Authority's right to "Administrative Expenses" and those indemnification rights that are set forth in §11.4(b) and (c) of the Loan Agreement. (Loan Agreement §6.3).

[7]     Section 11.4(b) required LBH to indemnify the Authority for "all claims, losses, damages or liabilities . . . to which the Authority . . . may become subject, insofar as such losses, claims, damages or liabilities . . . arise out of a Project or are based upon any other alleged act or omission in connection with a Project by the Authority." (emphasis added). The term "Project" was defined broadly in Article I as including "financing the Cost" of constructing, improving or maintaining grounds and buildings. In addition to the indemnification for losses, §11.4(b) also provided that in the event that a claim was brought against the Authority, the Authority could require LBH to "pay all reasonable expenses incurred therein."

liabilities are not caused by the gross negligence or wilful misconduct of the Trustee . . . ." (Id.

§11.4(e)).  Section 11.4(e) went on to state that LBH's indemnification obligation to the

Indenture Trustee shall apply "to the same extent and in the same manner" as LBH's

indemnification obligation to the Authority under §11.4(b) and (c).

The Indenture included provisions, inter alia, that:

- provided for the issuance of the Bonds, (Indenture, Art. II, III);

- obliged the Authority to make interest and principal payments on the Bonds, but only out of pledged revenues (i.e., the amounts payable by LBH under the Loan Agreement), (id. §§9.01, 15.01);

- obliged LBH to repay the Bond indebtedness directly to the Indenture Trustee, (id. §6.02);

- treated all moneys received by the Indenture Trustee under the Indenture as "trust funds," not subject to lien or attachment, (id. §7.01; see also id. §§6.03, 6.07);

- assigned the Authority's rights under the Loan Agreement to the Indenture Trustee, consistent with the assignment of those rights set forth in the Loan Agreement itself, (id. at pgs. 2-3; see also id. §6.02);

- created certain reserve accounts by the Indenture Trustee, (id. §§6.03, 6.04, 6.08);[8]

- established procedures that governed the respective rights and obligations of the Bondholders and the Indenture Trustee, particularly in the event of a default, (id. §§10.01-10.14; see also id. §11.07);[9]

---

[8]     Throughout the bankruptcy case, the Indenture Trustee has maintained that its security interest also attached to certain reserve funds.  (See Proof of Claim No. 377 (Attachment at 5)) (Ex. I-6).

[9]     Section 11.07 of the Indenture provides:

> The Trustee shall be under no obligation to take any action in respect to any Event of Default or otherwise unless it is requested in writing to do so by the Owners of at least 35% in principal amount of the Bonds then
> (continued...)

- limited the Indenture Trustee's liability to conduct constituting willful misconduct or negligence, (id. §11.03).

## C. The Bankruptcy Filing

On January 13, 2010, LBH filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[10] As LBH explained in its chapter 11 disclosure statement ("the DS"), between June 30, 2006 and June 30, 2010, it suffered operating losses in excess of $20 million. (DS at 15) (Bky. Doc. # 1352). From March 2009 through the date of its bankruptcy filing, LBH made no contributions to the pension plan it sponsored, the Lower Bucks Hospital Retirement Account Plan ("the Pension Plan") and in June 2009, it "froze" the Pension Plan. (Id. at 13). In December 2009, LBH failed to make an interest payment on the Bonds, thereby defaulting on its obligations under the Loan Agreement. (Id. at 15).

Aside from the pension plan and Bond repayment defaults, the timing of the bankruptcy filing also was motivated by LBH's desire to preserve, for the benefit of the bankruptcy estate, its claim that certain actions taken by the Indenture Trustee on October 16, 2009 could be set aside as a preference under 11 U.S.C. §§547 and 550. (More on that in the next section, below).

At the time of the bankruptcy filing, LBH's debt structure was essentially as follows:

---

[9] (...continued)

> Outstanding and, if in its opinion such action may tend to involve expense or liability, unless it is also furnished with indemnity satisfactory to it.

[10]    The two (2) other jointly-administered Debtors, Enterprises and APC, also filed chapter 11 petitions on January 13, 2010.

- $24.87 million in unpaid principal owed on the Bonds;

- $36.5 million in potential liability due to the underfunding of the Pension Plan; and

- $7.5 million in trade debt.

(Id. at 12-14).

## D. The Bond Litigation

On April 30, 2010, LBH commenced an adversary proceeding ("the Bond Litigation") against the Indenture Trustee.[11]  After the court granted in part and denied in part the Indenture Trustee's motion to dismiss the initial complaint on August 11, 2010, see In re Lower Bucks Hospital, 2010 WL 3239386 (Bankr. E.D. Pa. Aug. 11, 2010), LBH filed an amended complaint on September 1, 2010.  (Adv. Doc. # 23).   The court denied the Indenture Trustee's second motion to dismiss the amended complaint on October 18, 2010, (Adv. Doc. # 30), and the Indenture Trustee filed an answer to the amended complaint on November 29, 2010.  (Adv. Doc. # 39).

In the Bond Litigation, LBH's primary contention was that, as of October 16, 2009, when the Indenture Trustee filed certain financing statements, the security interests held by the Indenture Trustee (on behalf of the Bondholders) arising from the Bond Transaction were

---

[11]     In the initial complaint, all three (3) jointly administered debtors were plaintiffs.  As explained below, an amended complaint was subsequently filed.  LBH was the sole plaintiff in the amended complaint.

-12-

unperfected.[12] According to LBH, although the security interest had been perfected initially, the

perfection lapsed in 2006 when the Indenture Trustee (or the Authority) did not file an amended

financing statement within four (4) months after LBH changed its name from Temple Lower

Bucks Hospital to Lower Bucks Hospital. See 13 Pa. C.S. §§9503, 9505, 9507(c). Therefore,

LBH reasoned, the October 16, 2009 filing of new financing statements effected a transfer, see

11 U.S.C. §547(e), within ninety (90) days of the Debtors' bankruptcy filings, that was subject to

avoidance under 11 U.S.C. §547(b).

For its part, the Indenture Trustee maintained that the security interests were continuously

perfected pursuant to the "public finance" provisions of the UCC, 13 Pa. C.S. §9515(b). In

addition, in its answer to the amended complaint, the Indenture Trustee also asserted that the

relief sought was barred by the doctrines of in pari delicto and unclean hands.

On June 9, 2011, approximately forty (40) days before the expiration of the discovery

deadline set by the court's pretrial order, the Indenture Trustee (now represented by a different

law firm) filed a motion for leave to amend its answer to the amended complaint and a motion to

extend the pre-trial deadlines established in a prior court order. (Adv. Doc. #'s 80, 81). Through

the proposed amended answer, the Indenture Trustee sought to add six (6) additional affirmative

defenses and to assert eight (8) counterclaims and third-party claims.[13]

---

[12]    This was not the only issue in the Bond Litigation, but it was the most prominent. For
present purposes, it is unnecessary to detail all of the other issues. Suffice it to say that the other issues,
too, were important to the parties.

[13]    In the proposed First Amended Answer, Counterclaims and Third Party Claims, the
Indenture Trustee alleged that LBH breached the Indenture and the Loan Agreement by, inter alia, failing
to preserve the Indenture Trustee's perfected security interest. The Indenture Trustee asserted that
LBH's breaches gave rise to a host of remedies and affirmative defenses. Based on these defenses, the
(continued...)

-13-

Following the Indenture Trustee's request for leave to inject new defenses and claims in

the Bond Litigation, the parties renewed their settlement efforts and endeavored to reach a global

settlement for a consensual plan of reorganization. Those settlement discussions were mediated

by my colleague, the Hon. Jean K. FitzSimon. With Judge FitzSimon's assistance, the parties

reached an agreement in late July 2011.

### E. The Bond Litigation Settlement Terms

On August 12, 2011, the Debtors filed a Stipulation Resolving Adversary Proceeding

("the Settlement Stipulation"), and a Motion for Approval of the Stipulation Resolving

Adversary Proceeding Pursuant to Rule 9019 ("the 9019 Motion"). (Bky. Doc. # 1272; Adv.

Doc. # 102) (Ex. I-9). The Debtors served the 9010 Motion and the Settlement Stipulation on the

Bondholders.[14]

The centerpiece of the Settlement Stipulation is found in Paragraph 2, which provided

---

[13](...continued)
Indenture Trustee requested: (a) a determination that the security interest was not estate property subject
to avoidance; (b) imposition of an express or constructive trust in the Indenture Trustee's favor; and (c)
recoupment against LBH's avoidance power under various legal theories. The Indenture Trustee also
proposed to file a counterclaim and third-party claims against Enterprises and APC based on the cash
collateral orders entered in the bankruptcy case. (See Adv. Doc. # 82-2).

[14]      Service was effected by the Debtor's claim agent, Donlin Recano & Company, Inc.
("Donlin Recano") (See Bky. Doc. # 1277). In her testimony at the March 2, 2012 hearing, the
Indenture Trustee's Vice-President, Bridget Schessler ("Ms. Schessler"), explained that the Indenture
Trustee maintains a list of all registered holders of the bonds, including a clearinghouse registry known
as the Depository Trust Company ("DTC") (3/2/12 Transcript at 54, 56-58, 72) (Bky. Doc. # 1918).
Although DTC serves as a record bondholder, it is a mere custodian for many beneficial bondholders
and, upon receipt of a notice from the Indenture Trustee or the claims agent, would be obliged to pass on
the notice to the beneficial holder or financial institutions serving as custodians for the beneficial holder.
(Id. at 94-96). In any event, the Indenture Trustee provided its list of registered Bondholders to Donlin
Recano. (Id. at 72).

for: (a) the Indenture Trustee's secured claim to be allowed in the amount of $8.15 million (plus

the amounts in certain reserve funds); and (b) agreed-upon treatment of the claim in the Debtors'

reorganization plan, specifically, payment in full on the effective date.

The Settlement Stipulation was filed with the court as an attachment to the 9019 Motion.

Exclusive of the signature pages, it is seven (7) pages long. The first two (2) pages set forth

certain recitals and the final five (5) pages contain twenty (20) numbered, single-spaced

paragraphs.

In Paragraphs 3 and 4 of the Settlement Stipulation, the Debtors and the Indenture Trustee

granted each other releases (other than their obligations under the Settlement Stipulation).

Paragraph 5 of the Settlement Stipulation provided for the dismissal of the Bond Litigation on

the effective date of the Plan.

Paragraphs 8(a) and (b), on pages 4-5 of the Settlement Stipulation, set out further details

regarding the parties' agreed terms for a consensual Plan. It incorporated an attached "term

sheet" that "reflects a mutual understanding among the Debtors, [the Creditors'] Committee and

the Indenture Trustee on behalf of the Bondholders on the key economic provisions and

parameters of a consensual Plan of Reorganization . . . ." The term sheet set out some further

details regarding the Plan's treatment of the Indenture Trustee and addressed the Plan's proposed

treatment of the general unsecured creditors and the Pension Benefit Guaranty Corporation.[15]

---

[15]     At this time, the Debtors were contemplating a distress termination of the Pension Plan
pursuant to 29 U.S.C. §1341(c). On August 30, 2011, less than three (3) weeks after filing the Settlement
Stipulation, the Debtors filed a motion requesting that the court determine that they satisfy what is known
as the "reorganization distress test" set forth in 29 U.S.C. §1341(c)(2)(B)(ii)(IV). (Bky. Doc. # 1289).
The court granted that motion on September 19, 2011. (Bky. Doc. # 1332).

Near the end of Paragraph 8, subsection (a)(ii)(B), on page 5, the Settlement Stipulation

stated that the consensual plan shall:

> provide[] for a release of any and all claims and causes of action arising
> under or in any matter related to the Bond Documents against the Debtors,
> the Debtors' estates, and the Bond Trustee by any and all parties, including
> without limitation all Bondholders, to the extent permitted by applicable
> law.

Paragraph 8(a)(ii)(B) of the Settlement Stipulation, and in particular, the employment of

the three (3) words "and the Bond Trustee," is the original source of the Third Party Release

found in the Plan that is the subject of this contested matter.[16]  The text of Paragraph 8(a)(ii)(B)

appeared in the original document just as it does in this Opinion – without any highlighting or

emphasis.


### F. The 9019 Motion

The 9019 Motion, also filed on August 12, 2011, was seventeen (17) pages long,

containing 33 paragraphs, with a substantial amount of text single-spaced.  (Bky. Doc. # 1272;

Adv. Doc. # 102).  It was divided by a series of bold and underlined headings identifying topics

such as **"The Bankruptcy Cases"** and the **"The Adversary Proceeding,"** a lengthy **"Summary**

---

[16]      Paragraph 8(a)(ii)(B) appears to be referenced, albeit somewhat indirectly, in the "term
sheet" attached to the Settlement Stipulation, which states:

> The Debtors' estates shall waive all avoidance actions as of the Plan's effective
> date; *provided, however*, the Debtors' estates shall reserve the right to assert
> such actions as a defense to the allowance of a claim, upon consultation with the
> Committee. No other third party claims shall be waived or released except to the
> extent the Bond Trustee is released in the order approving the Rule 9019 motion.

of **Parties' Litigation Positions**," a description of the "**Settlement Process**" and a two-page,

mostly single-spaced description of the terms of "**The Settlement**."

In Paragraph 23(g), on page 13, the 9019 Motion stated:

> The Stipulation provides that the Debtors' plan of reorganization will
> include a release of any and all claims and causes of action arising under
> or in any matter related to the Bond Documents against the Debtors, the
> Debtors' estates, and the Bond Trustee by any and all parties, including
> without limitation all Bondholders, to the extent permitted by applicable
> law.

The three (3) words "and the Bond Trustee" in Paragraph 23(g) constituted the 9019

Motion's <u>sole reference</u> to the proposed Third Party Release (other than the repetition of the

same words in the attached Settlement Stipulation itself). Like Paragraph 8(a)(ii)(B) of the

Settlement Stipulation, Paragraph 23(g) of the 9019 Motion was not highlighted; nor was its

significance emphasized in any fashion whatsoever.

The proposed order submitted with the 9019 Motion included certain proposed findings

("the Proposed Findings") relating to the conduct of the Indenture Trustee:

> (v)  in entering into the Stipulation, the Bond Trustee has exercised its
> rights and powers and used the same degree of care and skill in its
> exercise as a prudent person would exercise or use under the
> circumstances in the conduct of such person's own affairs;
>
> (vi) the Bond Trustee has acted, in connection with entering into this
> Stipulation, consistent with its duties and responsibilities under, and
> entry of this Order does not violate, the terms of the Indenture . . . .

**G. The Indenture Trustee's August 16, 2011 Notice to the Bondholders**

In addition to the disclosures to the Bondholders described above, made pursuant to Fed.

R. Bankr. P. 9019, BNYM provided the Bondholders with certain additional, "unofficial"

-17-

disclosures. Between January 27, 2010 and October 14, 2011, it sent eight (8) notices to the

Bondholders (collectively, "the Non-DS Notices"). (Exs. I-24, I-26, I-28, I-30, I-32, I-34, I-36, I-

40). Generally speaking, through the Non-DS Notices, BNYM provided the Bondholders with

notice of LBH's default on its obligations, the chapter 11 bankruptcy filing, the Bond Litigation

and developments in the bankruptcy case generally and the Bond Litigation specifically.

The August 16, 2011 notice ("the Aug. 16th Notice") (Ex. I-38), was a seven (7) page,

single-spaced document, with the Settlement Stipulation (including the term sheet) attached as an

exhibit. The Aug. 16th Notice set forth a summary of the then-proposed settlement between the

Debtors and the Indenture Trustee on pages 3 to 5. The summary was broken down into nine (9)

paragraphs, (a) to (i). Paragraph (g), without any emphasis, stated that the settlement

> will include a release of any and all claims and causes of action arising
> under or in any matter related to the Indenture and/or the Bonds (as well as
> any other instruments or documents evidencing or creating any
> indebtedness or obligations of the Debtors in connection with the
> Indenture and/or the Bonds) against the Debtors, the Debtors' estates, and
> the Trustee by any and all parties, including without limitation all
> Bondholders, to the extent permitted by applicable law.

This language, quite similar to the Debtors' disclosure of the settlement terms in the 9019

Motion, again required the Bondholders to locate the term "and the Trustee" in this verbiage in

order to ascertain that, in a settlement of the Debtor-Bondholder dispute, the Bondholders were

releasing BNYM from any claims they may have had against BNYM.

### H. The September 14, 2011 Hearing on the Rule 9019 Motion

No objections were filed to the 9019 Motion. The hearing on approval of the 9019

Motion was held on September 14, 2011 ("the 9019 Hearing").

I will describe what occurred at the 9019 Hearing in some detail because that hearing was a critical point in the process that led to the dispute presently before the court and the subsequent procedural history is best understood against its backdrop.

Prior to the 9019 Hearing, I reviewed the 9019 Motion and the Settlement Stipulation. I did not notice, and certainly did not appreciate, the legal significance of, the three (3) words "and the Bond Trustee" in Paragraph 8(a)(ii)(B) (on page 5) of the Settlement Stipulation or in Paragraph 23(g) (on page 13) of the 9019 Motion. Consequently, when I commenced the hearing, I did not understand why the proposed order included the Proposed Findings set forth in Paragraphs (v) and (vi).[17]

At the hearing, the Debtors' counsel made an initial presentation in support of the 9019 Motion. He provided a cursory summary of the settlement terms, observing that the agreed treatment of the Indenture Trustee's allowed secured claim and the claims of the general unsecured creditors "creates the framework for a consensual plan." (9/14/11 Tr. at 5). He made no mention of the Third Party Release.

Following the Debtors' counsel's initial remarks, I expressed my concern about the

---

[17]   Paragraph (viii) of the proposed order included a finding that:

> upon the Plan Effective Date (as defined in the Stipulation), the Bondholders shall be deemed to have released and shall be permanently enjoined from asserting, pursuing or prosecuting, in any manner and in any forum, any and all claims and causes of action arising under or in any matter related to the Indenture, Bonds, and any other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors in connection with the Indenture and/or Bonds, against the Debtors, the Debtors' estates, and the Bond Trustee.

Just as with Paragraph 8(a)(ii)(B) of the Settlement Stipulation and Paragraph 23(g) of the 9019 Motion, I did not notice or appreciate the legal import of the words "and the Bond Trustee" in Paragraph (viii) of the proposed order.

-19-

Proposed Findings in the order presented for approval. I stated, "I'm not sure why I should be making findings . . . regarding the bond trustee and the bond trustee's relationship with the bondholders . . . ." (Id. at 7-8). The Debtors' counsel provided no explanation; his sole response was to defer to the Indenture Trustee's counsel. (Id. at 11).

In the colloquy with the Indenture Trustee's counsel that ensued, the Indenture Trustee's counsel initially justified the Proposed Findings on the basis that, with respect to any potential claims the Bondholders may have, both the Debtors and the Indenture Trustee were potentially "co-liable" for their "losses," to which I replied, "and why is that [of] any concern to the Bankruptcy Court, that there potentially is liability that the bond trustee may have to its own constituency." (Id. at 13).

Counsel for the Indenture Trustee responded with what possibly was a vague reference to the Third Party Release, stating:

> [T]hat's because the releases . . . are part of . . . a global settlement [in which] the claims against the bond trustee are claims that would be made over against the debtors and would deplete the estate. Now, we're settling those claims . . . . [T]hese things are all bound together . . . transactionally.

(Id. at 14-15). Counsel did not elaborate further on the nature of "those claims" being settled and did not explain that the claims against the Indenture Trustee that would be "made over against" the Debtors were Bondholder claims against BNYM that were subject to LBH's contractual indemnity obligation under §11.4 of the Loan Agreement.

I found the response not fully satisfactory, pointing out that the requested findings did not appear to relate to the Indenture Trustee's primary conduct that occurred pre-petition and gave rise to the Debtor's claims in the Bond Litigation. Rather, the findings seemed centered on the Indenture Trustee's conduct in the settlement process, (see id. at 15-16), causing me to question

why the bankruptcy court would make such a finding in the context of approving a settlement

between the bankruptcy estates' representatives and the Indenture Trustee:

> [The Indenture Trustee,] . . . the non-debtor made a business judgment to
> settle something with the debtor. . . .
>
> Why do I care whether it was a reasonable business [judgment] – I only
> care whether the bankruptcy estate made a reasonable business judgment,
> that's my jurisdiction. I don't know why I'd have jurisdiction to decide
> about the quality of your client's business judgment.

(Id. at 16-17). When the Indenture Trustee's counsel responded by suggesting the court's

involvement on the issue was appropriate due to the Bondholders' status as a creditor

constituency, I demurred, stating "not as to claims against the bond trustee, that's one non-

debtor's claim against another non-debtor." (Id. at 17).

This was probably the point in the hearing where the most direct and candid response to

the issues I was raising would have been to point out that the bankruptcy court was involved in

the claims of one non-debtor (the Bondholders) against another non-debtor (the Indenture

Trustee) due to the Third Party Release, and, therefore, needed be concerned about the Indenture

Trustee's conduct in the settlement process. But counsel for the Indenture Trustee said nothing.

Counsel for the Official Committee of Unsecured Creditors ("the Committee") spoke

next in support of the Motion, emphasizing that: (a) the parties "worked hard in negotiating the

settlement;" (b) "this language is important to bond trustee;" and (c) the parties "do not want to

risk losing the overall global settlement." (Id. at 19). He offered the following, somewhat

different, justification for the Proposed Findings:

> [I]f you had a creditor who wanted to go off the reservation so to speak with some
> litigation, et cetera, while you're mindful that there's not merit to that, there are
> still litigation costs involved in defending that.

> And -- and we understand one of the reasons here to be that <u>including this language is very helpful to the bond trustee as it would be to any other party in litigation.</u>

(<u>Id.</u> at 19-20).

This response made it sound like the rationale for the requested findings was that certain factual findings would assist the Indenture Trustee in later litigation. Returning to the theme of all my earlier questions, I asked the Committee's counsel, "but then, why isn't it an advisory opinion." (<u>Id.</u> at 20). He did not answer that question, stating that he would "leave those issues for . . . your ongoing discussion . . . with [counsel for the Indenture Trustee]" because, while the Committee and the Debtors "understand and appreciate" the Indenture Trustee's concerns, they were "on the sidelines." (<u>Id.</u> at 20, 22).

Here, once again, counsel for one (1) of the settlement proponents was in the position to give a direct explanation why the parties requested findings regarding the Indenture Trustee's conduct in responding to the Bond Litigation and engaging in the successful settlement negotiations. The response to the question why the Proposed Findings were necessary could have been as simple as "Judge, we need for you to make findings that the Indenture Trustee has acted appropriately in resolving the Bond Litigation because, as part of the settlement, the Bondholders are releasing any claims they may have against the Bond Trustee." Instead, counsel replied with a round-about answer that implied that the Indenture Trustee had negotiated for this language in the a settlement approval order for an entirely different reason: to provide a "collateral estoppel" type benefit in later litigation, without disclosing that there should be no later litigation in light of the Third Party Release.

Next, by agreement of the parties, the evidentiary record on the 9019 Motion was made

by the proffer of the testimony of the Indenture Trustee's Vice-President, Ms. Schessler.  The

proffered testimony briefly described:

> (a) the basic factual and procedural history of the Bond Litigation;
>
> (b) the Indenture Trustee's retention of Grant Thornton, LLP as its financial advisor to assist the Indenture Trustee in evaluation recovery and workout options;
>
> (c) the Indenture Trustee's efforts to permit Bondholders to participate in the settlement negotiation process and the multiple notices the Indenture Trustee sent to Bondholders regarding the status of the Bond Litigation and the settlement reached;
>
> (d) the settlement negotiation process; and,
>
> (e) the risk factors and benefits the Indenture Trustee considered in determining that a compromise of its position was in the best interest of the Bondholders.[18]

(Id. at 25-35).

Based on this record, I inferred that the settlement was "fair and equitable" to the

bankruptcy estate.  See, e.g., In re Nutraquest, Inc., 434 F.3d 639, 644 (3d Cir. 2006); see also In

re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (if trustee's or debtor-in-possession's decision to

settle has legitimate business justification, that decision is entitled to considerable deference); In

re Neshaminy Office Bldg. Associates, 62 B.R. 798, 803 (E.D. Pa. 1986) (court should not

---

[18]     The Indenture Trustee considered the risks of an adverse decision on the merits, the substantial litigation expenses that likely would be incurred by continuing to litigate; and the possibility that ongoing litigation of the Bond Litigation would prevent the confirmation of a reorganization plan, resulting in conversion of the case and magnifying the Bondholders' losses.  The Indenture Trustee perceived a number of benefits in settling the matter, including the enhanced recovery the Bondholders would receive in the consensual reorganization plan (as compared to general unsecured creditors) and the prompt payment of their claims.

substitute its judgment for that of trustee, so long as settlement does not "fall[] below the lowest

point in the range of reasonableness" (quoting In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir.

1983)).

After the evidentiary presentation, I announced my intention to sign the approval order

submitted by the settlement proponents.  However, in explaining this decision, I took pains to

emphasize that the intended consequences of the order were narrow:

> The more I've considered the rationales here, the more I'm realizing that
> these are factual findings, there are not coercive -- this is not a part of the
> coercive order. I don't know that there's anything in these findings that are
> direct determinations that are immediately binding on anybody. They're
> findings that support my approval of the settlement agreement.

> •  •  •

> I suppose the effect of the order if it accomplishes what the authors hope is
> really one of collateral estoppel, saying that there was another proceeding
> and these issues were determined and you can't re-litigate it.

> There may be some doubt in my mind whether it can serve that purpose,
> primarily, because one might question whether any of these findings are
> necessary.

> •  •  •

> But I do want to make it clear that, they're findings, I'm not ordering
> anything with respect to any of these issues. I suspect that . . . none of this
> will ever arise in the future or if it does, it may be that the qualifications
> that I am describing on the record today, will have an []practical obscurity
> that the parties will get the benefit of the findings that they're . . . looking
> for. But I'm making it clear that that's not what I'm directing.

(9/14/11 Tr. at 38-39).

These remarks may not have been as clear or articulate as is ideal, but considered in the

context of my prior colloquies with counsel, no attorney in the courtroom could have failed to

-24-

appreciate that, implicit in my concluding remarks as well as several of my prior comments

during discussions with counsel, was the premise that I considered it possible that the

Bondholders might later sue the Indenture Trustee for damages resulting from the asserted loss of

their perfected lien against LBH's assets and that I did not intend that the approval order would

have any preclusive effect on such later litigation.[19]  Of course, consideration of potential

collateral estoppel consequences of the Proposed Findings in future litigation is pointless if the

approved settlement includes a release that bars future litigation.  Yet, after I concluded this

explanation, every party's attorney did nothing more than thank the court.

In retrospect, what is perhaps most disappointing is that in a hearing filled with

opportunities for counsel to reveal the existence of the Third Party Release – a provision that

BNYM now contends was a critical part of the global settlement and that the Debtors

acknowledge was the product of intense negotiation[20] – at no point did any attorney disclose

candidly that the true purpose of the Proposed Findings had nothing to do with collateral estoppel

or with providing some vague "comfort" to the Indenture Trustee, but rather, that the findings

were requested to provide a foundation for approval of the Third Party Release.  Whether

purposeful or not, counsel's conduct served to conceal this material issue from the court.

On September 14, 2011, I signed the order ("the 9019 Order") approving the 9019

---

[19]     This is clear from my statement that I would sign the proposed order even though I
harbored a serious doubt that the findings were truly necessary to the settlement approval order, but that I
would do so because I did not believe that the findings would bind the Bondholders in any subsequent
litigation they might initiate against the Indenture Trustee.  The second consideration that was influential
in overcoming my doubts was the parties' strongly expressed preference that I not upset their delicate
settlement.

[20]     (See 9/14/11 Tr. at 19-20).

Motion. (Bky. Doc. # 1320; Ex. I-11).

## I. The Plan and Disclosure Statement

### 1. a short chronology

The Debtors filed their initial Joint Plan of Reorganization and disclosure statement on

July 8, 2011. (Bky. Doc. #'s 1207, 1208). After a hearing on the disclosure statement, the

Debtors filed a First Amended Plan of Reorganization and First Amended Disclosure Statement

on September 9, 2011. (Bky. Doc. #'s 1309, 1310). On September 27, 2011, the Debtors filed

the document that I have been referring to as the Plan (i.e., their First Amended Joint Plan of

Reorganization, As Modified) and their Disclosure Statement Relating to the Plan (previously

referred to as "the DS"). (Bky. Doc. #'s 1350, 1352).

On September 28, 2011, I entered an order approving the Debtors' Amended Disclosure

Statement to the First Amended Joint Plan of Reorganization, As Modified ("the DS Approval

Order"), and which also established the following schedule in the confirmation process:

- October 7, 2011 as the deadline for mailing of solicitation packages to the voting classes;

- November 10, 2011 as the voting deadline;

- November 10, 2011 for objections to confirmation;

- November 18, 2011 for the confirmation hearing.

(Bky. Doc. # 1355) (Ex. I-17).

## 2. the Plan

The Plan was a forty-seven (47) page, single-spaced document, divided into fifteen (15) "Articles." Each Article included a number of subsections.

It is not necessary fully to deconstruct the Plan. Suffice it to say that the Plan provided for nineteen (19) classes of claims (some impaired and some unimpaired), for several unclassified classes of claims and addresses various subjects typically covered in chapter 11 plans (e.g., detailed definitions, the means for implementation of the plan, the rules regarding the logistics of resolving disputed claims and making plan distributions and the treatment of executory contracts).

The Plan provision presently at issue was set forth in Article 15, "Miscellaneous Provisions." Section 15.7 of the Plan, found on page forty-two (42), stated:

> **15.7. Release - Bond Documents**
>
> In furtherance, and not in limitation of, the various releases and discharge provisions contained in this Plan, the occurrence of the Effective Date shall constitute a release of any and all claims and causes of action arising under or in any manner related to the Bond Documents against the Debtors, each of the Debtors' estates, and the Bond Trustee by any and all parties, including without limitation all Bondholders, to the extent permitted by applicable law.

## 3. the Disclosure Statement

The DS, (Ex. I-16), was a sixty-two (62) page, single-spaced document. Attached to the DS were various exhibits (the Plan, monthly operating reports, various financial projections). The DS included a helpful table of contents, and was organized into eleven (11) main subject

areas, some of which included sub-headings.[21] Most pertinent, for present purposes, are Parts IV,

VI and an uncodified section of the DS called "**The Chapter 11 Plan.**"


**a. Part IV of the DS**

Part IV, beginning at page 4 of the DS, was titled "**OVERVIEW OF THE PLAN**." It

began with a heading in bold titled "**A. Summary of Key Terms of the Plan**." This provision

stated that "the Plan implements and is built around the following key elements" and then sets

out three (3) subjects in bullet points, with bold and underlined script: "**Settlement of Bond**

**Trustee Litigation**," "**Other Claims**" and "**Funding**." (DS at 4-5). The "**Settlement of Bond**

**Trustee Litigation**" disclosure did not describe the actual terms of the settlement (stating that it

is "described in greater detail below"), but rather, marshaled the reasons why the Debtors

recommended approval of the settlement through acceptance of the Plan as "favorable to the

---

[21]     For example, in the table of contents, the disclosure of the content of the Plan is
organized as follows:

THE CHAPTER 11 PLAN......................................................................... 32
    A. Introduction.......................................................................... ...32
    B. Classification of Claims Against the Debtors.......................... 32
    C. Treatment of Claims Against the Debtors................................ 34
    D. Treatment of Unclassified Claims Under the Plan................... 41
    E. Means for Implementation of the Plan..................................... 43
    F. The Disbursing Agent.............................................................. 45
    G. Distribution Provisions...........................................................46
    H. Procedures for Resolving and Treating Contested Claims........49
    I. Treatment of Executory Contracts and Unexpired Leases...........51
    J. Conditions Precedent to Confirmation of the Plan and
       the Occurrence of the Effective Date..........................................53
    K. Discharge Provisions............................................................... 54

Bondholders." (Id. at 4).[22]

The next section of Part IV was titled, "**B. Summary of Distributions Under the Plan**." Part B included an easy-to-read table setting forth the classification of the claims and their proposed distribution. The Bondholders were classified as Class A3 claimants, to be paid in full by LBH on account of their allowed secured claims totaling $8.15 million (pursuant to the approved Settlement Stipulation of the Bond Litigation), plus the Reserve Funds, but subject to the deduction of the Indenture Trustee's fees, costs and expenses, to the extent permitted by the Indenture.

Part IV.B contained no reference to the Third Party Release.

### b. Part VI.O. of the DS

Part VI.O, titled "**The Bond Trustee Litigation**," provided a five (5) page discussion of

---

[22]    In substance, the DS identified the following benefits of the settlement in "bullet points:"

- it resulted from "intensive, arms-length, negotiations;"

- it provided the Bondholders with a greater percentage recovery on their claims than certain other classes of (unsecured) creditors;

- it provided the Bondholders a quicker recovery than they would realize if the Bond Trustee Litigation were to continue;

- it allowed the Bond Trustee to stop incurring legal and other fees and costs in connection that likely would be deducted from the recovery otherwise payable to Bondholders;

- the Bond Trustee had informed the Debtors that, given the settlement, it would stop defending the litigation unless it received a contrary directive from the owners of a majority in principal amount of the Bonds, together with an indemnity from such Bondholders.

the Bond Litigation, including the procedural history of the proceeding and a detailed description

of the legal issues in dispute. In subsection (c), the DS described the settlement negotiation

process and, essentially, repeated the reasons stated previously in Part IV of the DS for the

Debtors' recommendation that Bondholders vote for the Plan because it incorporated what the

Debtors characterized as the "beneficial" settlement). (Id. at 30).[23]

     Part VI.O contains no direct reference to the Third Party Release.


**c. The Chapter 11 Plan disclosures**

     Commencing on page 32, the DS provided a twenty-three (23) page, single-spaced

description of the Plan, titled **"The Chapter 11 Plan."** This section of the Disclosure Statement

(for some reason, not enumerated by a roman numeral) contained eleven (11) sub-headings. See

n.21, supra.

     On page 35, in a subsection titled **"C. Treatment of Claims Against the Debtors,"** the

DS identified the Bondholders claims as a Class A3 unimpaired claim (unimpaired by virtue of

the settlement of the Bond Litigation) and described the proposed $8.15 million distribution to

the class. The DS mentioned that the distribution was "subject to Section 10.3 of the Plan,"

which provided that all plan distributions to the Bondholders "shall be paid . . . to the Bond

Trustee, which shall distribute such [d]istributions (net of any Bond Trustee fees, costs and

expenses payable from such [d]istributions under the Indenture or applicable law) . . . ." (Plan at

---

[23]    In the course of the discussion of the settlement negotiation process, the DS stated that
mediation resulted in the formulation of a "term sheet . . . which formed the basis of the Bond Trustee
Settlement Agreement," (id. at 29), and that a copy of the term sheet was attached as an exhibit to the
Plan. As mentioned earlier, see n.16, supra, the term sheet included an oblique reference to the Third
Party Release.

29).

There was no reference to the Third Party Release in this section of the DS.

Subsection J. was titled "**Conditions Precedent to Confirmation of the Plan and the Occurrence of the Effective Date.**" Here, the Debtor identified three (3) conditions precedent to confirmation: (1) approval of the DS as containing adequate information; (2) authorization of the solicitation for votes, and (3) the court's determination that "all applicable tests, standards and burdens in connection with Plan have been duly satisfied. . . . " (DS at 53-54).

There was no reference to the Third Party Release in this section of the DS.

The following subsection was titled "**K. Discharge Provisions.**" Subsection K included three (3) sub-headings in bold print and underlined: (1) **Discharge of Debtors**; (2) **Release – Bond Documents**; and (3) **PBGC Stipulation**.[24] The relevant subsection for present purposes was the second one, which provided, in pertinent part:

> In furtherance, and not in limitation of, the various releases and discharge provisions contained in the Plan, the occurrence of the Effective Date shall constitute a release of any and all claims and causes of action arising under or in any manner related to the Bond Documents against the Debtors, each of the Debtors' estates, and the Bond Trustee by any and all parties, including without limitation all Bondholders, to the extent permitted by applicable law. The Debtors intend to present the Bankruptcy Court with a proposed form of Confirmation Order that provides that all claims and causes of action of Bondholders against the Bond Trustee arising under or in any manner related to the Bond Documents are released and discharged.

(Id. at 55).

Thus, like the disclosures in the 9019 Motion, the disclosure of the Third Party Release set forth on page 55 the DS, was not conspicuous and contained no emphasis. It required the

---

[24]    The "PBGC" refers to the Pension Benefit Guaranty Corporation.

reader to locate and discern the significance of the three (3) words "and the Bond Trustee." This
provision did include an additional sentence, i.e., the concluding sentence, which isolates the
Third Party Release from the other releases resulting from confirmation of the Plan and the
occurrence of the effective date, albeit without any emphasis to draw the reader's attention to it.

### J. Becker's Motion for Reconsideration of the 9019 Order

On September 29, 2011, Becker filed a Motion for Reconsideration of the 9019 Order
("the Becker Motion to Reconsider"). (Bky. Doc. # 1357, Adv. Doc. # 109) (Ex. I-13). In
paragraphs 9 and 12, Becker asserted that the parties lacked authority to provide for a release of
the Bondholders' claims against the Indenture Trustee, particularly because the Indenture Trustee
had a conflict of interest and the Bondholders "had no representation" in the matter. (Id. at 3-4).

Becker withdrew the Becker Motion to Reconsider on October 21, 2011. His withdrawal
papers stated that he did so "after having obtained the representations of the Debtors and the
Official Committee of Unsecured Creditors that neither will assert that this withdrawal of the
Motion for Reconsideration waives, releases, discharges or prejudices Becker's rights to object at
plan confirmation to the third party releases to be granted to BNYM by the Bondholders as set
forth in the Plan, on any basis . . . ." (Bky. Doc. # 1402; Adv. Doc. # 112) (Ex. I-14).[25]

---

[25]     The Indenture Trustee filed what it styled a "Response" to Becker's withdrawal of the
Becker Motion to Reconsider. (Bky. Doc. # 1407; Adv. Doc. #113). In the Response, the Indenture
Trustee stated that its position was that Becker had waived his right to challenge the 9019 Order and that
it reserved all of its rights arising from the withdrawal in connection with plan confirmation and related
matters.

### K. The Class Action Complaint in District Court

Between the filing and withdrawal of the Becker Motion to Reconsider, Becker filed a

class action complaint against the Indenture Trustee in the U.S. District Court for the Eastern

District of Pennsylvania, docketed at No. 11-cv-06460. (Ex. I-5). In this complaint, Becker has

asserted that (1) the class of Bondholders suffered losses due to avoidance claims raised by the

Debtors in the Bond Litigation and the compromise of those claims; and (2) BNYM is liable for

those losses under theories of breach of fiduciary duty, negligence and breach of contract.

### L. The Indenture Trustee's October 14, 2011 Notice to the Bondholders

On October 14, 2011, just after the commencement of the Plan voting period,[26] the

Indenture Trustee sent another written notice to the Bondholders regarding the status of the

bankruptcy case ("the Oct. 14th Notice"). (Ex. I-40). The Oct. 14th Notice was a four (4) page,

single-spaced document. Through this notice, the Indenture Trustee advised the Bondholders

that the DS had been approved by the court and summarized certain terms of the Plan's proposed

treatment of the Bondholders. The description was set out in paragraphs (I) through (vi), the

content of which was consistent with the 9019 Motion and the DS. Subparagraph (vi) repeated

most of the disclosure regarding the Third Party Release provided in the DS through the sentence

(now familiar to the reader of this Opinion):

> On the Effective date, any and all claims and causes of action arising under
> or in any manner related to the Bond Documents against the Debtors, each
> of the Debtors' estates, and the Bond Trustee by any and all parties,

---

[26]     According to the Debtors' claims agent, transmittal of the plan voting materials was
completed by October 13, 2011. (See Exs. 19-20).

-33-

including without limitation all Bondholders, to the extent permitted by applicable law.

Also, the Indenture Trustee reported that Becker had filed the Becker Motion to Reconsider and the Indenture Trustee's intention to contest it. Curiously, the Oct. 14th Notice did not describe the grounds for the Becker Motion to Reconsider and the Indenture Trustee's rationale for opposing it.[27]

### M. The November 16, 2011 Order Modifying the 9019 Approval Order

On November 10, 2011, Becker filed an objection to confirmation of the Plan. (Bky. Doc. # 1443). The objection made several arguments as to why that the Plan could not be confirmed due to the inclusion of the Third Party Release.

Once I reviewed Becker's objection to confirmation, the fuzzy colloquy with counsel during the 9019 Hearing came into focus.[28] In my view, the chasm between (1) the content of the Settlement Stipulation approved by the 9019 Order; and (2) content of the DS (not to mention the tight-lipped representations of counsel at the 9019 Hearing) raised serious issues regarding the confirmability of the Plan at the confirmation hearing, then scheduled for November 18, 2011.

In order to alert the parties to these concerns prior to the confirmation hearing, on November 16, 2011, I entered an order, sua sponte ("the November 16[th] Order") modifying the

---

[27]   I use the term "curious" because in the prior notices regarding developments in the Bond Litigation, BNYM described the legal arguments of the Bondholders' adversary in considerable detail, but did not do so here. Was BNYM reticent because a discussion of Becker's Motion to Reconsider would have brought the existence of the Third Party Release to the attention of the Bondholders in a more prominent way, right at the outset of the plan voting period?

[28]   Although the Third Party Release was mentioned in the Becker Motion for Reconsideration, Becker withdrew that Motion before I had any reason to study it closely.

9019 Order insofar as it addressed the Third Party Release. The November 16th Order provided:

    D.   At the conclusion of the [9019 H]earing, the court stated its intention to grant the [9019] Motion and approve the settlement, but also explained that the order approving the settlement would not affect, in any way, any claims that the parties known as the Bondholders may have against the Bond Trustee.

              . . .

    F.   Through inadvertence and clerical error, the Approval Order includes language that might be interpreted to provide that, upon the effective date of the Debtor's plan of reorganization, the Bondholders shall be deemed to have released the Bond Trustee from any and all claims and causes of action arising under or in any matter related to the Indenture.

    G.   The text of the Approval Order is inconsistent with the court's announced decision and its stated intent at the hearing.

    H.   Pursuant to Fed. R. Bankr. P. 9024, the court finds it appropriate to enter this order correcting its clerical error.

        It is therefore **ORDERED** that . . . Paragraph 2 [of the 9019 Order] is **MODIFIED** to read as follows:

        The Stipulation between and among the Debtors, the Bond Trustee, and the Committee, attached to the Motion as Exhibit "A" is **APPROVED; PROVIDED HOWEVER,** that nothing in the Stipulation or this Order shall waive, release, discharge or impair any claims that the Bondholders may have against the Bond Trustee.

(quotation marks and footnote omitted). (Bky. Doc. # 1457; Adv. Doc. # 115).

### N. The November 17, 2011 Telephone Conference

Not surprisingly, shortly after the November 16th Order was docketed, the parties

requested a conference with the court. An on-the-record telephone conference was scheduled

and held on November 17, 2011.  Counsel for BNYM, the Debtors, the Committee and Becker

participated in the conference call.

During the call, BNYM's counsel articulated to the court, for the first time, the legal

rationale for including the Third Party Release in the settlement of the dispute between the

Debtors and the Bondholders (and negotiated by BNYM on behalf of the Bondholders) –

essentially, that the overall settlement, including the Third Party Release, was in the best interests

of the Bondholders.  (11/17/11 Tr. at 6, 8, 13-18, 25).[29]  Counsel also asserted that the November

16th Order effected a "substantive change" in the rights of the parties and that BNYM would not

have entered into the settlement without court approval of the Third Party Release.  (Id. at 6, 30,

33).

The telephone conference concluded with counsel for BNYM requesting a continuance of

the confirmation hearing to permit the filing and resolution of a motion for reconsideration of the

November 16th Order.  Satisfied that the Order had accomplished its purpose of framing the issue

for the parties, I agreed that BNYM was entitled to be heard further on these issues.

Consequently, I issued an order: (1) setting a briefing schedule for the contemplated motion for

reconsideration and scheduling the hearing for December 2, 2011; and (2) granting the Indenture

Trustee's request for a continuance of the confirmation hearing, deferring that hearing as well to

December 2, 2011.  (See Bky. Doc. # 1466; Adv. Doc. # 117).

As promised, BNYM filed a motion to reconsider the November 16th Order ("the Motion

to Reconsider") on November 23, 2011.  (Bky. Doc. # 1476; Adv. Doc. # 120).

_____

[29]     I will discuss that rationale further in Part III.D.2, infra.

-36-

### O. The December 2, 2011 Confirmation Hearing

Like a Tarantino movie,[30] the narrative in this Opinion comes full circle back to its starting point – the confirmation hearing.

At the commencement of the hearing, the Debtors' counsel reported that the parties had reached a "partial resolution" because everyone was in agreement that a plan should be confirmed. (12/2/11 Tr. at 6) (Bky. Doc. # 1819). His statement proved to be overly optimistic because what followed was a lengthy colloquy with counsel regarding the terms and consequences of an order that would permit the Plan to be confirmed while deferring the approval of the Third Party Release to a later date. (12/2/11 Tr. at 6-34). After it became clear that it was unclear whether the parties truly had reached an agreement, the colloquy was followed by a lengthy recess in which the parties continued to negotiate.[31] Approximately 2 ½ hours later, the hearing resumed and the parties put on the record that they had, in fact, reached an agreement.

There were two (2) essential parts of the agreement.

The first part involved the "restoration" of the 9019 Order with one (1) change. That change was the deletion of Paragraph (viii) of the 9019 Order, see n.17, supra, i.e., the finding that upon the effective date of the Plan the Bondholders were releasing their claims against the Debtors and the Indenture Trustee. (Id. at 36).

The second part of the agreement provided for the inclusion of language in the

---

[30]     See Pulp Fiction (directed by Q. Tarantino) (Miramax Films 1994).

[31]     I participated in some of those negotiations with counsel in chambers.

-37-

confirmation order that would confirm the Plan without regard to the permissibility,

enforceability and scope of the Third Party Release and resolution of those issues at a later date,

with the rights of all parties reserved. (Id.).

Thereafter, as stated at the outset of this Opinion, the Debtors made their evidentiary

record. Included was the report of plan voting ("the Report") prepared by a representative of

Donlin Recano. (See Bky. Doc. # 1447) (Ex. I-21). According to the Report, all of the impaired

classes, except one (1) – medical malpractice claimants[32] – voted to accept the Plan. With

respect to Class A3 (the Bondholders), 95 votes were received: 90 votes to accept the plan,

representing $13.29 million of the voted claims and 5 votes to reject the plan, representing

$265,000.00 of the voted claims. The acceptances represented 98.05% of the amount and

94.74% of the number of the voted claims. (Id. at 7).

Following the Debtors' evidentiary presentation, I announced my decision to confirm the

Plan. (12/2/11 Tr. at 75-76).


### P. The December 7, 2011 Orders

On December 7, 2011, I entered two (2) orders, consistent with the events at the

confirmation hearing.

The first order "[v]acated" the Nov. 16th Order, and "reinstated" the original 9019 Order,

with one (1) modification. The modification was set forth in Paragraph 2, which provided that

"Paragraph (viii) of the [9019] Order is **DELETED**." (See Bky. Doc. # 1542, Adv. Doc. # 128).

---

[32]        No votes were received from this class.

The second order entered on December 7, 2011 was the confirmation order ("the

Confirmation Order") (Bky. Doc. # 1538).  In addition to confirming the Plan, the Confirmation

Order implemented the parties' agreement to sever the court's consideration of the Third Party

Release from the balance of the Plan.  The Confirmation Order provided:

> 4.  . . . [T]he entry of this Order is without regard to the permissibility,
> enforceability and scope of the release contained in **Plan §15.7**, which
> shall be subject to a further hearing before this Court by and between
> the Bond Trustee and Leonard Becker. The outcome of such hearing
> **WILL NOT AFFECT** the confirmation of the Plan in any manner
> whatsoever.

> 5.  Neither the Court's entry of this Order, nor the fact that the Bond
> Trustee and Leonard Becker have consented to the court's further
> consideration of **Plan §15.7** at a later hearing shall prejudice either
> such party at the subsequent hearing.

> 6.  . . . [T]he entry of this Order shall not affect the determination of
> whether the requirements for the release are met or not under any
> applicable law, including, without limitation, issues relating to
> adequate notice.

(Confirmation Order at 2-3) (Ex. I-23).

### Q. The March 2, 2012 Hearing

On March 2, 2012, the hearing contemplated by Paragraphs 4-5 of the Confirmation

Order was held.

At the hearing, the Indenture Trustee introduced more than forty (40) exhibits into

evidence.  Most of the exhibits provided documentary support for the procedural and factual

history that I have outlined above.

Ms. Schessler was the only witness at the hearing.  In her testimony, she authenticated

certain documents later admitted into evidence.  Also, she described in some detail the manner in

-39-

which the Indenture Trustee provided information to the Bondholders in the form of written notices.

At the conclusion of the hearing, I took this matter under advisement.


## III. DISCUSSION

### A. The Legal Dynamics Created by the Indemnification Provisions of the Loan Agreement and the Indenture

This dispute is an outgrowth of the exculpation, liability and indemnification provisions of the Indenture and the Loan Agreement. Consequently, before working through the various legal issues raised by the parties, it is helpful to begin by reviewing, a bit further, certain provisions of the Loan Agreement and the Indenture. Those provisions shed light on the reasons for the Third Party Release, the nature of the rights that the Bondholders would be giving up through the release and the sufficiency of the procedures that the parties employed in their attempt to bind all creditors to the global agreement memorialized in the Settlement Stipulation and the chapter 11 plan.


### 1. the relevant provisions of the Loan Agreement and the Indenture

The indemnification provisions themselves are best understood as products of the multi-party nature of the Bond Transaction.

The ultimate debtor-creditor relationship in the Bond Transaction was between LBH and the Bondholders. The Authority served essentially as a pass-through entity that facilitated the financing by raising the loan proceeds through the issuance of the Bonds, but then passing on all

-40-

further obligations in the Bond Transaction to other parties.  In fact, its obligation to repay the

Bondholders was severely circumscribed:

> The Bonds are payable solely from the Pledged Revenues, and any other
> moneys held by the Trustee hereunder for such purpose. There shall be no
> other recourse under the Bonds, this Indenture, the Loan Agreement or
> otherwise against the Authority or any other property now or hereafter
> owned by it.

(Indenture §15.01).

BNYM, in its capacity as the Indenture Trustee, too, played a specialized role as the

representative of the Bondholders in the Bond Transaction.  Though counterintuitive, the

prevailing view is that an indenture "trustee" is not a traditional "trustee" with fiduciary duties to

the bondholders.

> Unlike the typical trustee whose rights and duties are grounded in the
> common law, the obligations of the Indenture Trustee are circumscribed
> by the terms of the Indenture. [An indenture trustee's] duties are defined
> by contract, and [it] owes the debenture holders no fiduciary duties beyond
> those provided by the Indenture.

Lorenz v. CSX Corp., 736 F. Supp. 650, 656 (W.D. Pa. 1990), aff'd, 1 F.3d 1406 (3d Cir. 1993)

(collecting authorities and applying New York law); accord Baker v. Summit Bank, 46 F. App'x

689, 690 (3d Cir. 2002) (nonprecedential) ("prior to default, the Indenture Trustee owes the

debenture holders no fiduciary duties beyond any that may be required by the Indenture

instrument"); see also In re E.F. Hutton Southwest Properties II, Ltd., 953 F.2d 963, 968 (5th Cir.

1992) ("if an indenture trustee owes any fiduciary duties to the beneficiary above and beyond

those duties explicitly recited in the trust indenture, they are much more attenuated than those

normally owed by trustees").[33]

Another commentator has described the nature of an indenture trustee as follows:

> The term "trustee" evokes strictly enforced fiduciary duties. But an indenture trustee for a corporate bond has quite a different status and serves different functions than, say, a trustee in a traditional trust. Until an Event of Default occurs, the trustee has virtually no obligations towards the bondholders (though it performs administrative tasks for the company, such as mailing notices or selecting bonds for redemption). . . . The only substantive pre-Event of Default obligation of the trustee is to inform bondholders of any default known to the trustee, and even this obligation can be dispensed with if the trustee determines that withholding such notice from the bondholders is in their interest.  Once an Event of Default has occurred, the trustee's duties increase.

Marcel Kahan, Rethinking Corporate Bonds: The Trade-off Between Individual and Collective

Rights, 77 N.Y.U.L. Rev. 1040, 1063 (2002) (footnotes omitted).[34]

Perhaps consistent with the privileged status enjoyed by indenture trustees, the Bond

Transaction documents here included a number of provisions that protect the Indenture Trustee's

compensation rights.  For example, the Indenture provided that the Authority was obliged to pay

the Indenture Trustee reasonable compensation and reimbursement of its expenses[35] and, in the

---

[33]     Most of the case law on the subject of the duties of indenture trustees applies New York law.  The parties have not cited any germane Pennsylvania state court decisions on the subject.  Nor have I located any.

[34]     This conception of the role of the indenture trustee is not uniformly held.  Another commentator has written, "Currently, most courts agree that the indenture does not create a trust relationship as customarily considered in the private field, but many of them still regard the trustee as subject to full fiduciary responsibilities."  Efrat Lev, The Indenture Trustee: Does it Really Protect Bondholders?, 8 U. Miami Bus. L. Rev. 47, 61 (1999).

[35]     As explained earlier, however, this obligation is enforceable against the Authority only from the Bond revenues.  (Indenture §15.01).

event of a default on this obligation, "the [Indenture] Trustee may deduct the amounts owing to it

from any moneys coming into its hands before making any payment on any Bonds." (Indenture

§11.4). Similarly, if the Indenture Trustee exercised its duties and powers following a default, it

had the right to be repaid for its costs (including attorney's fees) from Bond revenues before

payments were made to the Bondholders. (See Indenture §10.11).

Most pertinent in the present dispute, the Bond Transaction documents also were

designed to narrow BNYM's exposure to liability and economic loss. The cumulative effect of

the various indemnification provisions was that LBH served as a guarantor against losses that

might be suffered by BNYM, except for those arising from conduct in the nature of gross

negligence, bad faith or misconduct.[36]

It is most instructive to compare BNYM's indemnification rights against LBH with the

Indenture provisions governing its potential liability to the Bondholders. Section 11.03 of the

Indenture provided that the Indenture Trustee "shall not be answerable for the exercise of any

discretion or power under this Indenture nor for anything whatever in connection with the trust

hereunder, except only its own wilful misconduct or negligence." (Indenture §11.03) (emphasis

added).[37]

---

[36]     As explained earlier in Part II.B. above, the Loan Agreement created broad
indemnification rights running from LBH to the Authority. See n. 7, supra & accompanying text.
Further, the Loan Agreement created a separate obligation on the part of the Debtor to indemnify the
Indenture Trustee in the same manner as the Debtor was obliged to indemnify the Authority. (Loan
Agreement §11.4(e)).

[37]     Negligence may not be a particularly "high" standard for potential liability; however,
consistent with the Indenture Trustee's rationale that it owes only contractual and not fiduciary duties to
the Bondholders, this provision presumably is intended to be one of limitation by establishing
"reasonableness" as the standard of conduct as opposed to any arguably higher standard of conduct that
might apply to a fiduciary.

Thus, while the Indenture Trustee could be liable to the Bondholders for its negligence, such liability was subject to indemnification by LBH. In short, in any case other than one involving gross negligence, bad faith or fraud, BNYM could look to LBH to make it whole for any liability or expenses it incurred as a result of litigation arising from the performance of its duties under the Indenture.

It is against this legal backdrop that the negotiations that resulted in the Settlement Stipulation and the Confirmed Plan took place.

### 2. the impact of the global settlement negotiations on BNYM's rights under the exculpation, liability and indemnification provisions

When the Settlement Stipulation was negotiated, Becker's class action lawsuit had not yet been filed. The negotiations themselves involved representatives of multiple creditor constituencies, the primary ones being the Indenture Trustee (for the Bondholders), the Committee (acting for the general unsecured creditors) and the PBGC.

Given what emerged from the settlement negotiations, as well as the undisputed economic exigencies that led to LBH's bankruptcy filing, it is apparent that the parties were negotiating over the division of a limited pie, i.e., the perceived maximum amount that the distressed Debtors would be able to distribute to creditors. For its part, LBH undoubtedly sought a global resolution that would result in a consensual reorganization plan that discharged not only its liquidated pre-petition obligations, but also its contingent, unliquidated indemnification obligations. From LBH's perspective, elimination of its indemnification obligations would be desirable as a means of minimizing unknown future risk.

The parties reached an agreement that satisfied both of LBH's objectives. It was LBH's achievement of its second objective – the release of its indemnification obligations under the Loan Agreement – that upset BNYM's equilibrium and created the negotiation dynamics that resulted in this contested matter. Any agreement that released LBH's indemnification obligations exposed BNYM to losses that were potentially substantial, without any right to look to LBH for indemnification.[38] It is not especially surprising, then, that as part of the negotiated release of LBH's indemnification obligations, BNYM pressed the Debtors to include the Third Party Release in the Settlement Stipulation and the proposed plan of reorganization. The Debtors agreed to this demand.

This is the flash point in the dispute.


## B. The Parties' Basic Contentions

To provide the reader with a frame of reference, I summarize below the primary contentions of the parties.[39]

---

[38]     The settlement resulted in a distribution to the Bondholders of $8.15 million on claims aggregating over $25 million. While it may be overly simplistic to assume that this entire loss was proximately caused by the loss of the perfection of the Bondholders' lien, it would not be surprising if an aggressive plaintiff bondholder took that position. Thus, even if BNYM were confident that it had not been negligent and was not liable to the Bondholders, bondholder claims would present a low risk of liability on a potentially substantial claim. And, in any event, the loss of the LBH indemnity would leave BNYM saddled with the ultimate responsibility for payment of its defense costs.

[39]     The summary in the text is just that – a basic statement of the fundamental contentions of the parties. In fact, in their detailed memoranda of law, the parties articulated a number of nuanced legal theories in support of their core contentions. Some, but not all, of these supporting theories will be discussed later in this Opinion.

-45-

Becker argued:

- the bankruptcy court lacks subject matter jurisdiction to enter an order that affects the legal relationship between the two (2) non-debtors involved here;

- inclusion of the *Third Party Release* in the Plan would violate Fed. R. Bankr. P. 3016(c) because the existence of the Third Party Release was not adequately disclosed to the Bondholders;[40]

- the Bondholders' claims against the Indenture Trustee may be released through confirmation of a chapter 11 plan only with the consent of each affected creditor and consent was not obtained in this case;

- even if the Bondholders' claims against the Indenture Trustee are "derivative" claims[41] that, in some circumstances may be released through confirmation of a chapter 11 plan,[42] the Indenture Trustee has not proven that the Third Party Release meets the applicable legal standards.[43]

---

[40]      Rule 3016(c) provides:

> **Injunction Under a Plan**. If a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction.

[41]      A "derivative" claim is one in which there is "an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate." In re Zenith Electronics Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999).

[42]      In In re Continental Airlines, 203 F.3d 203 (3d Cir. 2000), the court suggested that there may be cases in which a non-consensual third-party release may be permissible based on "fairness, necessity to the reorganization, and specific factual findings to support these conclusions," 203 F.3d at 214, but on the facts presented, found it unnecessary to establish a "rule regarding the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible," id. The court also implied that such release may be permissible only in "extraordinary cases." Id. at 212.

[43]      In In re South Canaan Cellular Investments, Inc., 427 B.R. 44, 72 (Bankr. E.D. Pa. 2010),
(continued...)

In its lengthy response, the Indenture Trustee argued:

- the court has jurisdiction to enforce the Third Party Release;

- there was adequate disclosure of the Third Party Release in both the Rule 9019 approval and confirmation processes;

- the Bondholders consented to the Third Party Release because no Bondholder objected to the 9019 Motion;

- the Third Party Release was an essential component of a global settlement that was fair to the Bondholders and necessary to the success of the Debtors' reorganization, thereby satisfying the standards under the applicable case law regarding bankruptcy court approval of third-party releases in chapter 11 reorganization plans.

.

---

[43](...continued)
the court stated:

> The courts issuing such injunctions and releases have identified a number of factors that are important in deciding whether an injunction and/or release should be issued. These factors include (1) whether the third party who will be protected by the injunction or release has made an important contribution to the reorganization; (2) whether the requested injunctive relief or release is "essential" to the confirmation of the plan; (3) whether a large majority of the creditors in the case have approved the plan; (4) whether there is a close connection between the case against the third party and the case against the debtor; and (5) whether the plan provides for payment of substantially all of the claims affected by the injunction or release.

Courts in this Circuit generally have evaluated the permissibility of third-party releases included in chapter 11 plans based on the test stated in South Canaan Cellular or a slight variant often attributed to Master Mortgage Inv. Fund, Inc., 168 B.R. 930, 934-35 (Bankr. W.D. Mo. 1994). See, e.g., In re Washington Mutual, Inc., 442 B.R. 314, 345-46 (Bankr. D. Del. 2011); In re Congoleum, Corp., 362 B.R. 167, 192 (Bankr. D.N.J. 2007); In re Prussia Associates, 322 B.R. 572, 597-98 (Bankr. E.D. Pa. 2005); In re Exide Technologies, 303 B.R. 48, 71-74 (Bankr. D. Del. 2003); In re Genesis Health Ventures, Inc., 266 B.R. 591, 607 n.15 (Bankr. D. Del. 2001); Zenith Electronics, 241 B.R. at 110.

### C. The Court Has Subject Matter Jurisdiction

Becker's lead argument is that this court lacks jurisdiction to enter an order approving the

Third Party Release. I must address that issue first.[44]

### 1. the court had subject matter jurisdiction on December 2, 2011
### to decide the contested matter relating to the confirmability of §15.7 of the Plan

Consistent with Paragraph 5 of the Confirmation Order, I will begin my analysis by

employing the legal fiction that I am determining whether the court has jurisdiction to approve

the Third Party Release as part of a comprehensive chapter 11 plan of reorganization. In other

words, the issue is whether this court had subject matter jurisdiction on December 2, 2011 to

confirm the entire Plan, including the Third Party Release. I conclude that it did.

As is often set out in reported opinions, bankruptcy subject matter jurisdiction provided

by 28 U.S.C. §1334(a) and (b) potentially extends to four (4) types of title 11 matters: (1) cases

under title 11; (2) proceedings arising under title 11; (3) proceedings arising in a case under title

11; and (4) proceedings related to a case under title 11. See, e.g., In re Combustion Engineering,

Inc., 391 F.3d 190, 225-26 (3d Cir. 2004). Ultimately, all matters, other than the bankruptcy case

itself, that a bankruptcy court may hear fall into two (2) categories: (1) "core proceedings" arising

under title 11 or cases under title 11; and (2) "non-core proceedings" that are otherwise "related

---

[44]     As a general rule, a federal bankruptcy court has an independent duty to satisfy itself that
it has subject matter jurisdiction over any pending matter before reaching the merits of a case. See, e.g.,
Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998); In re Mullarkey, 536 F.3d 215, 220-21
(3d Cir. 2008); Hubi v. Nalty, 2011 WL 2292808, at *1 (E.D. Pa. June 8, 2011); In re Olick, 2010 WL
4509828, at *1 n.5 (Bankr. E.D. Pa. Nov. 9, 2010) (citing cases); In re Shuman, 277 B.R. 638, 654 n.8
(Bankr. E.D. Pa. 2001).

to" a case under title 11. See 28 U.S.C. §157(b), (c); Mullarkey, 536 F.3d at 221.

Becker argues that no bankruptcy purpose is served by the release of the Bond Trustee

because the outcome of the Bondholders' claims against BNYM could have no conceivable

impact upon the Debtors' estates in this case. (Becker Mem. of Law at 13) (citing Pacor Inc. v.

Higgins, 743 F.2d 984, 994 (3d Cir. 1984)).

Based on the state of affairs on December 2, 2011, I am unpersuaded by this argument.

Assuming arguendo that Becker's "related to" jurisdiction is the proper analytic framework,[45] I

---

[45]    There is a reasonable case to be made that Becker, and perhaps the courts in some
reported decisions, have conflated subject matter jurisdiction with the substantive merits. The issue
before the court on December 2, 2011 was the confirmation of the plan, a contested matter designated as
a "core proceeding" in 28 U.S.C. §157(b)(2)(L).

While the Supreme Court's decision in Stern v. Marshall, 131 S. Ct. 2594 (2011)
certainly shows that courts cannot assume uncritically that Congress' designations in §157(b) are
constitutional, Stern involved the allocation of final decision-making responsibility as between the
district court and the bankruptcy court, not subject matter jurisdiction. It also involved bankruptcy court
resolution of a matter governed by state law, not confirmation of a plan pursuant to the Bankruptcy Code.
If a bankruptcy court lacks subject matter jurisdiction over plan confirmation, it is hard to conceive of
any matter that would fall within bankruptcy subject matter jurisdiction.

Because there is no express provision of the Bankruptcy Code authorizing the
confirmation of plans that include third party releases, the decisional law on the subject permitting
confirmation of such plans appears to be a judicial gloss on the statute, albeit one grounded in 11 U.S.C.
§105. Viewed from that perspective, arguably, it may be more accurate to conceptualize a ruling, in a
particular case, that the bankruptcy court lacks the authority to approve a particular third-party release or
impose a particular injunction because the nexus between the released or enjoined matter and the
bankruptcy case is too attenuated, as a decision of substantive bankruptcy law – i.e., establishing the the
boundary line of permissible plan provisions – rather than a decision based on subject matter
jurisdiction under 11 U.S.C. §1334(b). But see Tennessee Student Assistance Corp. v. Hood, 541 U.S.
440, 447 (2004) (suggesting that the exercise of bankruptcy jurisdiction involves in rem proceedings
"premised on the debtor and his estate").

The distinction I am drawing may be solely academic and have no practical
consequences, at least in most cases. Whether conceptualized as jurisdictional or substantive, Becker
contends that the nexus between his class action and the Debtor's reorganization is so minimal that the
bankruptcy court should not be involved.

-49-

perceive a sufficient impact on the bankruptcy estate to provide this court with "related to" jurisdiction.

The controlling case in this Circuit on the issue at hand is In re W.R. Grace & Co., 591 F.3d 164 (3d Cir. 2009).  In W.R. Grace, the court held that the bankruptcy court lacked jurisdiction to enjoin an action by one non-debtor against a second non-debtor who held only a potential common-law indemnification claim against the debtor and stated the rule that "a federal bankruptcy court does not have related-to jurisdiction over a third-party lawsuit if that lawsuit would affect the bankruptcy proceeding only through the intervention of yet another lawsuit." Id. at 175.  However, the court emphasized that common-law indemnification claims differ materially from contractual indemnities.  If the debtor's contractual indemnification obligation to the non-debtor defendant is clear, it may be a de facto determination of a claim against the debtor.  As such, the debtor's contractual indemnification obligation to a non-debtor defendant may "present[] a more direct threat to [the] reorganization" sufficient to provide the bankruptcy court with subject matter jurisdiction, a determination that the bankruptcy court should determine on "a fact-specific, case-by-case basis." Id. at 173-74 & n.9; see also McCartney v. Integra Nat'l Bank North, 106 F.3d 506, 510 (3d Cir. 1997) (holding that even though the automatic stay generally does not apply to actions by a creditor against third-parties, it may be extended to third-parties such as when "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor") (quoting A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986)).

As amplified below in Part V.A.I., LBH owed a clear contractual indemnification duty to

-50-

BNYM.  Absent the bankruptcy filing, there is no doubt that if Becker's class action complaint

against BNYM were successful, LBH would be obliged to indemnify BNYM for its liability and

defense expenses, unless the liability arose from gross negligence, wilful misconduct, fraud or

deceit.  Consequently, BNYM's contractual indemnification obligation gives it a potentially

significant claim in the bankruptcy case and creates the requisite nexus between Becker's class

action claims against BNYM and LBH's reorganization.  The indemnification is sufficient to

provide this court with subject matter jurisdiction over the Third Party Release provision in the

Plan.  See Toth v. Bodyonics, Ltd., 2007 WL 792172, at *2 (E.D. Pa. Mar. 15, 2007) ("related

to" jurisdiction exists if indemnification agreement "will create liability for the . . . bankrupt

estate if plaintiff prevails" in third-party action).

### 2. the court retained jurisdiction to decide the contested matter after entry of the Confirmation Order

As a result of the parties' agreement on December 2, 2011 to permit the confirmation

hearing to go forward on all parts of the Plan other than the Third Party Release, there is more to

Becker's jurisdictional argument.

The Plan has been confirmed and pursuant to Paragraph 4 of the Confirmation Order, the

outcome of this contested matter regarding the Third Party Release will not affect the

confirmation of the other provisions of the Plan.  Becker now argues that the outcome of the

class action litigation between the Bondholders and BNYM can have no effect on the Debtors'

estate or the allocation of assets because the Debtors' indemnification obligation to BNYM has

been discharged.[46]  See 11 U.S.C. §1141(d)(1).

Becker makes this argument notwithstanding the parties' agreement made in open court

on December 2, 2011.  Ordinarily, Becker would be bound by his agreement and the

Confirmation Order.  However, the issue here is the court's subject matter jurisdiction.  Because

it is black letter law that the parties cannot consent or stipulate to jurisdiction where it does not

exist, e.g., In re Seven Fields Dev. Corp., 505 F.3d 237, 262 n.23 (3d Cir. 2007); Wall St. Aubrey

Golf, LLC v. Aubrey, 189 F. App'x 82, 87 (3d Cir. 2006) (nonprecedential), Becker cannot be

said to have waived this objection when he consented to the deferral of the litigation without

prejudice.  Therefore, I must address the jurisdictional issue.

In Chapman v. Currie Motors, Inc., 65 F.3d 78 (7th Cir. 1995), the Seventh Circuit stated

the general rule regarding the effect of changes of circumstances as follows: "Ordinarily, when a

case is within federal jurisdiction when filed, it remains there even if subsequent events eliminate

the original basis for federal jurisdiction."  Id. at 81 (citing St. Paul Mercury Indemnity Co. v.

Red Cab Co., 303 U.S. 283, 293 (1938) and Pratt Central Park Ltd. Partnership v. Dames &

Moore, Inc., 60 F.3d 350, 351 (7th Cir. 1995)); accord Natural Resources Defense Council, Inc. v.

Texaco Ref. & Mktg., Inc., 2 F.3d 493, 502 (3d Cir. 1993) (subject matter jurisdiction is

determined with respect to circumstances at time complaint is filed and, subject to principles of

---

[46]    BNYM counters this argument by asserting that its indemnification claim is entitled to
administrative expense status and would thus be entitled to priority treatment in the bankruptcy. (BNYM
Mem. of Law at 52) (citing In re Garden Ridge Corp., 323 B.R. 136 (Bankr. D. Del. 2005); In re Bradlees
Stores, 2003 WL 76990, at *2 (S.D.N.Y. Jan. 9, 2003)).  Becker disputes BNYM's entitlement to an
administrative expense on the grounds that: (a) the deadline for filing a request for the allowance of an
administrative expense has expired; and (b) on the merits, the indemnity claim is a pre-petition claim, not
an administrative expense. (Becker Mem. of Law at 3 n.1, 16) (citing In re Grossman's, Inc., 607 F.3d
114 (3d Cir. 2010)).  Because I resolve the jurisdictional issue on other grounds, I express no view on the
strength of BNYM's argument.

mootness, post-filing events do not strip court of its properly conferred jurisdiction). <u>But see</u> <u>SG</u>
<u>& Co. Northeast, LLC v. Good</u>, 461 B.R. 532, 540 n.7 (Bankr. N.D. Ill. 2011).

  The question of retention of bankruptcy jurisdiction after a change in circumstances
frequently arises when an adversary proceeding is pending and the underlying bankruptcy case is
dismissed. In such situations, our Court of Appeals has held that there is an exception to the
general rule that dismissal of a bankruptcy case terminates all adversary proceedings for lack of
jurisdiction. <u>See</u> <u>In re Smith</u>, 866 F.2d 576, 580 (3d Cir. 1989). In its discretion, a bankruptcy
court may retain and continue to exercise jurisdiction that properly attached at the time an
adversary proceeding was commenced. In exercising this discretion, the court should consider:
(1) judicial economy; (2) fairness and convenience to the litigants; and (3) the degree of difficulty
of the related issues involved. <u>See</u> <u>id.</u>; <u>In re Blaylock</u>, 394 B.R. 359, 368 (Bankr. E.D. Pa. 2008).

  However, because the underlying bankruptcy case has not been dismissed and this is a
contested matter rather than an adversary proceeding, the analogy to <u>Smith</u> is not perfect. Nor
are some of the other common situations involving changes of circumstances on all fours with
this case. For example, there are decisions holding that a court may not exercise jurisdiction with
regard to property that no longer belongs to the estate. <u>E.g.</u>, <u>Matter of FedPak Sys., Inc.</u>, 80 F.3d
207, 214 (7th Cir. 1996). Other decisions discuss the exercise of bankruptcy court jurisdiction
after confirmation of a plan over post-petition breach of contract claims involving the debtor.
<u>See, e.g.</u>, <u>In re Blue Water Auto. Sys., Inc.</u>, 446 B.R. 808 (E.D. Mich. 2011); <u>NVF Co. v. New</u>
<u>Castle County</u>, 276 B.R. 340 (D. Del. 2002).

  To the extent the issue is discretionary, I will exercise my discretion to retain jurisdiction
over this contested matter. I reach this result for two (2) reasons. First, this is a core matter (<u>i.e.</u>,

confirmation of a plan), not a related proceeding, and the principle that the court retains

jurisdiction once it has validly attached generally should have more force in the context of core

matters.  See In re Williams, 256 B.R. 885, 892 (B.A.P. 8th Cir. 2001).  It is appropriate for this

court to exercise subject matter jurisdiction to decide whether the Confirmed Plan includes the

Third Party Release.  Perhaps the bifurcation of the confirmation ultimately will result in

disapproval of the Third Party Release on one (1) of the substantive grounds discussed in n.43,

supra,[47] but I consider it preferable to treat that argument as a substantive defense rather than a

jurisdictional one.  See id.  Furthermore, to the extent that the principles stated in Smith are

applicable, the equities favor retaining jurisdiction to consider the merits of the dispute.  The

court had jurisdiction to decide the issue on December 2, 2011 and all parties agreed to defer

litigation of the issue without prejudice.

For these reasons, I conclude that the court has subject matter jurisdiction over this

contested matter.


### D.  BNYM's Two (2) Distinct Roles in the Settlement Process

I now (at long last) approach the merits of the dispute.

In order to analyze the propriety of the Third Party Release and the sufficiency of the

process that was followed for obtaining court approval, it is necessary to consider, at least to

some degree, BNYM's role and status during the settlement negotiations.

Becker contends that once BNYM linked the terms of LBH's settlement with the

---

[47]      More specifically, Becker may continue to argue that with the discharge of BNYM's
indemnification rights, the Third Party Release is not necessary to the reorganization.

Bondholders to the Third Party Release, BNYM was hopelessly conflicted. Becker suggests that

BNYM had to be aware of the potential for litigation against it as the entity responsible for the

Bondholders' losses. As Becker sees it, why else would BNYM seek the Third Party Release in

the first place? Becker then suggests that once this conflict arose, BNYM breached its duty to

the Bondholders because it failed to obtain separate representation for the Bondholders and

compounded the error by demanding the Third Party Release as part of the settlement between

LBH and the Bondholders. (Becker Mem. of Law at 7). In Becker's view, this conflict of

interest poisoned all of the subsequent events in the Rule 9019 settlement approval and Plan

confirmation process.

      BNYM raises a host of arguments in response. The arguments fall into two (2) main

categories. First, BNYM asserts that due to the impending discharge of its indemnification rights

against LBH, it was within its legal rights to condition its acceptance on behalf of the

Bondholders of LBH's settlement terms on the inclusion of an additional term protecting BNYM

from liability from the constituency it was representing in the negotiations i.e., the Bondholders.

Second, BNYM suggests that, in any event, there was no conflict of interest because the terms of

the settlement, including the Third Party Release, were in the mutual best interests of the

Bondholders and BNYM. (BNYM Mem. of Law at 59-60).

      In order to decide this matter, I need not rule definitively on these issues. However, an

analysis of the arguments raised by BNYM provides a framework for evaluating the adequacy of

the disclosure in the Plan confirmation process, which is the issue that I ultimately find decisive

here. Therefore, I will discuss BNYM's position, briefly, below.

**1. Did BNYM have an unconditional right to condition its decision to settle the Bondholders' dispute with LBH on the inclusion in the settlement of a release of Bondholder claims against BNYM?**

BNYM's argument that it had the right to decline any settlement that benefitted the Bondholders unless the settlement included terms that protected it from Bondholder litigation is perhaps the most provocative contention in this dispute.

BNYM bases this argument on Article X of the Indenture, which includes provisions that, in BNYM's view, conferred upon the Indenture Trustee "the sole power to enforce rights on behalf of Bondholders." (Id. at 35 (citing Indenture §§10.03, 10.04, 10.07, 10.08)) (Doc. # 1959).[48] BNYM also stresses that not only was it "the only party that was empowered to represent the Bondholders collectively . . . in the [Bond L]itigation and in the bankruptcy case," but it was "not required to do so." (BNYM Mem. of Law at 38). In fact, BNYM asserts that it "was [not] required under the Indenture to take any action here whatsoever." (Id. at 38-39 (citing Indenture §11.07)).[49] Ultimately, BNYM's position appears to be that its willingness to participate in the settlement negotiations on behalf of the Bondholders justifies BNYM infusing demands for protection of its own interests in the negotiations because "[w]ithout the Bond Trustee, there could be no settlement." (BNYM Mem. of Law at 35).

---

[48]      Sections 10.03 and 10.04 of the Indenture authorize the Indenture Trustee to take various actions to enforce the Bondholders' rights in the event of a default, including instituting various forms of legal actions. Section 10.07 bars individual Bondholders from pursuing any default remedy, except upon certain conditions, which did not occur in this case. Thus, BNYM is correct insofar as it contends that during the relevant time period in this case, it served as the Bondholders' sole representative.

[49]      Section 11.07 of the Indenture provides that the Indenture Trustee has no duty to take any action after a default unless the owners of 35% of the principal amount of the outstanding bonds request that it do so and they provide the Indenture Trustee with a satisfactory indemnity.

This argument is flawed at its very core because it fails to evaluate properly the consequences of the indisputable fact that BNYM participated in the Bond Transaction in two (2) distinct capacities.

In one (1) capacity, pursuant to the contractual authority provided in the Indenture, BNYM served as the Bondholders' authorized representative in settlement negotiations that were designed to resolve the Bond Litigation and the Bondholders' claim in the bankruptcy case. In this first capacity, I refer to BNYM as "BNYM--Bondholder Representative." But during the negotiations, BNYM also acted in a second capacity. It took positions that were designed to protect its "personal" interests, i.e., its increased exposure to liability due to the fact that its indemnification rights against LBH (rights that belonged to BNYM, not the Bondholders) were on the negotiating table. In this second capacity, I refer to BNYM as "BNYM-Indemnitee."

I agree with BNYM that these indemnification rights were valuable and that it had a significant interest in the outcome of the negotiations. I also agree that without a resolution satisfactory to BNYM-Indemnitee, there could have been no truly globally consensual settlement. But it does not necessarily follow, as BNYM suggests, that BNYM-Indemnitee had a de facto veto power over confirmation of a plan. If the LBH-Bondholder settlement negotiations went forward without BNYM but with a different Bondholder representative and a global settlement agreement were reached without a Third Party Release that had the support of the other major creditor constituencies, it is by no means clear that the ensuing chapter 11 plan could not have been confirmed. (This is significant and I will further discuss the subject of BNYM's potential opposition to the reorganization in the next subsection).

More to the point, BNYM makes an unjustified leap in logic when it suggests that

-57-

because it was the Bondholders' sole authorized representative, it had the legal right to put the

interests of BNYM-Indemnitee ahead of the interests of the Bondholders. There is nothing about

BNYM's status as the Bondholders' sole authorized representative that justifies acting in any

manner other than in the Bondholders' interests. Nor does BNYM's lack of a threshold duty to

act on behalf of the Bondholders following a default justify self-serving conduct once it

undertook to represent the Bondholders' interests. Quite the opposite. Regardless of the label

put on its role (contractual agent or fiduciary), once BNYM chose to act as the Bondholders'

representative and participate in the settlement negotiations on their behalf, it was obliged to

represent the interests of the Bondholders faithfully.[50] A review of the relevant case law suggests

---

[50]     The potential consequences that could ensue if one accepts BNYM's position are
alarming, to say the least.

Consider the following hypothetical. During the negotiations, LBH offers the
Bondholders settlement terms on the economic issues (i.e., settlement of the Bond Litigation and plan
treatment of the Bondholders) that almost certainly appear to be favorable and acceptable to the
Bondholders. In response, BNYM proposes an additional term: tying the discharge of its indemnification
obligation rights to the Bondholders' release of their claims against BNYM. However, LBH (unlike the
facts in the real world case) refuses to include a provision requiring the Bondholders to release any
potential claims they have against BNYM, insisting instead, that those issues be resolved independently
from the Bondholder-LBH settlement. In these circumstances, according to BNYM, it would have the
right, while acting as the Bondholders' negotiating representative to reject the settlement on behalf of the
Bondholders, because BNYM's personal interests are not adequately protected by the proposed
settlement terms. Such a result would be antithetical with principles deeply rooted in our legal tradition.

It is possible to make the hypothetical even more extreme, for instance, by adding the
facts that: (1) BNYM was aware at the time it rejects the settlement, that it likely had been negligent and
could be held liable for substantial losses suffered by the Bondholders while also facing a substantial risk
that its indemnification rights against LBH were subject to discharge by confirmation of its chapter 11
plan; and (2) BNYM was aware that rejection of the global settlement likely would result in the failure of
the chapter 11 reorganization, imposing even further losses on the Bondholders.

By setting out this hypothetical, and adding these "aggravating" elements to it, I do not
mean to imply that I have any views on the merits of Becker's class action claims against BNYM.

that BNYM's argument to the contrary is utterly without merit.[51]

However, rejection of BNYM's contention that it had an absolute right to condition its

acceptance of the settlement terms offered by LBH to the Bondholders on the Bondholders'

release of their potential claims against BNYM is not dispositive in this matter.  BNYM contends

that the Third Party Release, in fact, was beneficial to the Bondholders, and therefore, that it

fulfilled its legal duties to the Bondholders.  I next consider that contention.

### 2. Was the Third Party Release in the mutual best interests of both BNYM and the Bondholders?

BNYM insists that its interests and the Bondholders' interests were consistent insofar as

the Third Party Release was concerned because inclusion of the Third Party Release in the global

settlement was beneficial to the Bondholders in at least two (2) material ways.

First, BNYM suggests that the Third Party Release maximized the Bondholders' return

---

[51]    BNYM states, unqualifiedly, that it "is not a fiduciary" and "[i]ts obligations and duties are governed entirely by the contract." (BNYM Mem. of Law at 59) (emphasis added).  It is difficult to understand how BNYM can make this claim in good faith.  Its statement is, at best, a superficial half-truth.

In Peak Partners, LP v. Republic Bank, 191 F. App'x 118, 122 (3d Cir. 2006) (nonprecedential), a decision cited by BNYM, a Third Circuit panel, acknowledged that an indenture trustee is not a traditional trustee and more akin to a stakeholder whose duties are contractually defined by the indenture.  However, the court also observed that New York law also imposes "a duty to avoid conflicts of interest with the beneficiaries" and further, after a default occurs, the indenture trustee's "duty to noteholders becomes more like that of a traditional trustee" with the obligation to "use the same degree of care and skill in [its] exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs while [the indenture trustee is] exercising its rights and powers under the Indenture." Id. (quotations and citations omitted).  Many other reported decisions concur with the analysis in Peak Partners. E.g., Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 2011 WL 6034310, at *16 (S.D.N.Y. Dec. 5, 2011) (even prior to default, when indenture trustee's duty is governed solely by terms of indenture, trustee must nonetheless "(1) avoid conflicts of interest, and (2) perform all basic, non-discretionary, ministerial tasks with due care"); Howe v. Bank of N.Y. Mellon, 783 F. Supp. 2d 466, 483 (S.D.N.Y. 2011) (same); Harriet & Henderson Yarns, Inc. v. Castle, 75 F. Supp. 2d 818, 832 (W.D. Tenn. 1999).

under the Plan because, absent the release, BNYM "would [have been] forced to exercise its

rights under the Indenture to assert a charging lien against the proceeds of the Stipulation to pay

for the costs of Mr. Becker's district court litigation." (BNYM Mem. of Law at 37). Second, as

mentioned earlier, BNYM believes that its involvement was essential to the global settlement

reached by the parties, a settlement that was in the Bondholders' best interests.

With respect to the first point, if BNYM is correct that it may ultimately pass on to the

Bondholders the expenses it incurs in defending against Bondholder claims, the dynamics of the

settlement are altered significantly. Assuming that the Bondholder claims are likely to be

unsuccessful, the Third Party Release would prevent dissipation of the Bondholders' distribution

by the Indenture Trustee expenses. In this respect, the Third Party Release would serve to protect

the majority of Bondholders from the having their distribution diminished by dissident

Bondholders who might bring meritless claims against BNYM. In these circumstances, the Third

Party Release may provide a benefit to the Bondholder constituency as a whole.

However, this asserted benefit may be illusory because it is not entirely clear that

BNYM's premise (i.e., the existence of a charging lien in its favor) is accurate. BNYM does not

pinpoint which provision in the Indenture gives it an unconditional charging lien for expenses

incurred in defense of the Bondholder litigation. Perhaps BNYM is referring to §11.04 of the

Indenture.[52] If so, and without deciding the issue, I have some doubt whether that provision

---

[52]     Section 11.04 of the Indenture provides:

> **Compensation and Indemnity.** The Authority shall pay, or cause the Hospital
> to pay, the Trustee reasonable compensation for its services hereunder, and also
> all its reasonable expenses and disbursements, all as shall be agreed upon in
> advance by the Authority, the Trustee and the Hospital. If the Authority defaults
> (continued...)

-60-

encompasses defense costs in Bondholder litigation, particularly if BNYM were found liable to the Bondholders in the litigation. Instead, §11.04 easily can be read to authorize BNYM's right to deduct its compensation and expenses only for performing its duties under the Indenture, not for defending itself from claims that it breached its duties. If BNYM's premise is incorrect, then the Third Party Release, by itself, would provide no particular economic benefit to the Bondholders.

As for BNYM's second "benefit" rationale, while my reasoning differs from BNYM's, I agree that its participation in and support of the Settlement Stipulation and the Plan arguably was very important to the success of the reorganization and maximization of the Bondholders' return and, therefore, might have provided the basis for the Bondholders to make a rational decision to support a global settlement that included the Third Party Release. This conclusion is neither self-evident nor indisputable, but it is an important point. So before I explain its ramifications, I will digress briefly to explain why BNYM's support of the global settlement may have been valuable to the Bondholders, but also why that conclusion is not tautological.

I have already rejected BNYM's contention that the Third Party Release can be justified based on its critical role in the reorganization arising from its status as "the only party that could achieve a settlement on behalf of the Bondholders." (BNYM Mem. of Law at 35). As discussed, once BNYM volunteered to act as post-default collective representative of the Bondholders in the bankruptcy negotiations, it had a duty represent the Bondholders' interests faithfully. However,

---

[52](...continued)
> in respect of the foregoing obligations, the Trustee may deduct the amounts owing to it from any moneys coming into its hands before making any payment on any Bonds.

-61-

BNYM was not only the Bondholders' representative; it also has its own separate interests and status as "BNYM-Indemnitee."

As BNYM-Indemnitee, BNYM always had the potential to decide that it no longer wished to participate in this case in both capacities. It could have withdrawn as the Bondholders' representative in the settlement process (perhaps by obtaining a "conflict" representative, as Becker has suggested) and simply asserted its personal rights as a creditor of LBH based on the indemnification provisions of the Loan Agreement. In such a scenario, it is possible to envision BNYM pressing for the allowance of a very large allowed unsecured claim based on its indemnification rights (before losing the benefit of the indemnification through its discharge in LBH's plan of reorganization) and the Debtor objecting to BNYM's claim. Resolution of that litigation likely would have resurrected many of the legal and factual issues from the Bond Litigation that the parties were attempting to resolve in the global settlement. Consequently, BNYM-Indemnitee could have acted as a hostile settlement holdout, threatening to jeopardize a fragile reorganization by imposing significant costs and delays on the confirmation of LBH's reorganization plan, to the detriment of the Bondholders.[53] BNYM had various weapons available for staking out such a position: pressing a large indemnity claim in claims litigation, voting to reject the chapter 11 plan and seeking allowance of a substantial administrative expense. See n.46, supra. Whatever the precise merits of BNYM's positions may have been, BNYM was in the position to place obstacles in the way of the reorganization.

---

[53] BNYM points out that "delay of a viable plan could [have] jeopardize[d] the proposed new bond issuance by Bucks County and the Bucks County Redevelopment Authority, which largely funded the cash settlement for the Bondholders." (Id. at 58). This concern, apparently, was shared by the other constituencies at the confirmation hearing on December 2, 2011.

Viewed in this light, a rational case can be made that the support of BNYM, <u>in its</u> <u>capacity as indemnitee</u>, was important, perhaps even essential, to the success of the reorganization. If so, all of the constituencies had an incentive to avoid this scenario, and in fact, did so by including the Third Party Release in the Settlement Stipulation. Under the foregoing analysis, the Third Party Release was an integral, inseparable and critical component of the global settlement.

Further, assuming that the economic terms obtained by the Bondholders in the global settlement were favorable (or at least the best that could be achieved), the Third Party Release arguably constituted a fair exchange for BNYM's support of the settlement. And, if the Bondholders made that judgment through the plan confirmation process in overwhelming numbers, a plausible case for court approval of the Third Party Release would exist under the case law in this Circuit. <u>See</u> n.43, <u>supra</u>.

There is, however, one (1) other variable. If the Bondholders believed that the claims being released (presumably, those raised in Becker's class action complaint) are meritorious and would result in a better return, a rational Bondholder might prefer to reject the global settlement and roll the dice on the option of litigating against BNYM, rather than accepting the global settlement and acceding to the Third Party Release. The converse, of course, is that if the Bondholders put little faith in the merits and potential benefits of pursuing claims against BNYM, acceptance of the global settlement that included the Third Party Release could be the more rational choice.

I now return to the key point here.

The above discussion illustrates that a reasonable, maybe even compelling, argument can

be made that inclusion of the Third Party Release in the Settlement Stipulation and the Plan was

fair to the Bondholders and in their best interests; or, as BNYM puts it, the interests of BNYM

and the Bondholders were "aligned." (BNYM Mem. of Law at 60). However, that conclusion is

not indisputable because it depends on one's assessment of the alternatives available to the

Bondholders to the global settlement that included a third-party release – specifically, whether

litigation against BNYM would produce a better outcome than the Settlement Stipulation.

But most importantly, in the context of a reorganization case, the permissibility of a plan

provision that releases a non-debtor from liability is <u>not</u> exclusively a question of whether a

bankruptcy judge is persuaded at the confirmation hearing that the negotiated plan that includes a

third-party release is a fair deal to the adversely affected creditor class. A critical factor in

assessing the confirmability of a plan that includes a third-party release is whether the adversely

affected class of creditors have manifested their strong support for the plan through the plan

voting process. <u>See</u> n.43, <u>supra</u>. In this respect, the chapter 11 process provides the opportunity

for the adversely affected constituency (here, the Bondholders) to make a threshold decision

whether they believe the plan is in their best interests, <u>i.e.</u>, to decide whether the benefits of the

proposed plan outweigh the drawbacks of the third-party release and to bind a minority of holders

within the class who disagree. Certainly, such a decision should be an informed decision. <u>See</u>

11 U.S.C. §1125(b). For the Bondholders to make an informed decision, it is essential that they

have adequate information.

Therefore, I turn next to the adequacy of the disclosures that were made to the

Bondholders in this case.

### E. The Third Party Release Cannot be Approved

#### 1. the 9019 Order does not control

Before considering the adequacy of the disclosures made to the Bondholders in the

confirmation process, I must address a preliminary argument made by BNYM.

This case differs from most chapter 11 cases in that prior to the plan disclosure and

solicitation period, the Third Party Release was presented initially to the Bondholders as part of a

Rule 9019 settlement approval process; the court approved the settlement. BNYM argues that

the court should not revisit the adequacy of the disclosures made to the Bondholders because that

issue was resolved by the entry of the 9019 Order, an order entered without objection by any

Bondholder. (BNYM Mem. of Law at 9). Respectfully, I disagree.

The flaw in BNYM's argument is that the Settlement Stipulation was not a stand-alone

agreement that was complete and enforceable upon court approval. The Settlement Stipulation

was linked inextricably to confirmation of the Plan. The enforceability of the material provisions

of the Settlement Stipulation were contingent upon the occurrence of the effective date of a plan

with provisions consistent with those described in the Settlement Stipulation. (See Settlement

Stipulation §§3-6, 19). Thus, the 9019 Order did not resolve with finality the treatment of the

Bondholders in the Debtors' plan of reorganization. That could be accomplished only through

the plan confirmation process, a process that requires adequate disclosure to the Bondholders.

See 11 U.S.C. §1125(a), (b).[54]

Indeed, when the Settlement Stipulation is examined closely, it becomes apparent that it

---

[54]      At the March 2, 2012 hearing, BNYM's counsel effectively conceded this point. (3/2/12
Tr. at 84-86).

was not a final settlement of any of the interrelated disputes among LBH, BNYM and the

Bondholders. At bottom, it provided only that the adversary proceeding would be dismissed and

that certain releases (including the Third Party Release) would be effective if and only if the

effective date were reached following confirmation of a chapter 11 plan that included certain

agreed-upon provisions affecting the Bondholders. In other words, at the time it was approved,

the Settlement Stipulation did nothing more than terminate the Bond Litigation, subject to the

resuscitation of that litigation if the confirmation process did not produce a result consistent with

the mutual expectations of the Debtors and BNYM.

This is not to say that the Settlement Stipulation was insignificant. To the contrary, it

changed the game dramatically by shifting the playing field from the adversary proceeding to the

confirmation process. On the new playing field, the former adversaries, BNYM and the Debtors,

were now on the same team. But, when the court approved the Settlement Stipulation, the

Bondholders had not yet taken the field (i.e., they had not yet voted to accept the plan whose

effective date was a condition to the finality of the settlement).

I am aware that the Debtors' "official" position, stated in the DS[55] and at confirmation,[56]

was that the Bondholder class was unimpaired following the approval of the Settlement

Stipulation. Presumably, this theory is based on the premise that the Bondholders were not

impaired so long as the Plan treated them consistently with the terms of the court approved

---

[55]    (DS at 1, 34).

[56]    (Affidavit of Albert Mezzaroba ¶¶42,67) (Doc. # 1456, the "Mezzaroba Affidavit"). The
Mezzaroba Affidavit was filed with the court on November 17, 2011. It also was admitted into evidence
by agreement at the confirmation hearing on December 2, 2011.

Settlement Stipulation. For the Bondholders to have been unimpaired, another necessary premise

is that, in settling the Bond Litigation, BNYM had the authority to bind the Bondholders to the

terms of a consensual plan, outside the plan solicitation and voting process, thereby effecting an

alteration of the Bondholders' "legal, equitable, and contractual rights"[57] prior to filing of the

Plan presented to the creditors and the court for confirmation.

I find both of these theories flawed.

As explained above, the Settlement Stipulation was fundamentally conditional. It did not

alter the Bondholders' rights in any final or conclusive fashion. It merely addressed the

consequences if the plan that the Debtors agreed to propose with BNYM's support were

confirmed and reached its effective date. Nor did it it deprive the Bondholders of their right to

vote on the Debtors' proposed plan.[58]

Nor can a convincing argument be made that in settling the Bond Litigation, BNYM had

the authority to bind the Bondholders to the terms of a consensual plan, outside the plan

solicitation and voting process. BNYM does not suggest that the Indenture gives the Trustee the

authority to vote Bondholder claims in a chapter 11 reorganization case. If the Indenture Trustee

cannot vote the claims, how can it bind the Bondholders to the terms of a plan that impairs their

---

[57]     11 U.S.C. §1124(1) states that a claim is unimpaired by a plan if the plan "leaves
unaltered the legal, equitable, or contractual rights to which such claim . . . entitles the holder . . . ."

[58]     It is likely that the Debtors harbored some doubt about the merits of their position that
the Bondholders were unimpaired. Why else solicit Bondholder votes on confirmation of the Plan? Was
it just a "straw poll" designed to provide evidentiary support for the proposition that the Plan (including
the Third Party Release) enjoyed the overwhelming support of the Bondholders – a requirement for court
approval of the Third Party Release under the applicable case law? Even if that were the sole function of
the solicitation to the Bondholders, the evidentiary value of the Bondholders' vote is dependent upon the
adequacy of the disclosure provided to the Bondholders. If the disclosure was inadequate, the results of
the voting have no probative value.

rights?[59]

In short, due to the relationship between the Settlement Stipulation and the Plan, the

finality of the LBH-Bondholder settlement embodied in the Settlement Stipulation was

contingent upon confirmation of the Plan.  Confirmation of the Plan, in turn, was necessarily

dependent upon the parties' compliance with the procedural and substantive confirmation

requirements established by the Federal Rules of Bankruptcy Procedure and the Bankruptcy

Code.

For all of these reasons, the 9019 Order is no bar to consideration of the adequacy of the

disclosures made to the Bondholders.[60]

---

[59]      Nor is the settlement of an adversary proceeding an appropriate vehicle to bind a class of
creditors to the terms of a proposed plan (absent authority delegated by the document appointing the
class' representative).  To permit the collective representative (BNYM) of a large, dispersed group of
creditors (such as the Bondholders) to achieve by settlement of an adversary proceeding what it
otherwise lacks authority to do would do violence to both the Indenture Trustee (and the principle that
the Indenture Trustee rights and duties are generally defined by the Indenture) as well as the chapter 11
solicitation and voting process.  Approval of a settlement agreement in which the parties resolve an
adversary proceeding by agreeing on terms for a consensual plan does not short circuit the plan
confirmation process or permit the parties to evade compliance with the applicable legal requirements for
confirmation of a chapter 11 plan.

[60]      Although BNYM has not specifically raised the argument, I have independently
considered whether the prior approval of the DS should preclude consideration of the adequacy of the
disclosure to the Bondholders regarding the Third Party Release at this stage of the confirmation process.
I conclude that it does not.

Ordinarily, the adequacy of a proposed disclosure statement is resolved at the hearing on
approval of the disclosure statement and would not be revisited at the confirmation hearing.  However, in
this case, in light of the content of Becker's objection to confirmation, the objection was a de facto
request for reconsideration of the DS Approval Order.  See Fed. R. Bankr. P. 9024 (subject to certain
exception not applicable here, Fed. R. Civ. P. 60 applies in bankruptcy cases); In re Spansion, Inc., 426
B.R. 114, 123-24 (Bankr. D. Del. 2010) (at confirmation hearing, court considered motion to vacate order
approving disclosure statement pursuant to Fed. R. Bankr. P. 9024 and Fed. R. Civ. P. 60(b)(3)).
However, I will not engage in a detailed analysis of Becker's rights under Rule 60(b).

Based on the factual history set out in Part II, particularly the disturbing events that
(continued...)

## 2. the pre-solicitation disclosures were inadequate

Based on my analysis of the purpose of the Third Party Release, the factors that the Bondholders necessarily needed to consider in evaluating whether the global settlement was in their best interest and the content of the disclosures provided to them (described in detail in Parts II.E., F., G. and I, supra), I am firmly convinced that the Bondholders did not receive adequate disclosures before they voted to accept the Plan.[61]

I find two (2) material deficiencies in the disclosures made to the Bondholders.

First, neither the DS nor the Non-DS Notices complied with Fed. R. Bankr. P. 3016(c).

Second, the DS was inadequate because it failed to provide the Bondholders with any information regarding the merits or value of the potential claims against BNYM that would be released by the Plan.

---

[60](...continued)
occurred at the 9019 Hearing detailed in Part II.H. above, I consider this an appropriate case in which to exercise the court's inherent power to reconsider a prior order. See, e.g., In re Waters, 2007 WL 3069326, at *3 (Bankr. D.N.J. Oct. 18, 2007); see also In re Rockaway Bedding, Inc., 454 B.R. 592, 598 n.3 (Bankr. D.N.J. 2011) (noting that majority view is that court's have authority to grant sua sponte relief under Rule 60(b)).

[61]      The Bankruptcy Code defines "adequate information" for plan disclosure purposes as including:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information . . . .

11 U.S.C. §1125(a)(1).

### a. Rule 3016(c)

Rule 3016(c) requires that a disclosure statement "describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction."[62]

Even assuming, as BNYM requests, that the adequacy of the disclosures for purpose of 11 U.S.C. §1125(b) and §1129(a)(1)-(3), are to be measured by considering not only the DS but also the Non-DS Notices, there was nothing conspicuous regarding the disclosure of the Third Party Release in any of the documents sent to the Bondholders. In both presentation and placement, the documents sent to the Bondholders did not differentiate the Third Party Release from any of the other information provided, and no effort was made to bring the existence of the Third Party Release to the eyes and attention of the Bondholders.

More specifically, the DS obscured the existence and significance of the Third Party Release by placing it along with the boilerplate disclosures of the Plan release provision that related to the Debtors. That provision, which provided for the release of Bondholders' claims against the Debtors, most likely is superfluous in that it does not expand the ordinary consequences of the Debtors' discharge at confirmation. See 11 U.S.C. §1141(a). By combining

---

[62]    Under a hyper-technical reading, Rule 3016(c) might be construed not to apply to a plan that includes a third-party "release," rather than "injunction." I decline to read the rule so narrowly. Its purpose is to alert parties in interest that the plan proposes to restrict their rights in ways that ordinarily would not result from confirmation of a plan. See generally, Advisory Committee Note to Rule 3016 (purpose of rule is to give "adequate notice" of plan injunction that is not "substantially the same" as that provided under the Code). Whether "enjoined" or merely "released," in this case, the Plan was designed to deprive the Bondholders of their right to prosecute a claim against a non-debtor. Therefore, Rule 3016(c) applies. Other courts appear to have assumed, as well, that Rule 3016(c) encompasses third-party releases. See, e.g., In re American Media, Inc., 2010 WL 5483463, at *6 (Bankr. S.D.N.Y. Dec. 20, 2010); In re Metro-Goldwyn-Mayer Studios, 2010 WL 5136417, at *3 (Bankr. S.D.N.Y. Dec. 6, 2010); In re Trident Resources Corp., 2010 WL 2881345, at *17 (Bankr. D. Del. June 15, 2010). BNYM does not argue to the contrary.

the two (2) disclosures, the DS required the reader to locate and process the words "and the Bond

Trustee" amongst less meaningful or even useless verbiage in order to ascertain and comprehend

its existence and significance. That is not a conspicuous disclosure.[63] Further, while the heading

"Release - Bond Documents" was in bold typeface, those words do not, by themselves, suggest

something out of the ordinary, i.e., anything other than the release of the Bondholders rights

against the Debtors under the Indenture. And, at the risk of over-analyzing this, the existence of

a second release (i.e., the Bondholders' release of claims against BNYM), was also obscured by

the use of the bolded word "Release" in the singular (as opposed to the plural "Releases").

    Not only did the DS obscure the significance of the Third Party Release by placing its

disclosure, without any emphasis, among the disclosure of other, routine, perhaps even

superfluous, releases that would result from confirmation of the Plan, the DS squandered the

opportunity to mention the Third Party Release in several places where it was germane. For

example, early in the DS, beginning at page 4, the plan proponents provide an "Overview of the

Plan" that begins with section "A. Summary of the Key Terms of the Plan." The Third Party

Release, the provision that BNYM now contends is "the backbone" of the Plan, (BNYM Mem.

of Law at 2), was not included in the bullet-point summary of the settlement of the Bond

---

[63]    As support for its position, BNYM cites the approval of a disclosure statement by a court
in another jurisdiction in which a "similar" plan release was disclosed "in a separate paragraph, with the
text of the release in a normal font, neither bolded nor italicized." (BNYM Mem. of Law at 44). I do not
find this authority persuasive because: (a) the facts are distinguishable (i.e., the disclosure of the release
in the cited case having been made in a separate paragraph from the other release disclosures); (b) there
is no indication that the court's decision was the product of an adversary process; and (c) the court
provided no explanation of why it considered Rule 3016(c) inapplicable. See In re Neenah Enters., Inc.,
2010 WL 3493037 (Bank. D. Del. July 6, 2010).

Litigation.[64]

BNYM points out that the (deficient) disclosure of the Third Party Release may have

been included in as many as ten (10) documents sent to the Bondholders. Again, this argument

makes the questionable assumption that the Non-DS Notices may even be considered when

determining the adequacy of disclosure (rather than measuring the adequacy of disclosure solely

by reference to the DS). However, assuming _arguendo_ that the Non-DS Notices are relevant, the

repetition of the same mistake made in the DS does not cure the Rule 3016(c) defect. It is

counterintuitive to assume that the Bondholders would locate an obscure disclosure simply

because it was repeated in a series of similar documents. If anything, the general similarity of the

serial notices would make it less likely that the recipients would parse carefully any of the later

documents.

Moreover, the obscurity of the Third Party Release was exacerbated in many of the

notices by BNYM's use of the somewhat misleading term "the Trustee Claim" to describe the

Bondholders' proof of claim against the Debtors that the Indenture Trustee filed on their behalf

in the bankruptcy case ("the Proof of Claim"). (Ex. I-6). Significantly, the Indenture Trustee

also included in the Proof of Claim its own claim for various expenses, including interest, fees,

and costs, it incurred pre-petition and post-petition and to which it was allegedly entitled under

the Bond Documents. By referring to both the Bondholders' claims and the Indenture Trustee's

indemnification claims as a single consolidated claim, BNYM created a significant ambiguity.

When BNYM "disclosed" the Third Party Release in the August 16th Notice by referring to "a

_____

[64]      I acknowledge that, unlike the Non-DS Notices, the DS disclosure included an additional
sentence that mentioned the Third Party Release. However, even that sentence was in regular typeface
and does not satisfy the "conspicuous language" requirement of Rule 3016(c).

release of any and all claims . . . against . . . the Trustee," a Bondholder could easily have

mistaken the words to refer to the Debtors' claims against BNYM and the Bondholders, rather

than the Bondholders' potential claims against BNYM, particularly because nowhere in any of

the Non-DS Notices did BNYM differentiate its indemnity claim against LBH from the

Bondholders' claim under the Bonds.

BNYM also suggests that it is "consistent with common practice for a bondholder

interested in the releases and discharges [in a chapter 11 case] to review such items in the

sections of the disclosure statement that describe such items." (BNYM Mem. of Law at 46).

This misses the point. Rule 3016(c) requires the DS to bring the third-party release to the

bondholders attention, not for the bondholder to hunt for it. In any event, BNYM presented no

evidence to support its contention as to bondholder "common practice" and there is no basis in

the record for the suggested factual finding.

### b. the absence of information regarding the merits or value of the potential claims against BNYM

The DS is also defective in that it failed to provide the Bondholders with any information

regarding the merits or value of the potential claims against BNYM that would be released by the

Plan. I have described the nature of the missing information above in Part III.B.2, so I will not

repeat that discussion. Suffice it to say that while the DS sets out the anticipated benefits of the

global settlement that was carried forward into the Plan, it failed to give the Bondholders any

sense of what they may have had to give up vis à vis BNYM in order to obtain those benefits.

**F. The Consequences of the Inadequate Disclosure**

Having concluded that the pre-solicitation disclosure to the Bondholders was inadequate

with respect to the Third Party Release, I now consider how to resolve this contested matter in a

manner consistent with the parties' agreement on December 2, 2011 and Paragraph 4 of the

Confirmation Order.

Preliminarily, I reiterate that the finding that the pre-solicitation disclosure was

inadequate does not in any way affect the validity of any provision of the Confirmed Plan other

than the Third Party Release. (Confirmation Order ¶4). My ruling today affects only §15.7 of

the Plan insofar as it provides for the Third Party Release.

As for the Third Party Release, without any further discussion, it is clear that I cannot

approve that provision or otherwise "re-attach" it to the Confirmed Plan at this time.

As stated earlier, confirmation of a plan that includes a third-party release requires that

the court makes specific factual findings regarding the release's fairness and necessity.

Continental Airlines, 203 F.3d at 214.  To make findings on these issues, I must consider: (1)

whether the third-party who will be protected by the injunction or release has made an important

contribution to the reorganization; (2) whether the requested injunctive relief or release is

"essential" to the confirmation of the plan; (3) whether a large majority of the creditors in the

case have approved the plan; (4) whether there is a close connection between the case against the

third-party and the case against the debtor; and (5) whether the plan provides for payment of

substantially all of the claims affected by the injunction or release.  See n.43, supra.

While the record conceivably could support favorable findings to BNYM on the first,

second, fourth and, perhaps, fifth factors, I am unable to make the requisite finding on the third

factor.  Because the pre-solicitation disclosure was inadequate, I cannot find that a large majority

of the Bondholders supported the Plan and acquiesced to the release of their potential claims

against BNYM.  I reach this result because I lack sufficient confidence that a large percentage of

the Bondholders (in both number and amount of claims) who voted to accept the Plan understood

that they would be releasing their claims against BNYM.  As a result, I do not consider it "fair"

to restrict the rights of the apparent minority of Bondholders in favor of the apparent majority.

Thus, at this time, I will not enter an order determining that the Third Party Release is

permissible.  However, because BNYM has otherwise made out a plausible case for the approval

of the Third Party Release, I am willing to consider the possibility of a re-solicitation of the

Bondholders, if the interested parties wish to pursue that option.[65]  However, re-solicitation

presents a number of practical and theoretical difficulties; it may be infeasible.  Rather than

resolve that question now, I consider it more appropriate to schedule a status hearing to ascertain

the parties' positions and to obtain the benefit of their input.


## IV.  CONCLUSION

I will not belabor this already lengthy Opinion with much more judicial musing

concerning the way this case went astray.  But a couple of things need to be stated to put this all

in some perspective.

The path of this reorganization case took a sharp turn upon the court's belated realization

---

[65]     I emphasize the word "plausible" in this statement.  To be clear, I am not making a
finding that the Third Party Release would have been approved if the pre-solicitation disclosure had been
adequate.  However, there is sufficient potential merit in BNYM's position to warrant consideration of
the re-solicitation option.

that a plan provision, emanating from a multi-party negotiation, included the Third Party Release.

In a perfect world, in which it were possible for the court to engage in a hyper-meticulous, word-

by-word review of the 9019 Motion, the Settlement Stipulation and the DS, the existence of the

Third Party Release would have been apparent to the court before the entry of the 9019 Order and

the DS Approval Order.  However, given the bankruptcy court's workload and the subtle drafting

techniques employed by sophisticated counsel, it is unrealistic to expect that bankruptcy judges

can digest and effectively "audit" the lengthy documents submitted by the parties in a relatively

complex chapter 11 case such as this and identify all of the important issues that may be lurking

in the documents.

In order for the system to function effectively and with integrity, chapter 11 practice and

culture imposes on counsel an affirmative obligation to flag the key issues for the court to

consider.  This principle finds expression in an increasing number of court rules, both national

and local.  See, e.g., Fed. R. Bankr. P. 3016(c); L.B.R 1002-4; see generally In re Gulf Coast Oil

Corp., 404 B.R. 407, 427 (Bankr. S.D. Tex. 2009) ("bankruptcy judge is dependent upon the

parties to present the necessary facts . . . and [t]o a large degree . . . is a captive of the parties"

(quoting Harvey R. Miller, Shai Y. Waisman, Is Chapter 11 Bankrupt, 47 B.C. L. Rev. 129, 155

(2005))).

In this case, the system broke down.  The problem resulting from this system breakdown

may have been exacerbated by the subject matter involved: a proposed plan provision in an

emerging area of the law involving third-party releases of non-debtors.  Such plan provisions

effectively permit a majority of a class of creditors to compel the minority in the class to release

their claims, not against the debtor, as is contemplated by the Bankruptcy Code, but as to a third-

party that has not subjected itself to the rigors of the bankruptcy system. While there is substantial (but not uniform) legal authority holding that a plan that includes a third party release may be confirmed by the court in appropriate circumstances, a third-party release through a chapter 11 plan is not the norm. It is the exception to the general rule. And, above all, it is not a routine plan provision that can be mentioned cavalierly in passing in the disclosures to the adversely affected creditors.

Had the system functioned properly in this case and had counsel "flagged" for the court the "hot button" Third Party Release, the need for additional disclosures would have come to the fore and been mandated in a timely manner, much earlier in the confirmation process: at or around the time of the September 14, 2011 hearing on the 9019 Motion. Instead, the existence of the Third Party Release was unknown to the court until mid-November 2011, shortly before the first scheduled date for the confirmation hearing.

The proponents of a plan that includes a third party release must be punctilious in adhering to all of the procedural requirements of the Bankruptcy Code and the rules of court, especially the pre-solicitation disclosure requirements of 11 U.S.C. §1125(b). For the reasons that I have explained, this did not occur here. As a result, at this time, I cannot approve the Third Party Release included in §15.7 of the Plan.

An order consistent with this Opinion will be entered.

Date: **May 10, 2012**

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**